# Actors' Equity Association

ACTORS' EQUITY
ASSOCIATION 1913

## AGREEMENT AND RULES GOVERNING EMPLOYMENT UNDER THE EQUITY/LEAGUE PRODUCTION CONTRACT

Effective Date: September 25, 2019

Expiration Date: September 30, 2022

www.actorsequity.org

## TABLE OF CONTENTS


1. ACTOR'S OBLIGATION TO EQUITY ..... 1
2. AGENTS ..... 1
3. ALIENS ..... 2
4. ARBITRATION AND GRIEVANCE ..... 4
5. AUDITIONS AND INTERVIEWS ..... 7
6. BENEFITS ..... 13
7. BILLING ..... 13
8. BINDING EFFECT OF AGREEMENT ..... 16
9. BLACKLISTING ..... 16
10. BREACHES BY PRODUCER ..... 17
11. CHANGES IN CAST: DUTY OF PRODUCER TO ANNOUNCE ..... 17
12. CHORUS: PROVISIONS FOR ADDITIONAL COMPENSATION ..... 18
13. CLAIMS ..... 22
14. CLOTHES AND MAKE-UP ..... 23
15. CONTINUOUS EMPLOYMENT ..... 25
16. CONTRACT ..... 25
17. COSTUME CALLS ..... 28
18. CUTS IN SALARY ..... 29
19. DANCE CAPTAIN ..... 29
20. DEFAULTING PRODUCERS ..... 30
21. DEFINITIONS ..... 31
22. DEPUTIES AND MEMBERS: NOT TO BE DISCRIMINATED AGAINST ..... 31
23. DIVERSE AND INCLUSIVE CASTING (See also Rule 42, NON-DISCRIMINATION) ..... 32
24. DUES AND INITIATION FEES ..... 32
25. DUTIES OF THE ACTOR ..... 32
26. EQUITY: SPECIAL PROVISIONS ..... 32
27. ESTOPPEL ..... 33
28. EXCLUSIVE SERVICE OF THE ACTOR ..... 33
29. EXTRAS ..... 34
30. GUARANTEED PERIOD OF EMPLOYMENT ..... 34
31. HEALTH FUND ..... 34
32. HOTEL RESERVATIONS ..... 35
33. ILLNESS AND SICK LEAVE ..... 36
34. INJURY: WORKERS' COMPENSATION INSURANCE ..... 39

35. INTIMIDATION ....................................................................................................40
36. JUVENILE ACTORS....................................................................................................40
37. LABOR/MANAGEMENT COMMITTEE....................................................................................................41
38. LAWS GOVERNING....................................................................................................41
39. LAY-OFF ....................................................................................................42
40. MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST PROVISIONS ....................................................................................................44
41. MILITARY SERVICE; OF THE ACTOR ....................................................................................................53
42. NO LOCKOUTS OR STRIKES ....................................................................................................53
43. NON-DISCRIMINATION (See also Rule 23, DIVERSE AND INCLUSIVE CASTING)........54
44. NON-EQUITY THEATRES ....................................................................................................55
45. NOTICES....................................................................................................55
46. NUDITY ....................................................................................................56
47. NUMBER IN CAST ....................................................................................................57
48. ORGANIZATION POINT....................................................................................................57
49. PENSION FUND AND 401(k) PLAN ....................................................................................................57
50. PERFORMANCES ....................................................................................................59
51. PERFORMANCES LOST ....................................................................................................62
52. PHOTOGRAPHS, PUBLICITY AND PROMOTION ....................................................................................................63
53. PRESS RELEASES....................................................................................................65
54. PREVIEWS....................................................................................................65
55. PRODUCTION PROSECUTED....................................................................................................66
56. PROPERTY; REIMBURSEMENT TO ACTOR FOR LOSS OR DAMAGE ........................66
57. RECORDINGS ....................................................................................................67
58. REHEARSALS....................................................................................................67
59. REOPENING OF A PLAY....................................................................................................73
60. REPLACEMENT OF ACTOR....................................................................................................73
61. REST PERIODS AND DAYS OFF ....................................................................................................74
62. SAFE AND SANITARY PLACES OF EMPLOYMENT....................................................................................................76
63. SALARIES....................................................................................................81
64. SECRET VOTE ....................................................................................................87
65. SECURITY AGREEMENTS....................................................................................................87
66. SHOWCASE PRODUCTION (NEW YORK AND CHICAGO)/LOS ANGELES 99-SEAT THEATRE PLAN/BAY AREA PROJECT POLICY: CONVERSION FROM........................87
67. SOCIAL SECURITY AND UNEMPLOYMENT INSURANCE....................................................................................................88
68. STAGE MANAGERS ....................................................................................................88

69. TERMINATION (See also Rule 45, NOTICES) .......... 93
70. TOURS .......... 96
71. TRANSFER TO PRODUCTION CONTRACT .......... 108
72. TRANSPORTATION AND BAGGAGE .......... 111
73. UNDERSTUDIES .......... 118
74. UNION EMBLEM .......... 119
75. UNION SECURITY .......... 119
76. VACATIONS .......... 120
77. VOLUNTARY CLASSES .......... 120
DURATION .......... 129

This Agreement is made between Actors' Equity Association (hereafter called "Equity") and The Broadway League (hereafter called "League") on behalf of its Producer members (hereafter referred to individually as "Producer").

## RECOGNITION

The Producer agrees to recognize Actors' Equity Association as the exclusive bargaining representative of all the Actors (Principals, Chorus, Extras, Stage Managers and Assistant Stage Managers) employed by them, for the purpose of collective bargaining and the administration of matters within the scope of this Agreement.

## RULES GOVERNING EMPLOYMENT UNDER THE EQUITY/LEAGUE PRODUCTION CONTRACT

### 1. ACTOR'S OBLIGATION TO EQUITY

(A) Nothing contained in any employment contract signed by any member of Equity shall be construed so as to interfere with the carrying out of any obligation which a member owes to Equity by virtue of such membership and the Producer shall not only not request or require any member to do any act or thing forbidden by the Constitution and By-Laws of Equity or by the rules or orders of the Council of Equity, or orders of its authorized executives, but will require the Actor to do and/or assent to the Actor doing any and all acts required by the foregoing.

(B) The Producer further agrees that Producer has notice:

(1) That the Associated Actors and Artistes of America is a voluntary Association hereinafter referred to as the "4 A's" and is subject to the Constitution, By-Laws, rules, regulations and orders of the American Federation of Labor-Congress of Industrial Organizations (AFL-CIO), from which it derives its charter.

(2) That Equity, deriving its charter from the "4 A's", is in turn subject to the Constitution, By-Laws, orders, rules and regulations of the "4 A's" and the American Federation of Labor-Congress of Industrial Organizations.

(3) That the Actor is directly subject to the Constitution, By-Laws, rules, regulations and orders of the "4 A's" and the Producer agrees that Producer will not require the Actor to do any act or thing forbidden by the Constitution or By-Laws of the "4 A's" or by its rules, orders, or regulations.

(4) All individual contracts of employment shall be subject to all such rules and regulations.

(C) Nothing contained in this Rule shall require the Producer to take any action which is not legally permissible, or shall permit Equity to change, modify, amend, supersede, or impose any conditions or obligations upon the Producer which are not specifically set forth in the Equity Rules Governing Employment or in the basic collective Agreement or in any individual Agreement made with an Actor consistent herewith.

### 2. AGENTS

(A) **Equity Franchise Required**. The Producer has notice that if the negotiations for, or the obtaining of, this contract by the Actor is through any employment agent or personal representative not holding an Equity Franchise or one whose Franchise is not in good standing, the Actor is liable to suspension or other disciplinary action.

(B) **Commissions**. Should the Producer contact the Actor directly and agree with the Actor as to the salary and role, the Producer shall not directly or indirectly require an Agent to intervene to complete the engagement or require the Actor to sign the contract at or through an Agent's office. Any such Agent so engaged does not represent the Actor and should such Agent make a claim for commission, the Actor will notify the Producer

accordingly and the Producer agrees to indemnify the Actor and hold the Actor harmless from any such claim.

(C) **Chorus, Commissions Prohibited**. The Producer has notice that Actors performing under a Chorus Contract shall not pay commission to any agent, except as in accordance with the Equity Agency Regulations.

**3. ALIENS**

(A) **Employment of Non-resident Aliens**. Non-resident aliens may be employed only if approved through the following procedures and the Producer agrees not to take any action (i.e., make contractual commitments with aliens, import a show or cast into the United States, or make application to the United States Immigration and Naturalization Service or any other government agency) unless Equity has given such approval in writing or there has been an arbitration award pursuant to this Rule and Rule 44, ARBITRATION AND GRIEVANCE. As a further part of the application procedures, the Producer agrees not to advertise and will endeavor not to publicize the engagement of any Alien Actor or Unit Company until written approval for such employment has been given by Equity.

(1) **Application Required**. A written application for such approval must first be submitted by the Producer to Equity, accompanied by whatever information the Producer thinks relevant.

(2) Following receipt of such application, which shall be accompanied by all materials specified herein, Equity's Alien Committee shall have 15 business days in which to render its decision.

(3) **Right of Appeal**. In the event the Producer is dissatisfied with the Equity Alien Committee's decision, Producer may appeal and present the case to the Equity Council at its next meeting, at which time the Council will render its decision, or Producer may go directly to arbitration under provisions of Rule4. In the event the Producer appeals to Equity's Council and is dissatisfied with the Council's decision, the matter may be submitted directly to arbitration.

(4) In the event of arbitration, the Arbitrator shall, within one week's time, render a decision which shall be final and binding on both Parties. The Arbitrator shall reach a decision based on the criteria set forth in Rule 3(B) below.

(5) Unless the Producer complies with the conditions or procedures set forth above, the Producer's request for employment of non-resident alien(s) will be automatically denied.

(B) To qualify for employment under terms of this Agreement, non-resident aliens must meet all the requirements of any one of the following three categories:

(1) **Star**. The application to Equity must include at least the following documentation:

(a) Evidence that the alien has been nominated for, or has been the recipient of, significant national or international awards or prizes in the particular field such as an Academy Award, an Emmy, a Grammy, or a Director's Guild Award; or

(b) At least three of the following forms of documentation:

(i) Evidence that the alien has performed, and will perform, services as a lead or starring participant in productions or events which have a distinguished reputation as evidenced by critical reviews, advertisements, publicity releases, publications contracts, or endorsements;

(ii) Evidence that the alien has achieved national or international recognition for achievements evidenced by critical reviews or other published materials by or about the individual in major newspapers, trade journals, magazines, or other publications;

(iii) Evidence that the alien has performed, and will perform, in a lead, starring, or critical role for organizations and establishments that have a distinguished reputation evidenced by articles in newspapers, trade journals, publications, or testimonials;

(iv) Evidence that the alien has a record of major commercial or critically acclaimed successes as evidenced by such indicators as title, rating, standing in the field, box office receipts, motion picture or television ratings, and other occupational achievements reported in trade journals, major newspapers, or other publications;

(v) Evidence that the alien has received significant recognition for achievements from organizations, critics, government agencies, or other recognized experts in the field in which the alien is engaged. Such testimonials must be in a form which clearly indicates the author's authority, expertise, and knowledge of the alien's achievements; or

(vi) Evidence that the alien has either commanded a high salary or will command a high salary or other substantial remuneration for services in relation to others in the field, as evidenced by contracts or other reliable evidence.

(2) **Actor Providing Unique Services**. The application to Equity must include at least the following documentation:

(a) That the Actor whose services are sought will be providing unique services which cannot be performed by any current member of Equity and that there is no citizen of the United States or resident alien domiciled in the U.S. capable of performing such services;

(b) That a diligent search has been made within the United States to find such an Actor.

(3) **Unit Company**. The application to Equity must include at least the following documentation:

(a) That the Unit Company is a repertory organization which will perform at least two full productions from its repertoire for a limited engagement not to exceed 20 weeks in any one city and that it be specified in advance to Equity that the Unit Company will give an equal number of performances in each city or town of each of the two or more productions to be presented in the United States;

(b) That it is of internationally recognized status and considered to be of the highest artistic standard and reputation;

(c) That it has established its identity over a period of at least 10 years;

(d) That the productions intended to be presented are regularly on its production schedule;

(e) That the Unit Company shall have a cast complement in which at least 80% of the members appeared in at least eight performances in the repertory production(s) in a repertory season at one of its repertory theatres. (Examples of companies which may qualify as Unit Companies are: *the Royal Shakespeare Company, the British National Theatre, the Comedie Francaise and the Jean-Louis Barrault Company.)*

(C) In the event the determination is made, pursuant to paragraph (A) above, that a non-resident alien or a Unit Company and its non-resident alien members satisfy the criteria set forth herein, Equity will support the Producer's application to the Immigration and Naturalization Service for the temporary admission and employment of said alien(s). Application on behalf of the same non-resident alien or Unit Company and its non-resident alien members for subsequent productions shall follow the procedures detailed herein.

(D) **Companies and Plays of Special Character**. Companies and Plays first presented outside the United States which do not fall within the categories described in paragraph

(B) above, may be allowed to perform in the United States under terms and conditions to be determined by Equity.

Applications under this paragraph shall be made to Equity in a form satisfactory to Equity and the determination of whether such a company or Play of special character shall be allowed to be performed in the United States and under what terms and conditions, shall be entirely within the discretion of the Council of Actors' Equity Association, such determination to be final and binding.

(E) **Additional Provisions Relating to Non-resident Aliens.**

(1) No Actor may be replaced by a non-resident alien.

(2) Non-resident aliens may not be employed under Chorus contracts except in Unit Companies.

(3) Each Unit Company, or company or Play of special character as defined in paragraphs (B) and (D) above shall be required to hire a resident Stage Manager qualified in accordance with Rule 68, STAGE MANAGERS. Such Stage Manager shall be hired no later than the first day of rehearsal or performance, whichever comes first, after the company arrives in the United States and shall remain employed until the final performance in the United States.

(4) A Unit Company accepted by Equity must perform an Actors' Fund Benefit as required by Rule 6, BENEFITS.

(5) When an alien Actor is employed in any company other than a Unit Company, an Actor other than an alien Actor will be engaged solely as Understudy to the alien Actor or in another job function which is in addition to the complement required under this Agreement for both Point of Organization and touring productions except that for Pre-point of Organization tryouts, such Actor shall be required commencing with the sixth week after the first paid public performance.

(F) Notwithstanding any of the above provisions, it is the purpose of this rule that a balance be maintained so that in each country where English is spoken, the number of non-resident aliens from each such country admitted to perform under this Rule shall not exceed the number of United States citizens employed in the theatre in such foreign country. It is understood that while absolute equality in numbers is not capable of attainment, it is nevertheless the intention of this Rule that failure to adhere to this precept violates the letter and spirit of this Rule.

(1) In order to implement the purpose stated in (F) above, The Broadway League and Actors' Equity Association will exercise their best efforts to foster reciprocal exchange of Unit Companies. Toward this end, the parties agree to meet quarterly to review the status of such exchanges.

(2) Further, to implement the purpose stated in (F) above, the Producer who licenses a play under the Production Contract to be performed in a country where English is spoken will use best efforts to place in the Agreement with the foreign Producer a provision that either two Actors or 15% of the cast, whichever is greater, engaged in the foreign production will be United States Citizens.

## 4. ARBITRATION AND GRIEVANCE

Except as otherwise expressly provided in these Rules, any dispute between a Producer and/or the League and the Actor and/or Equity relating to the interpretation or application of the Collective Bargaining Agreement between Equity and the League shall be submitted to the Grievance Committee at the request of either Equity, the Producer, or the League and, if not decided by the Grievance Committee, may be submitted to arbitration as provided below. If a dispute or grievance relates to a production with a Point of Organization other than New York, Equity shall have the right to demand arbitration of the grievance or dispute without prior resort to the Grievance Committee.

(A) **Grievance Committee**. The Grievance Committee shall consist of up to five representatives of Equity and up to five representatives of the League. In rendering decisions, the Equity representatives and the League representatives shall each cast, in the aggregate, one vote. No decision of the Committee shall be made in the absence of two concurring votes. A decision of the Committee (by two concurring votes) on a grievance or dispute shall be final and binding on the parties.

(1) **Expedited Procedures**. Matters of dispute set forth in paragraph (C) below shall be submitted to the Grievance Committee by written notice (sent by FAX, Email, Certified Mail/Return Receipt Requested, or by hand delivery with delivery acknowledged by a receipt) to the appropriate Regional Director of Equity with a copy to the Executive Director and to the Director of Labor Relations of the League with a copy to the Executive Director, which notice shall state that the dispute is subject to expeditious arbitration. In the case of a grievance or dispute submitted by Equity, a copy of the notice shall be sent to the Producer involved. The Committee shall meet promptly to consider the grievance or dispute. In the event that the grievance or dispute is not decided by the Committee within 72 hours (including at least two business days) after delivery of notice of the dispute to the Committee, the grievance or dispute may be submitted to arbitration as provided in paragraph (C) below.

(2) Matters of dispute other than those set forth in paragraph (C) below shall also be submitted to the Grievance Committee by written notice (sent by FAX, Email, Certified Mail/Return Receipt Requested, or by hand delivery with delivery acknowledged by a receipt) to the appropriate Regional Director of Equity with a copy to the Executive Director and to the Director of Labor Relations of the League with a copy to the Executive Director. In the case of a dispute submitted by Equity, a copy of the notice shall be sent to the Producer involved. The Committee shall meet promptly to consider the grievance or dispute. In the event that the grievance or dispute is not decided by the Committee within 30 calendar days after delivery of notice of the dispute to the Committee, the grievance or dispute may be submitted to arbitration as provided in paragraph (C) below.

(B) There shall be a board of seven arbitrators designated to hear and determine disputes between a Producer and/or the League and Equity relating to the interpretation or application of this Agreement. The seven arbitrators are Ralph Berger, John Donoghue, Howard Edelman, Carolyn Gentile, George Nicolau, Martin Scheinman and Alan R. Viani.

(1) The arbitrators shall serve for the duration of the collective bargaining Agreement unless either party, not more than 30 days prior to an anniversary date of the contract, requests in writing, by notice (sent by FAX, Certified Mail/Return Receipt Requested, or by hand delivery with delivery acknowledged by a receipt) to the other party and to the Arbitrator, the termination of their duties as arbitrator. In such event, or in the event an arbitrator should resign or for other reason be unable to perform arbitrator's duties, one or more successors shall be chosen by the mutual Agreement of the parties herein or, upon failure of such agreement, an arbitrator shall be selected on a case by case basis pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association.

(2) An arbitrator shall be selected via an alternate striking process. The parties shall alternate striking first, with the party first demanding arbitration after June 27, 2000 striking first. The striking procedure shall be completed in a telephone call between League staff and Equity staff, and the parties shall use best efforts to complete the strike process prior to the end of the business day following receipt of the demand. Both parties shall then contact the arbitrator selected to determine whether they have a date available in the next 60 days. If not, both parties shall contact the arbitrator last struck to determine whether they are so available, and shall continue in reverse striking order until an arbitrator can be selected.

(3) In the event it is necessary to hold an arbitration outside of New York City, the parties, by mutual agreement, may stipulate in writing to have such arbitration held before the American Arbitration Association in accordance with its Voluntary Labor Arbitration Rules.

(C) **Expeditious Arbitration**. When there is a dispute concerning the termination of an Actor by the Producer for reasons set forth in Rule 60(A), REPLACEMENT OF ACTOR, or in cases where there is a dispute under Rules 7(F), BILLING; 12(E)(2), CHORUS: PROVISIONS FOR ADDITIONAL COMPENSATION; 13(B)(2)(c), CLAIMS; 16(B)(3), CONTRACT; 16(F), CONTRACT; 22, DEPUTIES AND MEMBERS: NOT TO BE DISCRIMINATED AGAINST; 25, DUTIES OF THE ACTOR; 57, RECORDINGS; 62(H), SAFE AND SANITARY PLACES OF EMPLOYMENT (Inherently Dangerous Conditions Prohibited); 63(E), SALARIES; 68(G)(2)(a), STAGE MANAGERS; 40, MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST PROVISIONS; 72(C)(1)(g), TRANSPORTATION AND BAGGAGE; 72(F)(2)(c), TRANSPORTATION AND BAGGAGE; and the dispute has not been decided by the Grievance Committee, either Equity, the Producer, or the League shall have the right to invoke the following expeditious arbitration procedure:

(1) The dispute or grievance shall be asserted by a notice given to the other parties in writing (by FAX, Email, Certified Mail/Return Receipt Requested, or by hand delivery, return receipt requested). A copy of such notice shall be sent to the Arbitrator selected by the parties at an address to be designated by the Arbitrator.

(2) In cases where expedited arbitration is necessary, the parties will poll the arbitrators by telephone to determine which of them is most immediately available. The parties shall select the arbitrator whose availability is most immediate.

(3) The award of the Arbitrator shall be in writing and may be issued with or without opinion. If any party desires an opinion, said party may request same, but such request shall not delay compliance with, or enforcement of, the award.

(4) The failure of any party to attend the arbitration hearing as scheduled shall not delay said arbitration and the Arbitrator is authorized to proceed to take evidence and issue an award as though such party were present.

(5) The award of the Arbitrator shall be final and binding on all parties.

(D) **Arbitration**. In matters of dispute, other than those set forth in paragraph (C) above, which have not been decided by the Grievance Committee, the dispute or grievance may be submitted to arbitration by Equity, the Producer, or the League by a written demand for arbitration served upon the other party. The demand shall be sent by FAX, Email, Certified Mail/Return Receipt Requested or hand delivery with delivery acknowledged by a receipt. Hearing shall commence within 30 days following the submission of said notice if possible. The decision of the Arbitrator shall be rendered in writing within 30 days following the conclusion of the hearing. The Producer, Equity, or the League may request an expeditious arbitration pursuant to the procedure set forth in paragraph (C) above. Such request shall be sent by FAX, Email, Certified Mail/Return Receipt Requested or by hand delivery to all other parties (including the League) with delivery acknowledged by a receipt. The expeditious arbitration procedure shall be followed unless the other party objects within 12 hours after receipt of the request by FAX, Email, Certified Mail/Return Receipt Requested or receipted hand delivery. In the event the other party objects, the expeditious arbitration procedure shall not be used. It is understood by the parties that both the Producer and Equity should be permitted to use the expeditious arbitration procedure in cases where prompt award would necessarily limit the amount of damages in issue or in other cases where prompt determination is necessary or especially desirable. However, except in the instances set forth in paragraph (C) above, no party shall have the right to such an expeditious arbitration over the objection of the other party.

(1) The failure of any party to attend the arbitration hearing as scheduled shall not delay said arbitration and the Arbitrator is authorized to proceed to take evidence and issue an award as though such party were present.

(2) The award of the Arbitrator shall be final and binding on all parties.

(E) In the event Equity is given formal notice by the Producer of the discipline of an Actor pursuant to the provisions of Rule 60(A)(1), REPLACEMENT OF ACTOR, or pursuant to the provisions of Rule 33(D), ILLNESS AND SICK LEAVE, the matter shall be considered settled unless submitted by Equity to the Grievance Committee within 10 days and (if not decided by the Grievance Committee) submitted by Equity to arbitration within 10 days of written notice to Equity that the Committee has failed to reach a decision on the matter. In all other cases, the Arbitrator may consider the laches of either side initiating a grievance or arbitration procedure in their consideration of the dispute.

(F) In the event a Producer discharges an Actor in accordance with the provisions of Rule 60(A), REPLACEMENT OF ACTOR, while the production is in a city other than New York and in the event the Producer obtains the written consent of Equity for the discharge of the Actor, the discharge shall be considered justified for the purposes of Rule 60(A) and (B) and shall not be subject to grievance or arbitration procedures. In the event the Producer does not receive the aforesaid written consent, the matter shall be subject to grievance or arbitration procedures pursuant to the above provisions only if Equity submits the matter to the Grievance Committee within 72 hours after receipt by it of the Producer's written notice of dismissal and the reasons therefor and (if not decided by the Committee) shall be subject to arbitration only if submitted by Equity to arbitration within five business days of written notice to Equity that the Committee has failed to reach a decision on the matter.

(G) The cost of arbitration, and any compensation to and expenses of the Arbitrator, shall be borne equally by the parties.

**5. AUDITIONS AND INTERVIEWS**

(A) **Principal Interviews/Auditions**.

(1) General: Before any principal performers (other than "star" performers) are hired for a production, there shall be auditions at which performers will be seen, without appointment, for principal roles and for stage manager positions. Subsequent auditions may also be scheduled at this time. The following conditions shall apply:

(a) Among the auditions held for principal roles, there shall be interviews or auditions for Equity performers. The Producer shall follow all Equity rules regarding Equity interviews and auditions.

(b) The Producer is under no obligation to hire any person pursuant to any principal interview or audition procedures including the procedures for Equity performers set forth below.

(c) Auditions by appointment, except appointments taken pursuant to Equity Audition Codes, shall not be permitted prior to the completion of all other principal auditions.

(2) Equity Principal Interviews/Auditions:

(a) Equity Interviews/Auditions for Equity performers shall be conducted in accordance with the following:

(i) No later than two weeks prior to the first Equity interview/audition, the Producer shall submit a complete cast breakdown to Equity for posting at Equity, setting forth a definitive description of each character in the production, indicating which roles, if any, have been cast or are on offer, all stage managerial positions available and stating the agreed upon time, date and location of the interview/audition and specifying the name(s) and title(s) of personnel who are expected to attend the interview/audition. Any audition notice may also state if the Actor may submit a recorded audition. If the cast breakdown is distributed

to personal managers, agents and/or a breakdown service more than two weeks prior to the first interview/audition, it shall also be submitted to Equity at that time.

(ii) Simultaneously with the Producer's submission to Equity of the cast breakdown, the names of the Producer, composer, lyricist, author, book writer, if any, director, associate or assistant director, musical director, choreographer, stage manager, professional casting director, general manager, company manager and an address to which resumes may be sent are also to be submitted.

(iii) When a role to be cast depicts a person with a specific disability, the Producer agrees to include this information in the casting specifications and, at the same time, to notify Equity of such specifications so that performers with similar disabilities may be informed and given an opportunity to audition for the role.

(iv) There shall be three days during which Equity interviews/auditions shall be held in a theatre, rehearsal hall, or other Equity approved location which is accessible, as defined by federal law, and complies with Equity's safe and sanitary provisions.

(v) The Producer shall consult with Equity with respect to the scheduling of the Equity interview/audition. If more than one such interview/audition has been scheduled for the same day, they shall be within reasonable walking distance of each other. The Producer shall use the facilities of the Equity Audition Center (165 West 46th Street, New York City), if it is available and compatible with the interview/audition requirements of the Producer.

(vi) Equity interviews/auditions must be held in the city designated as the Point of Organization/Equity office city.

(vii) The Producer shall schedule the first day of Equity interviews/auditions no earlier than 26 weeks prior to the start of rehearsals. Should more than 26 weeks elapse before rehearsal begins, new Equity interviews/auditions shall be required. Equity shall not unreasonably withhold its permission to extend this period upon application by the Producer.

(viii) The location or time of the Equity interview/audition may not be changed without prior notice to Equity and unless the change can be published in trade publications prior to the interview/audition.

(ix) Equity, at no cost to the Producer, will provide a monitor to organize the scheduled Equity interviews/auditions.

(b) Equity Principal Auditions: Principal Auditions for Equity performers shall be conducted as follows:

(i) The Equity auditions will be conducted by the Producer, director, associate or assistant director, any author and/or professional casting director designated in writing by the Producer.

(ii) The Producer agrees to audition at least 115 Equity performers each seven hour day and may see more if time permits (see section (d)(i)below).

(iii) The Equity performer shall be limited to two minutes to present audition material of the performer's choice. Singing may be required for musicals.

(iv) Auditions for Equity performers will be available on a first come, first served basis.

(v) When a performer who identifies as d/Deaf or hard of hearing is sought or a character who is d/Deaf or hard of hearing is being cast, the Producer shall provide during the audition a qualified interpreter for the d/Deaf (i.e., an interpreter qualified or certified in American Sign Language or oral interpretation).

(vi) All audition material provided by the Producer shall upon request be made available, at a place to be designated by the Producer at least 48 hours in advance of the audition, to performers who are blind or have low vision.

(c) Equity Principal Interviews: Interviews for Equity performers and stage managers shall be conducted as follows:

(i) Equity performers and Stage Managers shall have the option to interview on any one of the three days of Equity interviews or auditions.

(ii) The Equity interview shall be conducted by a representative of the Producer with the authority effectively to recommend that the performer be called to a subsequent audition. The Producer, director, assistant director, any author and/or professional casting director are endowed with such authority.

(iii) The Producer agrees to see as many Equity performers as time allows (see (d)(i) below), and shall make best efforts to provide more than one interviewer, if necessary, to accommodate those performers wishing to be interviewed.

(iv) Equity performers will be seen on a first-come, first-served basis.

(v) The Equity interview is not available to any Equity performer who was previously auditioned at an Equity audition for the same production.

(d) Additional Equity Principal Interview/Audition Provisions:

(i) Each day of Equity interviews/auditions shall consist of seven hours. However, two separate half days of not less than four hours may be substituted and scheduled in place of any one day.

(ii) The Producer shall make the premises available to the Equity monitor and Equity performers one hour prior to commencement of the scheduled interviews/auditions.

(iii) The Producer shall provide a piano and professional piano accompanist who can sight read when Equity auditions for singers are held.

(e) Subsequent Equity Principal Auditions:

(i) Subsequent to Equity Principal interviews or auditions, Equity performers shall be called to audition at specific times and shall not be called in groups unless for physical screening and/or voice blending. Auditions and/or readings, excluding initial interviews/auditions, shall be limited to four in number for an Equity performer and said performer shall be compensated at the rate of one-eighth of minimum salary for each reading and/or audition over four, to which the performer is called. The above numerical limitations and payment shall not be applicable to recognized stars or top featured performers.

(ii) Equity franchised agents may accompany their clients to Equity auditions.

(iii) The Producer shall provide a piano and professional piano accompanist who can sight read when auditions for singers are held.

(iv) If an actor is requested to learn specific audition material, including music, for an audition, Producer shall provide all such material at no charge to the actor. If music must be learned, Producer shall provide piano accompaniment via electronic means at no cost to the actor.

(v) The director or assistant director must be present at all Equity auditions. The musical director or assistant musical director must be present at all auditions for singers and the choreographer or assistant choreographer must be present at all dance auditions. The Producer may request that Equity permit persons of equivalent authority to substitute for the above. If the audition is for screening purposes, a casting director may hold the audition, but there must be subsequent auditions with the persons enumerated in this paragraph present.

(vi) Equity performers must be given specific appointments and not more than 12 auditions may be scheduled in an hour. The Producer shall maintain a written schedule of the names of all performers auditioned and the dates and times of their auditions, a copy of which shall be sent to Equity.

(vii) The Producer, or the Producer's representative, shall keep a sign-in sheet at all callbacks and auditions to denote arrival and departure times of all Equity performers. Performers who are kept at an audition or callback longer than three hours shall be paid the overtime rate of $29 for the fourth hour and for each additional hour or part thereof.

(viii) Should the Producer choose to hold additional Equity interviews or auditions in a city where Equity maintains an office but which is not designated as the Point of Organization, the Equity interview or audition must be scheduled through the local Equity office and shall follow the designated procedures of that office.

(B) **Principal Replacement Calls**.

Each musical and dramatic production employing Principal performers shall conduct not less than one day of principal replacement calls at least every 12 months after the first anniversary date of the first paid public performance, unless the production has announced its closing date in which case there shall be no requirement to hold such replacement calls. The Auditions will be conducted by the Producer, director, assistant director, any author and/or professional casting director designated in writing by the Producer. The Producer is under no obligation to hire any person pursuant to any replacement call procedures including the procedures for Equity performers set forth herein.

(C) **Chorus Auditions**.

(1) General: Before any chorus performers are hired, there shall be chorus auditions open to all performers. The following conditions shall apply:

(a) Among chorus auditions held, there shall be auditions for Equity performers. The Producer shall follow all Equity rules regarding Equity auditions.

(b) The Producer is under no obligation to hire any person pursuant to any chorus audition procedures including the procedures for Equity performers set forth below.

(c) Auditions by appointment, except appointments taken pursuant to Equity Audition Codes, shall not be permitted prior to the completion of all other auditions.

(d) Any audition notice may also state if the Actor may submit a recorded audition.

(2) Equity Chorus Auditions: Chorus auditions for Equity performers shall be conducted as follows:

(a) The Producer shall provide Equity at least two weeks' notice of the first call for Equity chorus auditions (or one week's notice in the case of chorus replacement calls pursuant to Rule 5(D)below) and one week's notice of the final call. Equity representatives shall be present at the place of the call.

(b) The Producer shall not hold Equity chorus calls or auditions on any day when an Equity meeting is scheduled, provided that Equity gives notice in advance of such meeting.

(c) Either the director, musical director, composer, or choral director must be present at all Equity auditions for singers. Either the choreographer, assistant choreographer, or dance captain must be present at all Equity dance auditions.

(d) For productions in which Equity performers are required to sing, there must be an audition for singers at which performers must be given an opportunity to audition in their primary skill before they may be requested to move or dance. In productions in which Equity performers are required to dance, there must be an audition for dancers at which performers must be given an opportunity to audition in their primary skill before they can be requested to sing.

(e) Dance auditions must be conducted on approved dance surfaces.

(f) Equity auditions may, if necessary, be held on two separate days, one day for voice and one day for dance and general qualifications. If said two days are not consecutive, performers shall not be required to report for any purpose on the intervening days. The performers shall not be required, during the audition, to rehearse numbers to be used in the production. If so required, rehearsals shall be deemed to have begun.

(g) If Equity performers are called for any day, work on any day after the third audition day, or are called for a fourth audition, the performers shall be compensated on the basis of one-sixth minimum salary for each day or part thereof.

(h) For each Equity performer, there shall be a break of at least one hour, after not more than five consecutive hours of audition. For each hour or part thereof, over five hours without a break, the performer shall be paid the overtime rate of $29 until such break is given.

(i) The Producer shall provide a piano and professional piano accompanist who can sight read when auditions for singers are held.

(D) **Chorus Replacement Calls**.

(1) Each musical play employing chorus performers shall be required, at least every six months after the first paid public performance, to conduct chorus replacement calls.

(2) Before any chorus replacement performers are hired, there shall be chorus replacement calls open to all performers. The following conditions shall apply:

(a) Among the chorus replacement calls held, there shall be replacement calls for Equity performers which shall be conducted in accordance with the provisions of paragraph (C)(2) above.

(b) The Producer is under no obligation to hire any person pursuant to any chorus replacement call procedures including the procedures for Equity performers set forth herein.

(E) **Additional Equity Interview/Audition Provisions**:

(1) Equity Audition and Interview Code/Safe and Sanitary provisions:

(a) Whenever Equity auditions or interviews are held, the Producer agrees to provide:

(i) A separate room with seats and open space where the performer may wait and/or warm up.

(ii) Separate change facilities (not lavatories) for men and women required to dance.

(iii) Audition, change and waiting rooms which are properly lighted, ventilated and heated during inclement or cold weather to at least 68 degrees Fahrenheit.

(iv) Smoking shall not be permitted in the interview, audition or waiting room.

(v) Equity reserves the right to approve audition dance surfaces as per Rule 62(E).

(vi) Ample, pure, cool drinking water, and cups where necessary, shall be provided at no cost to the Actor wherever the Actor is required to audition.

(b) When auditions are held in premises which are not accessible, as defined by Federal law, the Producer, upon timely notification, by either the Equity Audition Center or by a performer with a disability who wishes to audition, will arrange accessible audition facilities to accommodate equal access casting for performers with disabilities.

(2) Liability Insurance: The Producer shall provide liability insurance to cover all Equity performers at Equity auditions and interviews.

(3) Equity and the League are committed to the belief that auditions must be done live. However, should a key member of the creative team not be able to attend a final Equity callback for a specific Principal role, Principal understudy assignment or a Chorus part or specialty, Recording of Equity performers shall be permitted, provided:

(a) Any resulting recording shall only be used internally for casting purposes;

(b) The recording shall not be released in any medium;

(c) The Actor and Equity shall receive no less than 24 hours' notice that the audition will be Recorded;

(d) There will be at least one person with casting authority in attendance at the Recording; and

(e) After the stated purpose has been accomplished, but no later than 30 days from the date of the Recording, the recording shall be destroyed, with written certification to Equity signed by the Producer that no copies were made or retained in any format.

(4) **Non-Discrimination in Auditions and Script Review**. It is the intent of the Producer and Equity that casting for all roles be made without bias on the basis of race, ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status, or political persuasion or beliefs and the parties affirm their commitment to equal employment opportunity, diversity and the elimination of discrimination in theater. In furtherance of this statement the Producer agrees that auditions for all productions and the hiring of Stage Managers will be conducted in such a manner as to provide full and fair consideration to actors of all races and ethnicities (including but not limited to American Indian or Alaska Native, Black, African-American, Asian or Asian American, Pacific Islander, Hispanic/Latino/a/x, Native American, Middle East and North Africa (MENA), Native Hawaiian, mixed-race, and/or multicultural), genders/gender identity or expressions, transgender status, ages, religions, national origins, disabilities, familial status, sexual orientations, veteran status, or political persuasions or beliefs and shall not discriminate based upon these characteristics.

As an aid in achieving the above-stated goals of non-discrimination, and in pursuance of equal opportunity for all performers, the Producer, at the time of submission of the cast breakdown, but in no event less than five weeks prior to the interviews/auditions, shall submit a script of the play and such other related information as may be relevant, to an advisory committee of Equity consisting of three members of its Equal Employment Opportunity Committee. This committee shall act in an advisory capacity only.

After reviewing the script, the committee shall submit recommendations to, and be prepared to discuss with, the Producer, director, playwright, choreographer and the League, those roles for which Actors with disabilities, ethnic minorities, seniors and women might be cast. It is understood that the script is delivered confidentially and is not for publication; that the recommendations submitted by the committee are advisory; and that the recommendations of said Advisory Committee shall be made only after an actual reading of the script. It is further understood that the Producer shall have the right to discuss the script and the committee's recommendations with the Advisory Committee.

Further, unless otherwise indicated textually or contextually, and consistent with the procedures set forth in Rule 5, auditions for all parts/roles shall be open to all Actors without bias, in which cases casting notices, calls and cast breakdowns shall clearly and unequivocally state that the audition process is open to Actors of all races and ethnicities (including but not limited to American Indian or Alaska Native, Black, African-American, Asian or Asian American, Pacific Islander, Hispanic/Latino/a/x, Native American, Middle East and North Africa (MENA), Native Hawaiian, mixed-race,

and/or multicultural), genders/gender identities or expressions, transgender status, ages, religions, national origins, disabilities, familial status, sexual orientations, veteran status, or political persuasions or beliefs.

(5) **Personal Information**. In consideration of the protection of Actors from unwanted and unauthorized solicitation by third parties, Equity and the Producer agree that an Actor's personal information, including, but not limited to such information as legal name, address, telephone number, e-mail address, and social security number, is provided in confidence, and is to be used solely for purposes of casting and employing Actors, and not for the purpose of soliciting or marketing to Actors or for unsolicited contact of a personal nature. Producer agrees that it will not disclose personal identifying information to third parties for any purposes other than casting or employing Actors, unless Producer has obtained the express written authorization of the Actor.

This provision shall not proscribe Producer's use of an Actor's performing name, headshot or image for purposes of marketing, advertising, or publicity for any show in which the Actor is cast.

This rule is not subject to 10 BREACHES BY PRODUCER of this Agreement. By this agreement, Actor does not waive any claims Actor may have under any applicable federal, state, or local law.

## 6. BENEFITS

(A) **Actors' Fund**. The Actor is to perform without compensation at a performance or performances to be given once during the first three months of the play's run and once every 12 months thereafter, upon at least 10 days' notice to the Actor, whether in New York City or on tour. A company on tour must give a benefit performance if it has been scheduled to play for at least five weeks in one city. If the Producer does not give a benefit within the stipulated period, then Equity and the Fund may designate a performance, the net proceeds of which shall be remitted to the Fund. The Producer agrees to give and properly advertise such performances and after deducting the actual expenses thereof, to turn over the net proceeds to the Actors' Fund of America. The Producer agrees that Actors giving the performance shall have preference in purchasing the tickets for said performance, except that 200 seats shall be reserved for the Producer and/or the Theatre.

(B) **Benefit Performances, Requests for**. All requests for benefits must be made through Equity. Notice of Equity approved benefits shall be served through the Deputy and Stage Manager by Equity.

(C) **Equity Benefit Performances**. Equity members may rehearse for and play in Equity benefits.

## 7. BILLING

(A) **House Boards**.

(1) The names of all Actors employed in the production shall be listed on the house boards in front of the theatre in letters no less than one-half inch in height. Such house board shall be entitled "The Company." Stage Managers, Understudies and Swings may be listed separately.

(a) The Producer agrees, in instances where there is no house board outside the theatre, to place one prominently inside the lobby.

(b) At least one such house board with names in alphabetical order shall be displayed so as to be clearly visible to the public at all times.

(2) Should the Producer fail to comply with this clause (A) prior to the first performance on the day following the giving of written notice, by the Actor or Equity, the Producer shall pay the Actor whose name is omitted, one-eighth of contractual salary for each performance that the violation continues to exist.

(B) **Playbill or Program**. A free Playbill or program shall be proffered to every patron prior to patron's arrival at patron's seat. Such program shall contain a listing of all Actors employed in the production together with their named part(s) or function.

(1) All Principal Actors, Chorus Actors (including Understudies and Swings) and Stage Managers must have a biography in the program or Playbill.

(a) The Actor shall have the right of approval of biographical material, which approval shall be in writing and which shall not be unreasonably withheld. Biographical material not disapproved within 48 hours of its submission to the Actor, shall be considered approved. Biographical material once approved must not be edited except where spatial limitations in the program require editing and then only upon mutual consent, which consent will not be unreasonably withheld. In the event that there are errors in the Actor's bio, Producer agrees to correct such errors in the next printing of the program upon receipt of written notice of said errors. Failure to correct the error as stated above shall require payment of one-eighth contractual salary to the Actor.

(b) The parties agree to use best efforts to limit all biographies in the program or Playbill to biographical data and professional credits.

(c) The Producer may limit biographies for Chorus and Stage Managers to four lines, exclusive of the Actor's name and parts/role played, of biographical data and professional credits only. Actors may review the galley sheet and be permitted to add material to reach four lines.

(2) Biographies for Understudies to Stars and Featured Principals will be inserted in the program when Producer chooses, per Rule 11(A), CHANGES IN CAST: DUTY OF PRODUCER TO ANNOUNCE, to announce their appearance by insert. Such biography may be limited to 50 words.

(3) In the event that there are errors or omissions in the printed cast listing or the omission of a biography in the Playbill or program, the Producer agrees, upon receipt of notice of such an omission or error and within 24 hours (including at least one business day), to place in the Playbill or program a photocopied or printed slip correcting the omission or error. In the event that advertising appears on the insert, the focus of the insert shall be the cast change announcement. On National and Tiered tours, Producer will correct such omission or error within 24 hours of the first business day free of travel. Producer agrees to correct such omission or error and to correct errors in biographical material in the next printing of the Playbill or program, provided such notice is given at least 24 hours prior to the press deadline.

(4) For each failure either to place a correction slip in the Playbill or program, as stipulated above, or to correct the Playbill or program cast listing or biography at the next proof printing after proper notice has been given, the Producer shall pay the Actor(s) involved, a sum equal to one-eighth of the Actor's contractual salary for each week or part thereof during which the omission or error continues.

(5) Each Principal and Chorus (including Understudies and Swings) in Point of Organization cities shall submit a single headshot for the entire period of employment for inclusion in the program or Playbill. Any photo insertion for replacement Actors must conform to Producer's printing schedule.

(6) Dance Captains shall be billed on the cast page.

(C) **Souvenir Programs**.

(1) All Actors must have a biography and headshot in the Souvenir Program, which may be satisfied by an insert. The Actor shall have the right of approval of biographical material, which approval shall be in writing and which shall not be unreasonably withheld. Failure to seek approval of Actor's biography shall require payment of one-eighth contractual salary. Biographical material not disapproved within 48 hours of its submission to the Actor shall be considered approved. Biographical material once

approved must not be edited except where spatial limitations in the program require editing and then only upon mutual consent, which consent will not be unreasonably withheld.

(a) In the event that there are errors or omissions in the biography or billing in the Souvenir Program, the Producer agrees, upon receipt of notice of such an omission or error, to correct biographical material and billing in the next proof printing of the Souvenir Program, provided such notice is given at least two weeks prior to the press deadline.

(b) Program inserts containing cast changes shall be permitted. Changes to the program or inserts as a result of cast changes shall be made at the next press printing. Producer shall make best efforts to provide written notice to the cast, with a copy to Equity, of the date of that printing.

(2) For each failure to correct the Souvenir Program biography and billing at the next proof printing after proper notice has been given, the Producer shall pay the Actor(s) involved, a sum equal to one-eighth of the Actor's contractual salary for each week or part thereof during which the omission or error continues.

(3) **Photographs**. Actor shall be properly identified in each photograph of three or fewer Actors in which Actor's likeness appears in the Souvenir Program.

(4) In addition, Producer will make best efforts to identify all Actors pictured in the Souvenir Program.

(5) When the Souvenir Program contains photographs of any other Companies, Producer shall identify which production (e.g., Broadway, Tour, London and the like) is pictured. It is understood that such identification may be listed in an index at the back of the Program. This rule shall not apply to productions in existence as of January 20, 1997, but shall be applicable if a new edition of a Souvenir Program for the production is printed. In addition, this rule shall not apply for generic images where individual Actors are not identifiable.

(D) **Websites**. (This rule shall apply to the Producer's "official show" websites only.)

(1) The official Playbill bio of every member of the Equity company shall appear on the website, subject to the approval of the Actor.

(2) Actors shall be properly identified in each photograph of three or fewer Actors appearing on the website. Such identification may be on a separate credit page used for photo identification. The Producer shall make best efforts to identify all Actors pictured on the website.

(3) Whenever there is a cast change, any "current cast list" will be updated as soon as possible.

(4) When the website contains photographs of any other companies of the show, Producer shall identify which production (e.g., "Original Broadway Cast", "London Company") is pictured. Such identification may be made on a separate credits page.

(E) **Photographs; Removal of**.

(1) When a Principal Actor leaves a cast, Actor's name and/or likeness (in photographs portraying three Actors or fewer) must be removed from all front of-the-house boards and frames where the show is playing as well as from all frames at other theatres.

(2) No photograph containing the names or likenesses of three or more Principal Actors who are no longer in the company shall be permitted to be displayed. The removal of such photograph shall be made prior to the first performance of the successor of the third Principal Actor so depicted. Should the Producer fail to comply with this Rule within three days after the written notice is given by any of the affected Principal Actors, successors and/or Equity, the Producer shall pay to the Principal Actor(s) currently performing and to the Principal Actor(s) whose name and/or likeness has not been removed, an additional one-eighth of their respective weekly salaries for each day that

the Producer has not complied with the Rule. In connection with all other advertising and display media under the Producer's control, Producer shall exercise reasonable diligence in removing the name and/or the likeness of the Principal Actor no longer in the cast.

(3) The Producer shall provide proper identification of each Actor in front-of-the-house photographs which contain the likenesses of three or fewer Actors.

(F) All provisions pertaining to the billing of the Actor not set forth herein shall be specifically set forth as a rider to Actor's employment contract. If billing is contingent on the billing of any other Actor, such contingency shall be clearly and succinctly set forth in the contract.

(1) Whenever a breach of a billing clause contained in an Actor's individual contract is claimed, Equity or the Actor shall notify the Producer by certified letter, email or fax of the breach.

(a) If the breach is not corrected within seven business days excluding Saturday and Sunday of receipt of notification, except as provided below, the Producer shall pay to the Actor a sum equal to one-eighth of the Actor's salary for the first week the breach continues beyond the seventh day. For each week the breach continues thereafter, or if additional breaches occur and the Producer has been properly notified, the Actor shall be paid cumulatively an additional one-eighth per week, or per breach, for as long as the breaches continue (i.e., two-eighths for the second week or second breach, three-eighths for the third week or third breach, etc.).

(b) If the breach involves billboards, the time interval for correction shall be extended to two weeks. Exempted from this provision shall be posters on unpaid locations, commonly known as "sniping."

(c) If the breach involves billing in a magazine or similar publication, the time interval shall be seven or more days prior to the press deadline. If the breach involves billing in a newspaper, the time interval shall be 48 or more hours prior to the press deadline and the payment to the Actor shall be per day rather than per week as stipulated in (1) above.

(d) These provisions shall not apply to breaches that are beyond the Producer's control.

(2) In the event of a dispute respecting a breach of the above provisions, the matter shall be resolved by expeditious grievance and arbitration procedures as provided in Rule 4.

## 8. BINDING EFFECT OF AGREEMENT

All contracts of employment signed pursuant to these Rules are binding not only upon the signers on the face thereof, but upon any and all corporations, co-partnerships, enterprises and/or groups which said signers or each of them directs, controls, or is interested in and are hereby agreed to be adopted as their contract by each of them.

## 9. BLACKLISTING

The League and Equity both pledge themselves to use their best efforts to prevent blacklisting in the theatre. The opposition to blacklisting is not a controversial issue between the League and Equity. The term "blacklisting" shall be deemed to mean the submission by a Producer to pressure groups and/or the use of private lists published or unpublished of persons not to be employed in theatrical productions. To that end, Equity and the League shall jointly investigate and deal with all complaints of blacklisting in the theatre and take any and all lawful means to correct, remedy and actively resist each and every instance of blacklisting as and when it arises. If a joint investigation is warranted, representatives of the respective parties will meet and adopt rules and regulations which will govern said investigation.

## 10. BREACHES BY PRODUCER

(A) In addition to any other remedies available herein, each Actor affected herein shall receive up to two weeks' salary as liquidated damages, no present basis of calculation existing, should the Producer:

(1) Breach an individual contract of employment, or any part thereof;

(2) Breach or fail to abide by or conform to any rule which is a part of the employment contract of any Equity member;

(3) Make any false statement in connection with any employment Agreement or regarding security;

(4) Employ or have employed any member of Equity under any form of contract other than a Standard Form;

(5) Be in default as to any employment contract with any member of Equity, or breach any such employment contract, past or present;

(6) In the future, breach any such employment contract;

(7) Fail to give or deposit security at the time and in the form and amount required by Equity;

(8) Otherwise breach or fail to live up to any contract of employment or Equity Rule.

The parties agree and mutually understand that the use of the word "shall" in the first sentence of (A) above is not intended to suggest that a violation of this Rule mandates any liquidated damages at all. Depending on all relevant considerations, including the seriousness of a breach and any mitigating circumstances, appropriate liquidated damages may range from zero to two weeks' salary and an arbitrator or other fact finder shall have full discretion to award no liquidated damages where appropriate even though a violation of the Rule has been found.

(B) Should any situation arise where, because of the act of the Producer, or Producer's fault or default, the Actor is released from Actor's obligation to work, then in any of said events, the Actor may, Equity consenting, forthwith terminate Actor's employment and is released from any obligation to render services to the Producer. In addition thereto, the Producer agrees that Producer shall pay the Actor forthwith, in full, for all services rendered, plus any other sums to which the Actor may be entitled by contract or by Equity Rules and also, as liquidated damages, no present basis of calculation existing, up to two weeks' salary for Actors signed to Standard Minimum Contracts and for Actors signed to Term Contracts, a sum equal to the Actor's salary multiplied by the number of weeks remaining under Actor's guarantee of employment, or by the number of weeks during which the production for which the Actor has been engaged runs during the season, calculated from the date when the Actor ceased to be employed, whichever period shall be longer. Against said sums, no offset shall be allowed the Producer for earnings of the Actor in a new or subsequent engagement. These provisions shall apply to each season contracted for.

(C) Disputes as to the applicability of the foregoing paragraphs shall be subject to grievance procedures and arbitration under Rule 4 and neither Equity nor the Actor may finally determine any questions of violation or breach on the part of the Producer, except as to violations of Rule 10(A)(3) and (A)(7). In the event of the Producer's breach of Rule 10(A)(3) or (A)(7), Equity may intervene, without penalty to itself and require the Actor to perform or rehearse or not perform or rehearse under such terms and conditions as Equity may consider just and equitable.

## 11. CHANGES IN CAST: DUTY OF PRODUCER TO ANNOUNCE

This Rule shall apply to all Actors who play or understudy specifically identifiable characters listed in the program or Playbill. All understudies to Principal parts listed in the program or Playbill shall be listed in the program or Playbill.

(A) When an understudy takes the place of an Actor whose part listed in the program or Playbill is a specifically identifiable character or where such an Actor is replaced by another then:

Either

(1) Announcement of change in cast shall be made at the rise of the curtain, stating the name of the Understudy or replacement Actor and the character portrayed; (Note: If this option is selected the Producer is not required to make the announcement(s) identified in (B) below. However, Producer shall be required to make all announcements set forth in (C) below.)

Or

(2) Such announcement shall be made in all programs or Playbills by the insertion of a printed slip stating the name of the Understudy or replacement Actor, that Understudy's or replacement Actor's biography (if required by Rule 7(B)(1) or (c)) and the character portrayed.

(B) In addition to the above, such announcement shall be posted conspicuously, prominently and in an unobstructed manner at the entrance to the theatre at the place where tickets of admission are collected. Such announcement shall be at least eight by 10 inches in size with the name of the part and the Actor in letters of at least one inch.

(C) All further changes in cast made necessary by the absence or replacement of an Actor shall be posted on the lobby board or announced (either from the stage or by program insert) in the following manner: "At this performance, the part(s) usually played by (Actor) will be played by (replacement Actor)."

(D) When a Swing is performing in a track with no identifiable characters, the Swing's name shall, at the producer's option, be posted by means of a slider on the House Board in the lobby, or by means of insert in the daily program.

(E) When an Understudy takes the place of a Principal, either during the first act or at intermission, an announcement of the change in cast shall be made at the rise of the Act II curtain, stating the name of the Understudy and the character portrayed.

(F) If the required announcement(s) are not made or are incorrect as of the rise of the Act I curtain, the appropriate announcement(s) may be made prior to the commencement of the final act.

(G) For each failure to give the notice of substitution required by this Rule, except for the requirement in (D), the Producer agrees to pay the Actor whose part is played by an Understudy or another Actor and also such Understudy or other Actor, an additional sum equal to one-eighth of Actor's own weekly salary.

(H) Upon request, Equity will provide a written list of which roles must be announced for a particular production, and both parties will be bound by it.

**12. CHORUS: PROVISIONS FOR ADDITIONAL COMPENSATION**

(A) **Chorus Playing a Part**.

(1) If a member of the Chorus is required to play a part, speak lines, sing a song, or perform a dance that is individual in its nature, the Chorus shall be paid not less than $20 per week in addition to Chorus' weekly contractual salary for each such assignment or part.

(2) **Payment for**. Such additional assignments, including understudy assignments, shall be reduced to writing no later than one week after such assignment. In a pre-Point of Organization or "tryout" tour or during previews at Point of Organization, should the assignments be deleted or reassigned prior to the Official Opening at Point of Organization, the Chorus shall receive payment for an additional assignment only for such weeks or part thereof during which Chorus was responsible for such assignment.

(B) **Chorus as Understudy**.

**Understudy for Principal Role**. If a Chorus understudies a Principal Role, Chorus shall be paid not less than the amount listed below per week for each such role in addition to Chorus' weekly contractual salary. (For Tiered Tours, see Rule 70(B)(2)(i), TOURS.) Chorus shall not be assigned to understudy more than three Principal Roles. (This rule also applies to alternate Understudies. See Rule 73(D) for performance payment.)

As of September 30, 2019: $56.00

Where there are non-enumerated Understudies for a particular role or part and a Principal Actor has given advance notice of a leave for vacation or any other purpose, Producer shall provide, absent extraordinary circumstances, two weeks' notice to said Understudies and post which Understudy will be performing for the Actor on leave.

(a) Understudy roles assigned to Chorus must be so assigned with new contracts or riders and salary adjustments made not later than two weeks after the first paid public performance of the production or at the time of the Official Opening, whichever is earlier.

(b) If the contract of a Chorus is amended to provide for the assignment of an Understudy role and additional compensation therefor, the Producer may, within two weeks of the first paid public performance at Point of Organization, withdraw said Understudy assignment and additional compensation therefor and assign said Understudy role to another Chorus. The foregoing shall not apply where the Understudy role and compensation therefor is part of the original contract of employment.

(2) **Understudy for Chorus Playing Parts**. If a Chorus (including Swings) understudies another member of the Chorus who is paid for playing a part, speaking lines, singing a song, performing a dance that is individual in its nature (see 12(A)(1) above), Chorus shall be paid not less than $15 per week for each such Understudy assignment or part in addition to weekly contractual salary. (This Rule also applies to second, third, etc., Understudies.) Such assignment must be attached to the contract by rider from the date of assignment.

(3) **Emergency Understudy for Chorus**. If, in an emergency, a Chorus goes on in a part not designated on the contract, as an Understudy to another Chorus playing a part, Chorus thereafter shall be contracted and compensated for such understudy duty at no less than $15 in addition to weekly contractual salary, subject to two week termination of such understudy duty only, without regard to the requirements of Rule 69(D).

(C) **Six-Month Rider**. An Actor engaged under a Chorus contract may be signed to a Six-Month Rider in accordance with the following form (For Tiered Tours, see Rule 70(B)(2)(f), TOURS):

"Six-Month Rider.

"Anything in the Standard Equity Contract of employment for Chorus of which this rider is a part to the contrary notwithstanding, it is agreed as follows:

(1) "This rider may be used only if the Chorus is paid at least the amount listed below more weekly than the minimum salary plus required payments for any and all other duties assigned to Chorus for which extra compensation is provided under Equity Rules.

Effective September 30, 2019 $80

(2) "Neither party hereto may give the other individual notice of termination of this Contract prior to 22 weeks from the date of the first paid public performance of the play, exclusive of eight weeks of an out-of-town tryout or Point of Organization Preview. At the conclusion of this 22 week period, all provisions in the Standard Minimum Contract of employment pertaining to individual notice of termination shall apply.

(3) "If, in the 23rd through 26th weeks of the Six-Month Rider, the Producer should wish to execute a second or subsequent Six-Month Rider and the Chorus consents thereto, Producer shall pay an additional increment of not less than the amount listed below for a second or subsequent Six-Month Rider. If the Producer should wish to execute a One-Year Rider, then the applicable provisions of Rule 12(D) of the Equity/League Production Contract shall apply. If the Chorus rejects the Producer's offer of a second or subsequent Rider, the Producer need not continue to pay the additional increment provided for in (1) above and this (3). If an Actor on tour rejects the Producer's offer of a second or subsequent Six-Month Rider and the Actor subsequently tenders a notice of termination, said Actor's notice of termination must include two performance weeks.

Effective September 30, 2019 $40

(4) "If the Chorus, during the term of a Six-Month Rider, obtains a contract to play the part of an Onstage Principal or Alternate to a Principal role in any "Qualifying Production" (as defined herein), the Producer agrees that Chorus may, upon four weeks' notice, terminate employment hereunder. A Qualifying Production shall be defined as a production: (i) under the Equity/League Production Contract; (ii) under the League/AEA SET Agreement; (iii) under the AEA Off-Broadway Contract; (iv) covered by Rule 71 in which a Producer has a financial or controlling interest as defined in Rule 71(C); or (v) under the AEA LORT contract in a theater designated as Category B or above.

(5) "This rider shall be valid only if signed and executed by the parties prior to the first day of rehearsal.

(6) "This rider shall apply to the Road Tour or Point of Organization run only, tryout period included. (Delete inapplicable phrase.)"

(D) **One-Year Rider**. An Actor engaged under a Chorus contract may be signed to a One-Year Rider in accordance with the following form (For Tiered Tours, see Rule 70(B)(2)(g), TOURS):

"One-Year Rider.

"Anything in the Standard Equity Contract of employment for Chorus of which this rider is a part to the contrary notwithstanding, it is agreed as follows:

(1) "This rider may be used only if the Chorus is paid at least the amount listed below more weekly than the minimum salary plus required payments for any and all other duties assigned to Chorus for which extra compensation is provided under Equity Rules.

Effective September 30, 2019:

(a) $80 per week for the first six months of the One-Year Rider; and

(b) an additional $40 per week in the second six months of the One-Year Rider;

(2) "Neither party hereto may give the other individual notice of termination of this Contract prior to 48 weeks from the date of the first paid public performance, exclusive of eight weeks of an out-of-town tryout or Point of Organization Preview. At the conclusion of the 48-week period, all provisions in the Standard Minimum Contract of employment pertaining to individual notice of termination shall apply;

(3) "If, in the 49th through 52nd weeks of the One-Year Rider, the Producer should wish to execute a second or subsequent One-Year Rider and the Chorus consents thereto, Producer shall pay an additional increment of not less than $40 per week for the first six months of the second or subsequent One-Year Rider and $40 per week in the second six months of the second or subsequent One-Year Rider. If the Producer should wish to execute a Six-Month Rider, then the applicable provisions of Rule 12(C) of the Equity/League Production Contract shall apply. If the Chorus rejects the Producer's offer of a second or subsequent Rider, the Producer need not continue to pay the additional increment provided in (1) above and this (3). If an Actor on tour rejects the Producer's offer of a second or subsequent Rider and the Actor

subsequently tenders a notice of termination, said Actor's notice of termination must include two performance weeks;

(4) "If the Chorus does not terminate their employment as provided below, Producer shall pay the Chorus a retention bonus of $2,600 at the conclusion of the One-Year Rider period. If the production closes before the conclusion of the One-Year Rider period, the Chorus shall be paid a pro-rata bonus for weeks worked at a rate of $70/week for the initial 26 week period and $30/week for the second 26 week period;

(5) "If the Chorus, during the term of a One-Year Rider, obtains a contract to play the part of an Onstage Principal or Alternate to a Principal Role in any "Qualifying Production" (as defined herein), the Producer agrees that Chorus may, upon four weeks' notice, terminate employment hereunder. A Qualifying Production shall be defined as a production: (i) under the Equity/League Production Contract; (ii) under the League/AEA SET Agreement; (iii) under the AEA Off-Broadway Contract; (iv) covered by Rule 71 in which a Producer has a financial or controlling interest as defined in Rule 71(C); or (v) under the AEA LORT contract in a theater designated as Category B or above;

(6) "The rider shall be valid only if signed and executed by the parties prior to the first day of rehearsal;

(7) "This rider shall apply to the Road Tour or Point of Organization run only, tryout period included. (Delete inapplicable phrase.)"

(E) **Swing**.

(1) A full Swing (i.e., a non-performing member of Chorus who Swings all or fewer than all Chorus performing in Chorus numbers in the production) of each gender must be employed not later than two weeks prior to the first paid public performance. In all tours, the full Swing shall be employed from the first day of rehearsal. In all instances, the Swing shall be signed to a Swing singer and/or dancer Chorus contract at the time of assignment or employment. Until four weeks after the first paid public performance, Producer reserves the right to reassign full Swing duties to another member of the Chorus who may accept or reject such assignment. Acceptance of such Swing assignment may not be a condition of continued employment in the production. A full Swing may be assigned to cover the full tracks of up to ten contracted ensemble members exclusive of specialties or parts. Although the specific tracks for which a full Swing is assigned may be altered based on the needs of the production, such alterations may not be made more than once each quarter, except that tracks may be reassigned as a result of a company member leaving the production. This provision shall not apply to Dance Captains and Assistant Dance Captains. This provision also shall not apply to productions running as of the October 16, 2019, except that such Grandfathered productions may not change the coverage assignment of a Swing currently covering 10 or fewer full tracks to more than 10 full tracks, or increase the number of coverage assignments of a Swing currently covering more than 10 full tracks. This provision does not alter any emergency swing provisions in the Agreement.

(2) Notwithstanding anything to the contrary herein, the procedure described hereafter shall not be used to require any production to assign less than the full tracks of up to ten contracted ensemble members to a Swing, the need for and employment of additional full Swings shall be subject to negotiation between Equity and the League at Equity's instance. A committee consisting of two representatives of Actors' Equity, and two representatives of the League, none affiliated with the production, shall meet to determine such need. In rendering such determination, Equity representatives and the League representatives shall each cast one vote. Unanimous opinion shall be binding on the League and Equity. Failing unanimity, the matter may be taken to expeditious grievance and expeditious arbitration by either party.

(3) The Producer and Equity shall be provided with a weekly report from the Stage Manager on the approved form detailing for each performance: the number of performers absent, the reason they were absent, the number of performers who covered for the absent performers, and the number of roles or tracks that were altered or uncovered.

(4) A Swing may be required to attend understudy rehearsals provided that Swing rehearses only those functions for which Swing is contracted.

(5) No Swing shall be permitted to perform for more than three consecutive weeks for any one Chorus, except in the case of sickness, injury, or disability in which event the period shall be four consecutive weeks.

(6) A full Swing shall be paid not less than 5% of actor minimum (as stated in Rule 63(A)) per week above minimum salary in addition to all other increments required by the Agreement. (See Appendix A for compensation chart.)

(7) **Partial Swing**. If a member of the Chorus is designated to swing a Chorus number in a production and is not hired solely as a full Swing performer (see above), Chorus shall receive not less than $15 per week in addition to Chorus' weekly contractual salary for each such number so assigned.

(8) **Vacation/Temporary Replacement by Swings**.

(a) A Vacation/Temporary Swing shall be defined as an Actor who swings and/or replaces specific chorus actors on a series of temporary contracts for one or more companies of a production and has previously either been contracted as a Swing or has been rehearsed by one company of the production as a Swing for one or more companies of the production.

(b) Each temporary contract for a Vacation/Temporary Swing shall be for no less than one week for each company and shall include a rider listing the swing increment and all pertinent increments applicable to the track(s) being covered.

(c) Should an Actor hired pursuant to this provision be required to travel away from the Actor's residence to work in a production playing in its Point of Organization city, the Producer shall provide all transportation and, except in New York, hotel choice and Per Diem for up to two weeks, as if the Actor were on tour (see Rules 32, 70 and 72). Producer may offer and Actor may accept a provided hotel (at no cost to Actor) and one-half per diem in lieu of applicable Per Diem under Rule 63(C).

(d) A Vacation/Temporary Swing shall accrue one performance of sick leave for each four weeks of employment, which need not be consecutive, regardless of how many or which companies employ the Actor. Accrued sick days shall be available for the Actor's use in any company of the show.

## 13. CLAIMS

(A) **Waiver or release not permissible**. Upon any claim of the Actor arising under Actor's agreement through any breach thereof, no receipt, waiver, release, or adjustment by the Actor is of any validity whatsoever unless Equity consents in writing. The Producer, by agreeing to this rule, agrees that Producer will not seek or solicit any such waiver, release, or settlement, nor offer the same in any arbitration or any proceeding in court unless Equity specifically consents thereto in writing.

(B) **Time limit for lodging claims**.

(1) During the run of a show the following procedure shall apply:

(a) Claims (i) against a Producer, by either Equity or an Actor, or (ii) by a Producer against either Equity or an Actor, must be filed in writing no later than 30 calendar days after the claim is known or reasonably should have been known by the claimant. Claims not filed within this period shall be waived unless the claimant

shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period.

(b) Any claim not resolved in discussions with the Producer and/or Equity must be submitted to grievance within 30 days following the filing of the claim. Claims not submitted to grievance within this period shall be waived unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period.

(c) Claims not resolved in the grievance process must be submitted for arbitration within 30 days following the first grievance meeting at which the claim was discussed. If no demand for arbitration is filed within the period, the claim shall be waived unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period.

(2) Once a show closes, the following procedure shall apply:

(a) Claims (i) against a Producer, by either Equity or an Actor, or (ii) by a Producer against either Equity or an Actor, must be filed as soon as reasonably possible but no later than eight weeks after the closing of a show. Claims not submitted to grievance within this period shall be waived (unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period) and the bond released. If a claim is filed during the eight week period, the bond shall be reduced to the amount necessary to satisfy the claim.

(b) Any claim not resolved in the grievance process must be submitted for arbitration within 30 days following the first grievance meeting at which the claim was discussed. If no demand for arbitration is filed within the period, the claim shall be waived (unless the claimant shall give to the Grievance Committee and the Arbitrator a good and sufficient reason for any delay after such period) and any remaining bond released.

(c) A grievance filed after closing may be treated as expedited and submitted to expedited arbitration at the option of either party.

(C) In no case shall claims of Actors under employment contracts be handled or enforced by agents or attorneys of Actors unless such representation is consented to by Equity in writing.

**14. CLOTHES AND MAKE-UP**

(A) **Costumes, Producer Must Provide**. The Producer shall furnish all Actors engaged hereunder with all costumes and clothes (period or modern), including wigs, hats, beards, hairpieces, tights, hose, stockings and properly fitted footwear. Unless otherwise necessitated by the costume design, tights, hosiery and skin parts shall be appropriate to the Actor's skin color and tone.

(B) **Costumes, Rental of**. Actor shall not rent or lend any wardrobe to a Producer for use in any production unless the terms of the rental or loan are stated in the contract of employment by rider and approved by Equity. If the Actor wishes to wear Actor's own clothes (including shoes) instead of those supplied by the Producer, Actor may do so only with the consent of the Producer and under terms expressed in the employment contract. Any approval required by this paragraph shall not be unreasonably withheld or delayed. Any rental approved by Equity shall be paid by the Producer to the Actor weekly with salary.

(C) **Cleaning and Upkeep of**. Costumes or clothing, including hats, furnished by the Producer shall be freshly cleaned when delivered to the Actor and cleaned thereafter whenever necessary but at least once every three weeks and in any case within one week before the production goes on tour. Spot cleaning, when required, shall be completed in time to allow at least four hours for drying and airing prior to the half-hour call. In order to assure that costumes are cleaned as required, the Stage Manager shall maintain a cleaning

schedule. Clean and dry shirts, blouses, stockings and other skin parts shall be furnished for every performance. Skin parts, including undergarments, bodysuits, stockings, dress shields, bathing suits, dance trunks and slips, shall be individually assigned and shall not be switched from one Actor to another. After cleaning, every effort shall be made to dry and air costumes prior to their issue to the Actor. All skin parts, including dance belts not provided by the Producer, must be laundered and thoroughly rinsed and dried.

(D) **Kneepads and Protective Clothing**. Prior to any activity that requires knee and elbow pads and protective clothing, the Producer shall furnish new and properly fitted (i.e., small, medium, or large) items for the exclusive use of the Actor for all rehearsals and performances.

(E) **Costumes for Understudies and Swings**.

(1) Swings and Understudies must be assigned properly fitted shoes and skin parts for their sole and exclusive use in performance except, however, that special leotards or unitards need not be exclusively assigned, provided that they are washed, thoroughly dried and properly fitted prior to use by each Actor. Producer agrees to make available undergarment liners to any Actor who is not exclusively assigned special leotards or unitards.

(2) A Swing or Understudy shall be provided with a properly fitted costume whenever the Swing or Understudy is required to perform. Absent good and sufficient cause based on the particular circumstances of the production, the Producer shall provide full Swings with their own basic costumes no later than eight (8) weeks after the official opening. Any costume worn by another Actor shall be cleaned prior to its use by any Swing or Understudy and again prior to its further use by any other Actor, including the Actor to whom it is regularly assigned. However, if a Swing or Understudy who does not have a full set of costumes is required to appear, costumes worn by said Swing or Understudy must be cleaned not later than the first business day on which no matinee performance occurs following the Swing or Understudy's appearance.

(3) Understudies and Swings shall be advised by contract rider at the time their original employment contracts are executed whether or not the Producer will provide said Actors with their own set of costumes. It is understood that there is no requirement for individual costumes for Understudies.

(F) **Shoes**.

(1) All footwear shall be clean, sanitary, properly fitted and in good repair and, if modern and conventional or for dancing, shall be new. No Actor shall be required to perform in shoes which are unsafe, unsanitary, or in poor repair.

(2) The Producer shall provide properly fitted professional dance shoes for all members of the company who are required to dance. Actors and Agents are encouraged to inform the Producer, the General Manager, the Costume Designer and/or the Wardrobe Department as to their preference in shoemaker. Dance shoes may represent the period of a production or nature of a specific character (e.g., sneakers in *WEST SIDE STORY*; athletic shoes in *DAMN YANKEES*) which must conform to the appropriate style of the movement. All footwear shall be of suitable construction for dancing when used for theater dance movement and shall be rubbered and braced when necessary. Professional dance shoes are not required for normal ballroom dancing or where there are minimal choreographed movements. Producer agrees to use best efforts to supply professional dance shoes by the third week of rehearsals, but in no event later than one week prior to dress rehearsal. During rehearsals, the Producer shall furnish at least one pair of pointe shoes for each member of the Chorus called upon to dance in pointe shoes.

(3) Shoes for dancing shall be replaced in accordance with Paragraph (1) above or when the Dance Captain, authorized Producer's representative, Stage Manager and Deputy agree by majority secret ballot vote that the shoes are either in unfit condition for the

safety of the performer or are deemed unsafe or unsanitary. Meetings of the committee shall occur at least monthly. If the committee votes that the shoes be replaced immediately, the order for new shoes shall be placed by telephone no later than the next business day.

(G) **Make-up**.

(1) The Producer shall furnish all make-up except ordinary and conventional make-up. If the Actor is required to use body make-up, the Producer shall furnish a regular towel service for the removal of such make-up. The Producer shall also provide body make-up remover.

(2) With respect to ordinary and conventional make-up, if the Actor is given a design either orally or in writing by a representative of the Producer or creative team, either

(a) the design will be generic and any specific brands will be clearly identified as an example, in which case the Producer will not furnish or reimburse the Actor for the make-up; or

(b) If a specific brand is identified but not labeled as an example or suggestion, the Producer will furnish the make-up or reimburse the Actor for the purchase of such required brand make-up.

(H) **Hairstyle and Hair Color**.

(1) The Actor may not be required to change the color of Actor's hair unless Actor agrees in writing at the time of signing the contract to such a change. The Producer shall pay for the original expense of such change, its upkeep during the run of the engagement and its restoration to the original color when the Actor leaves the production.

(2) The Actor may not be required to cut or change the style of Actor's hair in any way or to shave Actor's head unless Actor agrees in writing at the time of signing the contract. The Producer shall pay the original expenses of such change and the expense of the upkeep of said hair or hairstyle during the run of the production. When the Actor leaves the production, the Producer agrees to restore the length and shape/style of hair when an Actor has been asked to grow Actor's hair out for a role.

(I) **Facial Masks, Hairpieces and Wigs**.

(1) Beards, hairpieces and wigs furnished by the Producer shall be freshly cleaned when delivered to the Actor and cleaned thereafter whenever necessary but at least once every three weeks. Lace on all beards, mustaches and hairpieces will be cleaned daily. No Actor shall be required to use a facial mask, wig or hairpiece including a facial hairpiece (beard or mustache) which has been worn by another Actor until the facial mask, hairpiece or wig has been thoroughly cleaned and properly fitted. After cleaning, facial masks and hairpieces must be dried and aired prior to issue to the Actor.

(2) Protective breathable liners must be inserted into facial masks whenever a replacement or Understudy uses the facial mask of another Actor. Liners shall be issued for the exclusive use of the replacement or Understudy.

(J) No agreement to the contrary between the Producer and the Actor shall relieve the Producer of the obligations under this Rule without the written consent of Equity.

## 15. CONTINUOUS EMPLOYMENT

Continuous employment is of the essence of all employment contracts and all calculations of sums due or benefits accruing to the Actor shall be computed on the basis of consecutive rehearsals and consecutive employment.

## 16. CONTRACT

(A) **Effective Date**. Contracts between the Producer and the Actor must be signed before the Actor shall be permitted to rehearse or perform and shall be signed on the date when the

terms of the contract are agreed upon between the parties. If not signed on said date, when issued, they must be signed as of said date.

(B) **Signing of**.

(1) Unless contracts are signed concurrently, they must be signed by the Producer first. If the contract is not signed concurrently, the Producer may notify the Actor, or their designated representative, by personal delivery or Certified Mail, that unless the contract is signed and returned to the Producer within a specified time period, which shall not be less than 72 hours after receipt of notice by the Actor or their designated representative, the Contract shall be deemed null and void.

(2) The Producer agrees that all blanks, including opening date, name of part and salary shall be filled in, in writing, before signing or delivery.

(3) **Contract Determination**. As soon as it is available, the Producer shall furnish to Equity the script of any scheduled new musical and/or new adaptation of a musical production with casting breakdowns of Principal roles and number of Chorus to be employed. Equity will then issue its preliminary determination of Principal roles and Chorus parts no later than two weeks after the Producer furnishes such script. Equity Representative(s) shall then attend a dress rehearsal. Within seven business days following such attendance, Equity Representative(s) and the Producer's representative(s) shall meet to review Equity's classifications and determinations in an attempt to create consensus. If there are disagreements regarding any classifications and/or determinations following this meeting, the same Equity Representative(s) or Representative(s) with similar experience shall attend one or more of the next eight performances of the production, after which they shall meet again with the Producer's representative(s) within seven business days, for the purpose of finalizing the classifications and determinations. If any disagreements remain following this second meeting, the Producer shall have the option to convene a third meeting with Equity within five calendar days in order to provide the Director and/or other creative team member(s) an opportunity to express any creative, artistic, musical, and/or technical grounds to support their positions. Following agreement between Equity and the Producer on the designations of all Principal, Chorus, parts and specialties, the Producer shall notify Equity in advance of any subsequent changes and the parties shall meet to discuss and resolve any disagreements regarding the designations resulting from such changes. If the challenged designations have not been resolved following the third meeting as outlined above, the Producer may proceed to expeditious arbitration in accordance with Rule 4(C), and the Producer shall prevail if Equity's designations are found to be unreasonable.

(4) **Change in Contract Determination**. Producer and Actor may negotiate and include in an Actor's individual contract of employment those terms and conditions that shall apply should the Actor's designation change as a result of the process described in (3) above.

(5) The Producer may designate two numbers in the production, one of which must be either the opening number or the finale, in which Principal Actors may be assigned to perform unidentified on-stage Chorus functions. The two numbers shall be determined by the Producer on or before Official Opening, subject to finalization of the contract determination.

(C) **Changes and Alterations**. All concessions or waivers granted to the Producer by Equity prior to signing shall be made known to the Actor in writing before signing of the contract. Omission of such notification shall render the concession or waiver invalid at the discretion of Equity. The Actor has no right or power to waive any of the minimum conditions set forth in the employment contract or Equity Rules without the written consent of Equity. Unless any and all riders, changes, alterations, waivers, or substitutions made prior to, when, or after a contract of employment is made shall have been consented to by Equity in writing, such riders, changes, alterations, waivers, or substitutions, or any part thereof,

are void at the option of the Actor, Equity consenting. It shall be the duty of the Producer, not the Actor, to submit proposed changes to Equity for its written approval by a duly authorized representative.

(1) At the option of Equity, no such riders, changes, alterations, waivers, or substitutions shall be admitted in evidence in any arbitration or by any tribunal for the disposition of any claim without the written consent of Equity.

(2) If Equity fails to notify the Producer of its disapproval of said riders, changes, alterations, waivers, or substitutions within five business days, excluding Saturday and Sunday, after receipt thereof by Equity at its office at the Point of Organization, they shall be deemed approved.

(D) **Hiring "As Cast": Obligations to Actor**. If in the contract of a Principal Actor, a part is not specified, then unless Equity shall otherwise order, the Principal Actor shall only be required to appear and perform in the part or parts in which Actor makes Actor's first public appearance.

(1) A Principal Actor may be employed "As Cast" only if Actor is signed to a Standard Minimum Contract and the production is a new work or a new concept of an old work.

(a) When Actor is hired "As Cast," the Producer must designate at least one-half of the parts the Actor may perform on the Actor's contract.

(b) An Actor hired "As Cast" may terminate Actor's employment during the rehearsal period without penalty by giving the appropriate termination notice.

(2) If a Principal Actor is employed to "Understudy-As-Cast," all the provisions of 16(D)(1) above apply except that Actor shall not be required to appear and perform or understudy in any part (or parts) other than the part or parts Actor was assigned to understudy no later than the day following the first two weeks after the opening of the play at Point of Organization or four weeks after the first paid public performance on tour. The re-assignment of understudy parts contemplated by this paragraph shall not be applicable in the event the Actor and the Producer have agreed to a specific understudy part (or parts) in the original contract of employment.

(3) The provisions of paragraphs 16(D)(1) and 16(D)(2) shall not be applicable to revues.

(4) The Actor shall be permitted to accept assignments other than those originally played or assigned provided that, when assigned, they are designated on a rider to the Actor's contract and additional compensation is negotiated for each assignment.

(E) **Contracts covering employment in outside fields**. Before any person holding a blanket employment contract covering several employment fields may work in any Equity jurisdiction, the Producer must secure and file with Equity for such person, a duly executed contract on a standard Equity form covering only employment within Equity's jurisdiction, which contract shall be satisfactory to Equity and shall be paramount to any then existing arrangement between said person and the Producer. Said contract shall exclusively govern the employment relationship of said person to said Producer while said person is working in any field over which Equity has jurisdiction. No Actor shall be required to work with any such person not holding such contract so procured and filed.

(F) **Filing contract**. Within one week after entering into any employment contract, but in no event more than three days after the Actor has begun to rehearse, the Producer shall file with Equity a signed copy thereof. Failure to do so shall constitute a breach of contract by the Producer and the Actor may, at any time, Equity consenting, which consent will not be unreasonably granted, terminate the contract without notice and the Producer agrees to pay the Actor as damages for breach a sum or sums to be computed as in the case of breach of Rule 10, BREACHES BY PRODUCER. If the Producer disagrees with Equity's consent, the Producer may submit the matter forthwith to expeditious arbitration in accordance with Rule 4, ARBITRATION AND GRIEVANCE.

(G) **Attempted breach**. No Equity member shall agree with a Producer, Employment Agent, Personal Representative, or other Equity member and no Producer shall agree with any

Equity member, Employment Agent, or Personal Representative to cause, or attempt to cause, or agree to permit any breach of any term of any employment contract.

(1) Should any Equity member engage in such conduct, such member shall be subject to such disciplinary action as the Council of Equity may determine.

(2) Should any Producer be found by the Grievance Committee or Arbitrator to have engaged in such conduct, said Producer agrees that such conduct shall be a breach of Producer's employment agreements with Equity members, entitling any such Equity members to recover from the Producer, Equity consenting, a sum equal to two weeks' salary as liquidated damages, no present basis of calculation existing. The Producer further agrees that upon such breach, Producer's name may be posted on the Defaulting Producers List at Equity.

(3) In the event of a recovery of liquidated damages by or on behalf of the offending Actor, the same shall be paid into the Actors' Equity Foundation, Inc.

(H) **Term Contract**. For Tiered Tours, See Rule 70(B)(2)(h), TOURS.

(1) A Term Contract may be signed only if the salary is at least the amount listed below over the current minimum salary plus required payments for any and all other duties assigned to the Actor for which extra compensation is required under this Agreement. The period of such contract may be for the term or such fixed period as may be agreed by the Producer and the Actor and may include a guarantee of employment in excess of two weeks.

As of September 30, 2019: $212

(2) If more than one year is contracted for, the guarantee for the second year shall apply unless the Producer notifies the Actor and Equity by written notice not later than five weeks after the first paid public performance, that Producer will not present the play during any year following the current one and at the same time pays the Actor any and all sums due under Actor's guarantee for each year contracted for beyond the second year. Upon such notice and payment being given and made, neither the Actor nor the Producer shall be bound hereunder beyond the term during the current year.

(I) **Conversion of Standard Minimum Contract to a Term Contract**. A Principal Actor signed to a Standard Minimum Contract expressing a salary of not less than double the applicable Production Contract minimum may agree to convert said contract to a Term Contract by signing a rider at the time of signing Actor's contract, which rider shall read as follows:

"The Actor hereby grants the Producer the right to convert this Contract into a Standard Term Contract for a period not to exceed one year from the date of the first public performance, at a weekly salary of ........................ Dollars ($................) (this sum shall represent an increase in the weekly salary of not less than 100% of the Actor's original contractual salary), said right to be exercised by the Producer only through written notice delivered to the Actor personally prior to the fifth consecutive performance of the Actor in the play. Promptly upon delivery of such notice, both parties agree to sign and execute a Standard Term Contract under all of the special terms and conditions provided for in this Agreement.

"The Producer guarantees the Actor not less than five weeks' consecutive employment instead of the minimum two weeks."

## 17. COSTUME CALLS

(A) Once a contract has been issued by the Producer, the Actor shall be available prior to the rehearsal period for up to five costume calls, at mutually convenient times, for purposes of measuring and trying on all items including, but not limited to, hats, shoes, wigs and costumes. Such calls scheduled contiguously at a distinct location shall count as one costume call. A call scheduled on the same day as a call at another location shall be counted as a separate call. Any calls beyond five shall be paid at one and one-half times

the overtime rate (see Rule 58(D)(3)) for each hour or part thereof, to be paid with the Actor's first paycheck. If given their notice prior to the third week of rehearsal, Actor shall receive one-sixth of Rehearsal Salary, for each such day or part thereof applied to costume measuring in addition to other sums provided for in the Contract of Employment.

(B) **After the First Day of Employment**.

(1) Actors may be called for up to five hours of costume calls in addition to the rehearsal period herein prescribed. In no event may a costume call be less than one hour. Should the total time of costume calls exceed five hours, the Actor shall be paid at the overtime rate (see Rule 58(D)(3)) for each hour of part thereof beyond five.

(2) Said costume calls shall be permitted in addition to the rehearsal period herein described, provided they are consecutive with the eight and one half-hour period specified in Rule 58(D)(1)(a).

(3) After the Actor's first paid public performance, costume calls shall be considered part of the rehearsal hours and span of day.

(C) When a costume call under (A) or (B) above occurs locally at a place other than the place of rehearsal, the Producer shall provide, or reimburse the Actor for, transportation to and from such costume call. The manner of transportation shall be determined by the Producer.

(D) When an Actor is required to travel to another city or town for measurement or fitting, the Producer shall pay the cost of airfare and ground transportation and shall pay the Actor full per diem for each night the Actor is away from their current residence or one-half per diem if the Actor can return to their current residence the same day. If the Actor has not yet begun employment, the Producer shall also pay the Actor no less than one-sixth of minimum salary for each day the Actor is required to be away from their current residence. If the Actor is already employed by the Producer, the Actor shall be paid all salary due for the week, including salary for any rehearsals or performances missed because of the travel. If travel or measuring/fitting takes place on the Actor's scheduled day off, Actor shall be paid no less than one-sixth of Actor's current salary in addition to all other salary due or be provided a compensatory day off in the workweek.

**18. CUTS IN SALARY**

(A) All cuts in salary must be approved by Equity except salary cuts for bona fide stars (as determined by Equity) and all discussion regarding cuts shall be with Equity. If the Producer wishes cuts considered, Producer shall notify the Equity Deputy and the Deputy shall arrange a meeting for the cast at the Equity Offices. For the purpose of considering cuts, Equity has established a Cuts Board and its rules, which have been published in the Equity Office, shall govern.

(B) If the Producer wishes cuts considered while the company is on the road, Producer shall make application to Equity and bring such data as required by the Cuts Board. Equity shall make its findings and report to the Equity Deputy. The Equity Deputy will then call a meeting of the cast at which a vote by secret ballot shall be taken on the Producer's request for cuts. Upon receiving the Deputy's report of the results, Equity will notify the Producer of said results.

(C) When the Cuts Board agrees to approve a Producer's application for a cut in salary, such cut shall be effective beginning with the first full week following the date on which the Producer's application was received.

**19. DANCE CAPTAIN**

(A) A Dance Captain must be hired where there is movement of such a nature that the maintenance of its artistic quality, as originally staged, does not fall within the normal duties of a Stage Manager. The Stage Manager shall not serve as Dance Captain.

(B) Dance Captains shall be paid not less than 20% of actor minimum salary (as stated in Rule 63(A)) per week in addition to their weekly contractual salary and may, as a condition of employment, upon payment of the additional compensation stated in 12(C), 12(D) or 16(H), sign a Six-Month Rider, One-Year Rider or Term Contract which shall begin on the date of the first paid public performance. (See Appendix A for compensation chart.)

(C) The Dance Captain shall be paid from the date of assignment or first day of employment, but in no event later than the first day of rehearsal. The Dance Captain designation may be reassigned and the increment deleted within four weeks of Dance Captain's first paid public performance unless they are signed to a Term Contract. Following the first four weeks of Dance Captain's first paid public performance, upon two weeks' advance notice to the Dance Captain, the Dance Captain may be reassigned and the increment deleted, provided that Dance Captain receives one week of the Dance Captain increment for each five weeks' employment as a Dance Captain, up to a maximum payment of 15 weeks of the Dance Captain increment, plus one additional week of the Dance Captain increment for each six months of employment or part thereof as a Dance Captain thereafter. In no event will the payment be less than two weeks of the applicable Dance Captain increment. There will be no hiatus between Dance Captain assignments.

(D) After Official Opening at Point of Organization or first paid public performance on Tour, rehearsal hours for Dance Captain(s) shall be limited to 12 hours per week.

(E) The Producer, at its sole option, may designate an Assistant Dance Captain for an additional payment of not less than 10% of actor minimum salary (as stated in Rule 63(A)) per week in addition to said Assistant's weekly contractual salary. (See Appendix A for compensation chart.). Upon two weeks' advance notice to the Assistant Dance Captain, the Assistant Dance Captain may be reassigned and the increment deleted, provided that Assistant Dance Captain receives one week of the Assistant Dance Captain increment for each five weeks' employment as an Assistant Dance Captain, up to a maximum payment of 15 weeks of the Assistant Dance Captain increment, plus one additional week of the Assistant Dance Captain increment for each six months of employment or part thereof as an Assistant Dance Captain thereafter. In no event will the payment be less than two weeks of the applicable Assistant Dance Captain increment.

(F) If the Dance Captain is absent for any reason for one week or longer, and no replacement Dance Captain has been employed, then:

(1) The Assistant Dance Captain shall be paid the Dance Captain increment in lieu of the Assistant Dance Captain increment; or

(2) For productions that do not employ an Assistant Dance Captain, a temporary Dance Captain or Assistant Dance Captain shall be assigned from within the company, provided there is an Actor who is willing and able to perform the duties.

Actor shall be paid the applicable increment commencing with the first day of the Dance Captain's absence.

(G) If requested by the Producer, Dance Captains shall provide a copy of choreographic or musical staging notes kept during the course of their employment. The cost of materials and copying shall be paid by the Producer.

(H) Dance Captains shall be billed on the cast page of the Playbill or program.

## 20. DEFAULTING PRODUCERS

(A) A Producer shall be ineligible to engage Actors unless and until such Producer shall have furnished security in such amount and in such manner and form as may be satisfactory to Equity to insure the payment of the claims of Actors against such Producer.

(B) Any Producer engaging any Actor represents that such Producer is not in default under any agreement with Equity at the time of such engagement and that no contract has been entered into between the said Producer and Equity or any Actor, any breach of which remains unsettled or unliquidated.

(C) No Actor shall work or be required by any Producer to work for any person, partnership, corporation, or enterprise which has failed to abide by any arbitration award or court order (unless such award or order has been successfully challenged in a subsequent court proceeding).

(D) No Actor shall work or be required to work or continue in the employment of any Producer or company, if and when Equity shall be dissatisfied with the quality or amount of any security which may be offered or given or requested by Equity to secure the payment of any claim, present or future, of any Actor.

## 21. DEFINITIONS

(A) **Actor**. The term "Actor" shall refer to and include all persons who are engaged under Principal, Chorus, Stage Manager and Extra contracts.

(1) **Chorus**. The terms "Chorus," "Chorus member," "member of the Chorus," "Actor engaged under a Chorus contract" and "Chorus actor" shall include all persons who are engaged under Chorus contracts and/or actually performing Chorus work, as may be determined by Equity.

(2) **Extra**. See Rule 29, EXTRAS.

(3) **Principal Actor**. The term "Principal Actor" shall include all persons who are engaged under Equity contracts other than those engaged under Chorus, Stage Manager, or Extra contracts and/or engaged to perform Chorus, Stage Managerial, or Extra work.

(4) **Stage Manager**. The term "Stage Manager" (unless the context otherwise requires) shall refer to and include all persons who are performing the customary duties of "Stage Manager," "First Assistant Stage Manager," and "Second Assistant Stage Manager."

(B) **Disability**. The term disability shall be defined by the applicable federal laws.

(C) **Employment by Producer**. Employment by the Producer, or operation of a company or companies by the Producer, as such phrases are used in employment contracts, shall include employment or operation by the Producer alone, or by any corporation or management, corporate or otherwise, which Producer controls or directs.

(D) **Gender**. All references to "Actor" shall be deemed to refer to both sexes.

(E) **Salary**. All references in this Agreement to "salary" or "salaries" or "weekly minimum salary" shall be deemed to exclude the out-of-town living expenses set forth in Rule 63, SALARIES.

(F) **Work Week and Day**. A week means from and including Monday through Sunday. A day means at least 24 hours, in addition to the regular period of rest allowed at the close of each working day.

(G) **Part**. The term "part" shall mean each character, specialty, or function for which the Actor is responsible.

(H) **Role**. The term "role" shall mean the sum of the parts, specialties, functions and assignments for which an Actor is responsible.

## 22. DEPUTIES AND MEMBERS: NOT TO BE DISCRIMINATED AGAINST

(A) It is agreed that deputies may be designated by Equity without let or hindrance. Whenever a Chorus is employed, there may be Deputies for Chorus singers and Chorus dancers, in addition to a Deputy for Principal Actors. Deputies shall have the duty and obligation to report non-compliance with this Agreement to Actors' Equity Association.

(B) The Producer shall not dismiss or otherwise penalize any Actor for fulfilling the duties or obligations of an Equity Deputy or an Equity member. Any Equity Deputy or member who claims that the Producer has given notice, or otherwise penalized a member for fulfilling such duties either as a Deputy or as an Equity member may present the case to Equity which shall give the Producer an opportunity to be heard if Producer so desires. If Equity

is satisfied that such activities are the real cause of dismissal or of any penalty, it shall have the right to submit the matter to the Grievance Committee and, if not decided by the Committee, to demand expeditious arbitration and shall have the power to determine the character and the amount of the claim to be submitted thereto.

(C) It is further agreed that, if upon arbitration, the claim of the Deputy or other Actor is sustained, the Arbitrator shall have the right to impose a penalty, which penalty shall be at the discretion of the Arbitrator, but shall not exceed the sum of five weeks' salary. If the claim is sustained, the Deputy or other Actor shall also be reinstated with back pay from the date of dismissal to date of reinstatement.

**23. DIVERSE AND INCLUSIVE CASTING (See also Rule 42, NON-DISCRIMINATION)**

The parties recognize the principle of Diverse and Inclusive Casting. The parties further agree, the foregoing notwithstanding, that there can be no interference with the contractual rights or artistic discretion of the playwright, director, or choreographer. Subject to these limitations, the Producer will attempt to achieve Diverse and Inclusive Casting.

(A) Diverse and Inclusive Casting is defined as the casting of Actors with disabilities, Actors of any underrepresented ethnicity (including but not limited to American Indian or Alaska Native, Black, African-American, Asian or Asian American, Pacific Islander, Hispanic/Latino/a/x, Native American, Middle East and North Africa (MENA), Native Hawaiian, mixed-race, and/or multicultural), Actors over 60 and women in roles where race, gender/gender identity, transgender status, age or the presence or absence of a disability is not germane.

(B) Quarterly meetings will be held between Equity and the League to assure that this Diverse and Inclusive Casting policy is being observed and to monitor its implementation.

(C) An analysis of all productions in performance during the previous quarter shall be conducted at these quarterly meetings.

(D) If a dispute under this Rule cannot be resolved by the parties at the quarterly meeting, the dispute shall be submitted to grievance and arbitration in accordance with Rule 4.

**24. DUES AND INITIATION FEES**

The Producer agrees to deduct from the Actor's salary and remit to Equity, union dues, initiation fees and assessments provided that the Producer receives from Equity a proper authorization, agreed to and signed by the Actor.

**25. DUTIES OF THE ACTOR**

The Actor agrees to be prompt at rehearsals and to appear at the theatre no later than one half-hour prior to the performance; to pay strict regard to make-up and dress; to perform Actor's services as reasonably directed to the best of Actor's ability; to properly care for Actor's costume and props; when required by the Producer to wear and use electronic equipment; to respect the physical property of the production and the theatre; and to abide by all reasonable rules and regulations of the Producer not in conflict with Equity Rules.

**26. EQUITY: SPECIAL PROVISIONS**

(A) **Equity Representatives**. Duly authorized representatives of Equity shall have free access to the stage and to all Actors at all times, inclusive of rehearsals and performances. Sufficient time shall be set aside within the first two days of rehearsal, at Producer's discretion, for an Equity Representative to conduct Equity business. It is understood that: (a) the meeting shall not be scheduled at the end of a full rehearsal day and (b) until the meeting has occurred, the show may not ask the cast to undertake business that would require the presence of an Equity deputy. Such time shall not be considered part of the official rehearsal hours.

(B) Equity may represent Actors in any dispute which may arise with the Producer, and Equity may, at all times, represent Actors in relation to any matter arising under any employment agreement and when any act or request or consent of any such Actor is provided for in such agreement, the request, consent, or approval of Equity shall, for all purposes, be deemed the consent, request, approval, or act of the Actors.

(C) **Meetings: privilege of Actors to attend**. The Producer shall neither schedule auditions nor require the services of the Actor for rehearsals (except in cases where dress rehearsals are being held or rehearsals are being held on opening date) at any time when a regularly called meeting of Equity is being held. Time off for this purpose shall not be counted as a part of that day's rehearsal.

(D) **Special power to act for Actor**.

(1) Whenever it is provided in any employment contract (a) that any act or thing may be done by an Actor at the option of, with the consent of, or at the request of Equity, or, (b) on the demand of or with the consent of such Actor, Equity, representing the Actor, has and is given the authority to act for and in place of the Actor and to assert the Actor's position or make Actor's request or demand as the case may be, with all of the power and authority of the Actor, without liability to itself.

(2) In all cases where, by virtue of any employment contract, the consent or approval of Equity is required, the Association has and reserves full discretionary power in giving its consent to change, modify, or limit rights of any Actor under Actor's contract, said action to be taken on behalf of the Association in writing by either the President or Executive Director or one of the executives or members of the Legal Department especially authorized by either of said officers to act.

(E) **Oral and written interpretations**. Oral or telephone rulings made by Equity are not binding upon the Association or, except with its consent, upon Actors. Written rulings or interpretations of the employment contract or the Agreement and Rules Governing Employment under the Equity/League Production Contract must be either approved or given by the President or Executive Director or one of the executives or members of the Legal Department specifically authorized by either of said officers to act and shall be binding upon the Association only when said persons act within the power delegated to them by the Council.

(F) **Council powers**. Should there be any conflict between any Rules or any basis for more than one interpretation as to the meaning of any of them, the Council of Equity has the right to determine the correct interpretation or resolve the conflict and its decision shall be binding upon Equity and its members.

(G) **Determination of classification**. Equity has the sole right to determine whether an individual is correctly classified as an Actor, Stage Manager, Assistant Stage Manager, or Extra and the Producer agrees that Equity's determination shall be final. For Principal and Chorus classifications, see Rule 16(B)(3), CONTRACT.

## 27. ESTOPPEL

Reasons given by Equity for requiring Actors to do any act, such as withdrawing from a cast, shall not preclude Equity from giving or relying on other or different valid reasons for its action.

## 28. EXCLUSIVE SERVICE OF THE ACTOR

(A) Except as otherwise provided in the contract of employment, the Actor shall not accept any other engagement in the legitimate and/or musical comedy field from the date of beginning of rehearsal and until said contract is lawfully terminated, without the written consent of the Producer. The Actor shall, however, have the right to accept other employment, not conflicting with the fulfillment of Actor's duties under said contract.

(B) If the Actor is a star or featured player in the production covered by said contract, Actor may enter into a written agreement to be annexed to said contract, agreeing not to accept

any other employment and to render Actor's services exclusively to the Producer and not to render services to any other person or corporation, without the written consent of the Producer. The Actor shall recognize that it is Actor's responsibility to perform under Actor's Equity contract in the legitimate theatre. If during the term of Actor's employment under Equity contract, a Principal Actor receiving star or featured billing is also employed in radio or television, Actor shall require as a condition of that employment, where the radio or television program is shown or heard at the same time that the Actor will be appearing in the legitimate production, that any advertisements, written or otherwise, which publicize Actor's appearance on radio or television must expressly mention that Actor is currently appearing in the legitimate production.

**29. EXTRAS**

Producer may employ Extras so long as the Extras comply with the following definition:

(A) **Definition**. The function of an Extra is to provide atmosphere and background only. An Extra may not be identified as a definite character, either singly or within a group and may not be required to change make-up. An Extra may, however, make a single costume change. An Extra may not be rehearsed more than two weeks before the first public performance, may not speak except *in omnes*, may not sing (except with the consent of Equity in relation to a particular play), dance, or understudy and may not tour except with a pre-Broadway tryout of eight weeks or less.

(B) **Auditions**. When a Producer determines to conduct auditions for Extras, such auditions shall be conducted consistent with the provisions of Rule 5(A), Principal Interviews/Auditions, provided, however, that there shall be no required minimum number of audition days, and performers may be screened for general type during the scheduled audition.

(C) **Salary and other conditions of employment**. Rehearsal and Minimum Performance Salary shall be no less than one-half Actor's minimum salary. During a pre-Broadway tryout, Extras shall be paid the applicable out- of-town expenses set forth in Rule 63(C) for each day spent out of town, in addition to their regular salary. Extras shall receive hospitalization and medical coverage as provided in Rule 0.

(1) Rehearsal hours for the first two weeks after the Point of Organization opening may be the same as those for Principal Actors, as provided in Rule 58, REHEARSALS. After said two weeks, Extras shall be paid the rehearsal overtime rate (see Rule 58(D)(3)) per hour for any hour or part thereof of rehearsal.

(2) Extras shall be signed on Standard Form Contracts supplied by Equity, which Standard Forms shall stipulate:

(a) A one week guarantee of salary from the date of opening of the play;

(b) A requirement of one week notice for termination of contracts.

**30. GUARANTEED PERIOD OF EMPLOYMENT**

If Actor's contract specifies a guaranteed period of employment or a notice of termination greater than two weeks, said greater period shall be substituted for two weeks where used in these Rules. However, under Rule 69(A)(2), the notice period under Standard Minimum Contract may not exceed four weeks. The guaranteed performance period for temporary replacements may be one week, provided that the engagement under the temporary contract is for one week of performances exclusive of the rehearsal period. (See also Rule 54, PREVIEWS.)

**31. HEALTH FUND**

(A) For all productions except Tier B, C and D Tours (see Rule 70(B)(2)(b)), the Producer agrees that the contribution rate for League/CBP Producers to the Equity-League Health

Trust Fund, payable per week per Actor, shall be the negotiated rate effective as of September 28, 2015.

The contribution rate is inclusive of a contribution for Supplemental Workers' Compensation Disability benefits administered by the Fund.

(B) This contribution is not refundable in whole or in part. The Health benefits afforded shall be determined by the Trustees of the Fund and shall include, but shall not be limited to, medical and hospital benefits.

(C) Contributions are payable and begin to accrue on the first day of employment hereunder.

(D) The Producer further agrees to be bound by the Agreement and Declaration of Trust establishing the aforesaid Health Trust Fund, including all its rules and regulations and any and all amendments and modifications thereto which may be adopted by its Trustees during the term of this Agreement.

(E) As provided for in Rule 49, PENSION FUND AND 401(k) PLAN, the annual net tax relief surplus in excess of the pension and 401(k) contributions required under that Rule, up to a maximum of $3,325,000 per year, shall be allocated to the Equity-League Health Trust Fund, and shall be designated as current income to the Health Trust Fund to defray actual operating expenses and not for reserves.

**32. HOTEL RESERVATIONS**

(A) The Producer shall be responsible for securing hotel reservations and shall furnish Actor with an up-to-date list of no less than two available hotels for single and double occupancy at different price ranges. The Producer shall request of each hotel that free internet access be provided to the Actors. For stays in a city for four weeks or more, or where a Tiered tour stays in a city for more than four weeks, the Producer shall provide an unofficial third housing option that will include a kitchen, unless another housing option includes a kitchen. Responsibility for hotel accommodations shall include ensuring that, to the extent there are vacancies, hotel accommodations are available for each member of the cast in each hotel regardless of race or ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status or political persuasion or belief. When hotel accommodations are limited, assignments shall be made pursuant to a lottery system, subject to the contractual housing guarantees of any Actor. A lottery will not be necessary where there is no dispute in the company regarding the hotel accommodations. The lottery may consist of all members of the traveling company including, but not limited to, traveling Stagehands, Wardrobe and Musicians.

(1) Two weeks prior to the play date, the advance agent or company manager shall submit such list to the Actor. In addition, a copy of the list provided to the Actor shall be sent to Actors' Equity Association.

(2) Within one week thereafter the Actor shall indicate the Actor's acceptance, or the Actor's preference to arrange for Actor's own accommodations. Unless the Actor notifies the company manager of acceptance of such accommodations, the Producer shall be relieved of further responsibility.

(B) If the Actor has complied with the requirements of (A) above and does not receive accommodations upon arrival, Actor shall not be required to rehearse or perform until such accommodations are forthcoming.

(C) If the Actor refuses to accept accommodations that Actor has requested and obtained through the Producer, Actor shall pay for one night's accommodation.

(D) Due regard shall be given to obtaining such accommodations within a reasonable distance of the theatre and that the same shall be clean and sanitary. When a show is not playing at its own Point of Organization and the theatre is more than one-half mile from the hotel, transportation to the theatre and return after the performance will be furnished at the Producer's expense.

(E) **Security of Actor's Possessions**. See Rule 56, PROPERTY; REIMBURSEMENT TO ACTOR FOR LOSS OR DAMAGE.

(F) **Advance Deposit**. The hotel accommodations list shall state which hotels require advance deposits. When requested, management will forward to Actor, as an advance, any deposit required in advance by lodging accommodations. Management will deduct the advance from the Actor's expense monies reimbursement in the first week of Actor's stay at the lodging. Actor will be obliged to reimburse management for the full amount of the advance even if Actor elects not to stay at the lodging and the lodging refuses reimbursement of the deposit.

## 33. ILLNESS AND SICK LEAVE

(A) **Illness: Standard Minimum Contracts**. Except as provided in (B)(2) below, if the Actor cannot perform on account of illness, injury (other than an injury as specified in Rule 34, INJURY: WORKERS' COMPENSATION INSURANCE), or any other valid reason including leave covered under the New York City Earned Safe and Sick Time Act, then the Actor shall not be entitled to any salary for the time during which said services shall not for such reason or reasons be rendered. Should the foregoing condition continue for a period of 16 performances or more, or for any 24 performances within a period of 48 performances and the Actor has not requested and received Disability Leave under the provisions of paragraph (I) below, the Actor may terminate the contract effective immediately or the Producer may terminate the contract upon one week's notice and in either case, the Producer shall pay for all services to date and transportation back to the Point of Organization or Place of Engagement at the Actor's option.

(B) **Illness: Term Contracts**. Except as provided in (2) below, if the Actor cannot perform on account of illness, injury (other than an injury as specified in Rule 34, INJURY: WORKERS' COMPENSATION INSURANCE), or any other valid reason including leave covered under the New York City Earned Safe and Sick Time Act, then the Actor shall not be entitled to any salary for the time during which said services shall not for such reason or reasons be rendered. If during such illness an Actor other than an Understudy plays the part and the original Actor has not requested and received Disability Leave under the provisions of paragraph (I) below, the original Actor shall give two weeks' notice of the date of Actor's return to the cast together with a doctor's certificate certifying Actor's ability to act on that date.

(1) If the Actor must travel to rejoin the company, the Producer shall furnish transportation.

(2) Should the illness of the Actor continue or should it appear that it should necessarily continue for 10 days or more, Equity, at the request of the Producer, shall have full power to modify or terminate the Actor's contract on such terms as it may consider just if it shall be satisfied that it will be necessary for the Producer to employ a successor under a Standard Term Contract.

(C) Actors earning up to $150 above the Stage Manager's (Musical) applicable minimum salary per week, exclusive of Per Diem and the Media Fee, shall earn one performance of sick leave for every four weeks of employment. There shall be no limitation upon the accumulation of such sick leave for Actors who are eligible. In the event the Actor must use such sick leave, Actor shall suffer no diminution of contractual salary so long as Actor uses the number of performances Actor has accumulated. Sick leave, however, shall not be added to or be consecutive with Actor's vacation without the written consent of the Producer.

(1) Upon the termination of the Actor's employment and provided that the production has been organized for at least three months or was organized as an announced limited engagement providing less than three months employment, the amount of accumulated sick leave, up to 11 performances per year of employment, shall be paid to Actor on the basis of the applicable minimum salary for the Actor's category from the date of first employment. At Actor's option, accumulated sick leave may be paid

in the workweek that includes the last Sunday in June, based upon the prevailing salary at that time.

(2) Actors who earn in excess of $150 above the Stage Manager's (Musical) applicable minimum salary per week, but not more than $3,600, exclusive of Per Diem and the Media Fee, shall be entitled to one performance of sick leave for each four weeks of employment, provided that the payment for such sick leave shall not exceed one-eighth of the Stage Manager's (Musical) applicable minimum salary for each performance lost. These Actors shall not be paid for unused sick leave.

(3) Actors earning in excess of $3,600 per week, but not more than $6,000, exclusive of Per Diem and the Media Fee, shall earn one performance of sick leave for each four weeks of employment, up to a cap of four performances of sick leave per year, provided that the payment for such sick leave shall not exceed one-eighth of the Stage Manager's (Musical) applicable minimum salary for each performance lost. These Actors shall not be paid for unused sick leave.

(4) Actors earning in excess of $6,000, exclusive of Per Diem and the Media Fee, shall not be entitled to sick leave.

(5) If an Actor's salary increases during the course of an Actor's employment so that Actor no longer accrues sick leave, Actor may still utilize any previously accrued sick leave.

(6) After Actor's first six weeks of employment or first paid public performance, whichever is later, Actor shall be entitled to "borrow" up to six performances of sick leave (up to four performances of sick leave for Actors entitled to such leave pursuant to (3) above). This entitlement expires after Actor accrues six performances of sick leave.

(7) In the event an Actor cannot attend a rehearsal or complete a performance on account of illness or injury (other than an injury as specified in Rule 34, INJURY: WORKERS' COMPENSATION INSURANCE), Actor will utilize one-half of one performance of sick leave for each such rehearsal or performance.

  (a) An Actor who is absent as provided above from both a rehearsal and an entire performance on the same day will utilize a maximum of one performance of sick leave for that day.

  (b) An Actor who is absent from a rehearsal and two performances on the same day will utilize two performances of sick leave for that day.

  (c) An Actor who attends more than half of a rehearsal called on a performance day, and is absent from any performance that same day due to illness or injury (other than an illness or injury as specified in Rule 34, INJURY: WORKERS' COMPENSATION INSURANCE) will utilize one-half of one performance of sick leave for the first performance missed on that day and one and one-half performances of sick leave for two performances missed on that day.

  (d) The use of sick leave described in this paragraph (B)(2)(7) will not apply if the Actor's absence has been approved.

  (e) Subject to (B)(2)(6) above, Actors who have no accrued sick leave shall have their salaries reduced by 1/16 of weekly contractual salary for each rehearsal missed or each performance that they fail to complete.

(D) The Producer may require reasonable proof of illness to determine the validity of the Actor's illness as a requisite for sick leave. If the Producer thereafter disallows said sick leave, said decision shall be subject to the grievance and arbitration procedures set forth in Rule 4. If the sick leave claimed is found to be invalid by the Producer subject to grievance procedures and arbitration, the Actor making such claim shall forfeit, in addition to the period in question, up to four future performances of paid sick leave. Any deliberate misrepresentation by an Actor under this rule may subject the Actor to termination.

(E) Any dispute between Equity and the Producer as to whether any of the above sections apply to any given situation may be submitted to grievance and arbitration pursuant to Rule 4.

(F) **Unpaid Absence Only for Compelling Circumstances or Emergency**. Actors shall be entitled to take up to two days of unpaid absence in each year of employment for compelling circumstances or emergency. For purposes of this rule, a compelling circumstance or emergency shall be expressly limited to either a wedding, graduation, family or medical emergency and must involve a member of the Actor's immediate family (spouses and spousal equivalents, domestic partners, parents, children, siblings, in-laws, grandparents and grandchildren). Such absence is subject to the following:

(1) Actor will give one week's written notice when possible;

(2) Producer may limit the number of Actors out at any one time for Unpaid Absence but may not limit it to fewer than one Actor per performance;

(3) Such absence may not be taken during the week between Christmas and New Year's except in extraordinary circumstances;

(4) Such Unpaid Absence may not be used by Actor to accept other work or to attend an audition;

(5) Producer may require Actor to explain the compelling circumstance or emergency;

(6) Any Unpaid Absence for a non-compelling circumstance may be granted at the Producer's sole discretion.

(G) **Bereavement Leave**. Actors shall be entitled to take up to three days of paid leave in each employment year to attend the funeral(s) of a member of Actor's immediate family (spouses and spousal equivalents, domestic partners, parents, legal guardians, children, siblings, in-laws, grandparents and grandchildren). Actors earning a weekly salary in excess of $3,000 shall be paid one-eighth of $3,000 for each performance missed under this rule.

(H) **Personal Days**. Actors shall be entitled to take two unpaid Personal Days in each year of employment for any reason. These Personal Days are subject to the following:

(1) Actor will give one week's written notice when possible;

(2) Producer may limit the number of Actors out at any one time for Personal Days but may not limit it to fewer than one Actor per performance, unless a requested Personal Day of a Principal or either of the Understudies for a role overlaps with the previously approved vacation of a corresponding Understudy or Principal;

(3) These Personal Days may not be taken during the week between Christmas and New Year's except in extraordinary circumstances;

(4) Replacement Actors need not be granted Personal Days until three weeks following the individual Actor's first performance;

(5) Personal Days need not be granted during the rehearsal period prior to the first paid public performance;

(6) The Producer may designate up to ten weeks from the first public performance until three weeks after the official opening during which personal days need not be granted. The ten weeks applicable shall be designated and posted no later than two weeks prior to the first paid public performance;

(7) For all tours, Personal Days need not be granted until after the press opening of the first engagement. In addition, Personal Days need not be granted on the actual press opening nights of the second and third engagements of the tour and on press opening night of any engagement of two weeks or longer;

(8) Personal Days need not be granted during the Tony nomination period for any production with a Tony nomination in any category. The Tony nomination period shall be defined as from date the nominations are announced through the date of the Tony Awards broadcast.

(I) **Disability Leave**. Any Actor who becomes disabled during the course of Actor's employment in the production shall be eligible for Disability Leave in accordance with the following provisions:

(1) An Actor who is unable to work may request an unpaid leave of absence for a period of up to 12 months.

(2) Such request must be supported by an acceptable medical certificate indicating the time necessary for the leave.

(3) Actors are eligible to request only one such leave for any single medical condition within any collective bargaining period. However, if a work-related injury is at issue, Actor shall be eligible for one extension of the leave and/or one additional leave if the Actor returns to work prematurely or the same work-related injury recurs. Producer may, in its discretion, limit total leave(s) for a single work-related injury to a 12 month period, measured from the first day of the first leave.

(4) Producers shall use best efforts to ensure that the duration of the leave relates to the nature of the disability. However, in order to accommodate the needs of the production, the Producer may require that the leave be at least three months in length.

(5) Actors on approved leave must notify the Producer at least one month prior to the expiration of the leave of their intention to return to work as scheduled or to resign.

(6) When a disability leave is requested, Equity will advise the Actor about sick leave benefits, health benefits, medical coverage and, if applicable, the procedures for direct payment.

(7) Prior to an Actor's return from a leave, Actor will be required to establish that Actor is able to meet the artistic and physical requirements of the production. In addition, at Producer's option, Actor may be required to submit to an appropriate examination by Producer's medical representative at Producer's expense. Actor, at Actor's option, may seek a second opinion at Actor's expense.

(8) See Rule 58(C)(1)(c) regarding rehearsal upon return from a leave.

(9) Actor's salary on Actor's return to the production will be the same as when the leave began, plus any increases required by the Production Agreement.

(10) Actors on Term contracts will be eligible to request a leave under this provision only if at least nine weeks remain on their contract on the first day of disability. If the Actor is eligible and elects to take a disability leave, the Actor will complete the remaining term of the contract upon Actor's return to the production.

(11) Temporary replacement Actors may be hired under "Replacement Contracts" for periods up to the full term of the leave. The replacement Actor may be employed for the designated term on a Standard Minimum or Term contract. Under no circumstances will the Producer be required to employ both Actors simultaneously. Such replacements will not be eligible for disability leave under the terms of this provision.

(12) During the term of disability, the Actor shall not be entitled to any salary for the time during which services are not rendered.

(13) If the Actor commences a Disability Leave while required to be away from the Point of Organization, the Producer shall return Actor to the Point of Organization or to Actor's residence, at the Actor's option, and will, after the leave, transport Actor to the next place of engagement.

(J) The parties agree to waive the provisions of the New York City Earned Safe and Sick Time Act.

**34. INJURY: WORKERS' COMPENSATION INSURANCE**

(A) The Producer agrees to obtain and maintain Workers' Compensation Insurance Coverage for all Actors in their employ. Failure to obtain Workers' Compensation Insurance shall make the Producer individually liable to the Actor for payments equivalent to any Workers' Compensation lost. This obligation shall survive the termination of the Actor's contract of employment.

(B) Supplemental Workers' Compensation. The Producer agrees to provide supplemental workers' compensation, in addition to Workers' Compensation Disability benefits, through the Equity-League Health Trust Fund. The Producer's obligation to provide such benefit is met by the contributions made under Rule 31,

(C) HEALTH FUND.

**35. INTIMIDATION**

(A) An Actor shall not be compelled to participate in encounter groups, sensitivity sessions, or classes which Actor deems dangerous to Actor's mental health or an infringement upon Actor's mental or physical privacy.

(B) If an Actor makes claim in writing to Equity within seven days that Actor was intimidated into terminating their contract by being compelled to participate in such encounter group, sensitivity session, or class, Equity shall promptly notify the Producer. If such intimidation is acknowledged or established, the Actor shall be reinstated and shall be made whole for any loss.

(C) Neither the Producer, nor any personnel under the Producer's supervision or control, shall intentionally intimidate, harass or humiliate any Actor at any time, including, but not limited to, all communications to Actors in connection with artistic notes. However, it is understood that there is no intent to interfere with the original Director's or original Choreographer's ability to critique Actors in connection with artistic notes.

**36. JUVENILE ACTORS**

(A) The following special provisions shall apply to all Actors who are both under 19 years of age at the time of signing and who have not completed high school:

(1) Juvenile Actor may not be called to understudy or brush-up rehearsals which would intrude on the Actor's normal school day more than once per calendar week.

(2) Producer shall be responsible for providing services of an accredited or licensed tutor while the company is on tour and during the period of out-of-town tryout or previews at Point of Organization during the Actor's applicable school year until one week following the Official Opening at the Point of Organization. Tutors shall be required to familiarize themselves with the reasonable and customary schooling requirements of the Juvenile Actors by the first day of rehearsal.

(3) During the rehearsal period, prior to Official Opening at Point of Organization or first paid public performance on tour, up to six hours per week of required tutoring must be held during the permitted rehearsal hours. However, when the Juvenile Actors are rehearsing and/or performing on "10 out of 12" hour days, all required tutoring must be held during the permitted rehearsal hours.

(4) If rehearsals for a Juvenile replacement Actor intrude on the Actor's normal school hours for more than 10 school days prior to Actor's first paid public performance or Official Opening, whichever is later, then an accredited or licensed tutor shall be offered.

(5) For Juvenile Actors between 16 and 18 years of age, Producer shall use best efforts to schedule publicity assignments in accordance with Rule 52, PHOTOGRAPHS, PUBLICITY AND PROMOTION, so as not to interfere with Actor's normal school day. For Juvenile Actors under 16 years of age, see (B)(2) below.

(6) **Working Papers**. To the extent working papers may be required by law, a copy of the Juvenile's working papers must be filed with Equity by the Juvenile's first day of rehearsal.

(B) The following special provisions shall apply to Actors under 16 years of age at the time of signing:

(1) Producer shall provide a responsible person to supervise Juvenile Actors during the rehearsal period and, after the first public performance, from half-hour until Juvenile Actor is called for by a responsible parent or guardian after curtain down. Such person shall not be assigned any other duty under jurisdiction of Equity or another theatrical craft Union which conflicts with the supervision of Juvenile Actors.

(2) Juvenile Actors under 16 years of age shall be permitted to accept publicity assignments in accordance with Rule 52, PHOTOGRAPHS, PUBLICITY AND PROMOTION, provided such activities do not interfere with the Actor's normal school day.

(3) A Juvenile Actor may be signed to a Six-Month Term Contract in accordance with Rule 16(H)(1), CONTRACT.

(4) Whenever Juvenile Actor is required to live away from Actor's permanent residence as registered with Equity and further provided the Juvenile Actor is traveling with a parent or legal guardian not regularly employed in the production, Producer, in addition to any other payments required, shall pay Juvenile Actor not less than one-third of minimum Per Diem required by Rule 63(C), or Rule 70(B)(2)(c) for Tiered Tours.

(5) **Dressing Rooms**. If available, separate dressing rooms for male and female Juveniles will be provided and shall be separate from the adult dressing rooms.

(C) Chorus Actors under 10 years of age at the time of signing and Actors under 6 years of age at the time of signing playing minor Principal Roles may alternate at the Point of Organization as follows:

(1) After Official Opening at Point of Organization, each Actor will perform up to four performances per week. Weekly performance salary shall be not less than one-half of minimum salary for actors as set forth in Rule 63(A). In addition, alternating Juveniles shall receive the full amount of all applicable increments.

(2) Prior to Official Opening at Point of Organization, Juvenile Actors shall be paid no less than minimum salary for actors as set forth in Rule 63(A).

(3) After Official Opening at Point of Organization, rehearsal hours shall be limited to four per week. Said rehearsals must be scheduled on the Juvenile's performance days. Actors will not be required to work on any day other than a performance day.

(4) Juvenile Actors may be employed as Understudies under this provision with the same terms and conditions as set forth herein.

(5) Except as modified herein, all rules of the Production Contract are applicable.

(6) This provision shall not apply to National or Tiered tours.

(7) Nothing contained herein shall preclude Actors from alternating at full salary.

## 37. LABOR/MANAGEMENT COMMITTEE

The Parties agree that in order to facilitate an ongoing dialogue and address issues of mutual concern, a Labor/Management Committee consisting of staff and members of Actors' Equity Association, the Broadway League, and Disney Theatrical Productions will convene at least four times per year during the term of the collective bargaining agreement.

## 38. LAWS GOVERNING

(A) All contracts of employment shall be subject to, be construed by and all the rights of the parties thereto shall be determined by the laws of the State of New York, except as otherwise may be provided.

(B) If there are any valid provisions of law applicable to a contract of employment which are in conflict herewith, the provisions of the contract which conflict therewith shall be deemed modified in conformity with the provisions of such applicable laws.

(C) If any provision of this Agreement shall be held invalid or unlawful by any tribunal of competent jurisdiction, the remaining provisions shall not be affected thereby, but shall remain severally valid, binding and in full force and effect.

(D) Rule 43, NON-DISCRIMINATION and/or 32, HOTEL RESERVATIONS, shall be deemed binding and shall remain in full force and effect, notwithstanding any state, local, or municipal ordinance to the contrary.

**39. LAY-OFF**

(A) **Point of Organization and Pre-Point of Organization Productions**.

Producer shall be able to lay off the Company without salary under the terms provided below:

(1) **Point of Organization**. Provided Producer shall have given to the Actor two consecutive weeks of employment prior thereto, and gives to the Actor two consecutive weeks of employment subsequent thereto, the Producer shall have the right to lay off their Company during Holy Week and/or for not more than seven consecutive days during the 14 day period prior to Christmas Day. The Producer agrees to give the Actor four weeks' written notice in the event said lay-offs are to be taken. Should such lay-off take place, the Producer shall not, during said period, be entitled to the services of the Company, except that on the day of reopening there may be a run-through rehearsal provided the Actors are paid one-eighth of contractual salary for this rehearsal up to a ceiling of double Actor's minimum salary. This rehearsal time shall not be deducted from the regular weekly rehearsal allowance after opening. Equity may allow additional rehearsals in case of change in cast or illness of the star or prominent member of the Company.

(2) **Outside Point of Organization**.

(a) Subject to the terms set forth in paragraph (1) above, if the production is outside the Point of Organization, the Producer shall have the right to lay off the Company for not more than seven consecutive days during the 28 day period commencing 14 days prior to Christmas Day, provided the Actors are paid not less than the applicable minimum per diem.

(b) **Other Lay-Off Weeks**. The Producer shall also be permitted to schedule up to four weeks of lay-offs in the course of a year counting from the first paid public performance provided the Actors are paid not less than the applicable minimum per diem and are given written notice at least two weeks in advance of the anticipated lay-off. In addition, health contributions shall be paid and vacation and sick time will continue to accrue.

(3) **Transportation**. When the company is laid off, the Actors shall have the option of receiving a round-trip ticket to the Place of Engagement or Point of Organization and back to the city where the production will re-open or remaining in the city where the lay-off occurs.

(B) **National and Tiered Tours**. On all National and Tiered tours, Producer may schedule a total of 10 lay-off weeks without salary in the course of each year counting from the first paid public performance as provided below. Lay-offs may be scheduled only if Producer reserves the right, in the Actor's original contract, to use lay-offs. No lay-off may be longer than four consecutive weeks.

(1) Producer may schedule a total of six lay-off weeks in which Actors shall not receive Per Diem, and in which Actors shall not accrue sick leave or paid vacation during any such lay-off, provided the following conditions are met:

(a) The Actors are given written notice at least four weeks in advance of the anticipated lay-off;

(b) There shall be not less than four weeks' employment immediately prior to the lay-off and at least two weeks' employment immediately following the lay-off;

(c) The Producer shall have confirmed bookings of not less than 10 consecutive weeks of employment before and/or after said lay-off. In counting the required 10 weeks of employment, weeks of permitted lay-offs shall be disregarded and any weeks of employment occurring between two permitted lay-offs may be counted to satisfy the 10-week requirement for each lay-off;

(d) Transportation is supplied as required by (5) below; and

(e) In the event a lost booking causes a layoff and said layoff would otherwise disqualify a previously scheduled layoff under (B)(1) above, such previously scheduled layoff will qualify under (B)(1) above if documentation of the lost booking is provided to Equity.

(2) The Producer may schedule up to four weeks of lay-offs in the course of a year provided the following conditions are met:

(a) Actors are paid not less than the applicable minimum Per Diem for each week of such lay-off. Producer agrees to advance one-half of the expense monies prior to any layoff period for which it may be due, but in no event less than one week of expense monies;

(b) Actors are given written notice at least two weeks in advance of the anticipated lay-off;

(c) Prior to taking any such lay-off the production must have accrued no less than four weeks of employment for each such lay-off week;

(d) In the calendar year in which any such lay-off is used, the production must provide no less than two weeks of employment for each such lay-off week;

(e) Health contributions are made during any such lay-off; and

(f) Vacation and sick time will continue to accrue during any such lay-off.

(3) In no event may the number of lay-off weeks in any given year exceed 10 weeks.

(4) If a Producer does not provide at least two weeks of employment following a lay-off prior to the close of the production, Producer shall pay two weeks' contractual salary in lieu thereof to each Actor, except in circumstances where two weeks of employment could not be provided following a layoff of two weeks or less, in which case only one week of post-layoff employment shall be required.

(5) In the event of a lay-off, Producer shall return Actor to Point of Organization or to the Actor's Place of Engagement, at the Actor's option, and will thereafter transport Actor to the next engagement, provided, however, that an Actor may choose to travel independently. An Actor choosing to travel independently must so notify the Producer within 48 hours of Producer's notice of the pending lay-off. In lieu of transportation, the Actor choosing to travel independently will receive payment equal to the Producer's actual cost of travel, if any, to and from Point of Organization.

(6) On the day of return to Point of Organization or Place of Engagement, the Producer will pay Actor Per Diem as follows:

(a) If Actor arrives at the destination terminal at or before 2:00 p.m. (local time), Actor will receive 10% of daily Per Diem;

(b) If Actor arrives after 2:00 p.m., Actor will receive 50% of daily Per Diem.

(7) On the day of reopening following any lay-off of two weeks or more, the Producer may call a run-through or dress rehearsal. This rehearsal shall be without additional compensation but shall be charged against the regular weekly rehearsal allowance.

(8) Rule 39(A) will apply to a Tiered tour or National tour playing at its own Point of Organization for six months or longer during such engagement.

(C) **Illness or death of star**. If after the production has opened, the star shall die or shall be ill and a lay-off shall be taken as a result thereof, the following rules shall govern.

(1) If the lay-off shall be followed by at least one week of employment:

(a) For the first week of the lay-off, or any part thereof, if the cast is at Point of Organization or is returned to Point of Organization and no rehearsals are held, the Actor's salary may be reduced to one-eighth of minimum for the first day lost and thereafter a per diem payment of one-seventh of the amount deemed to be the out-of-town living expenses set forth in Rule 63(C) or Rule 70(B)(2)(c). Rehearsals may, however, be called, in which event the Actor shall receive minimum salary for said day of rehearsal and the balance of the week.

(b) For the second and third weeks of such lay-off, or any part thereof, the applicable minimum weekly salary plus out-of-town expenses shall be paid to each Actor whether or not the Actor is called to rehearsals. Thereafter, full salary shall be paid up to the time of resuming production.

(c) If the cast remains out of town during the first week of the lay-off, the applicable minimum salary plus out-of-town expenses shall be paid whether rehearsals are held or not.

(d) In the event that the Producer has secured insurance upon the star or featured player whose illness has prevented the continuation of performances and the Producer becomes entitled to and is paid insurance benefits pursuant thereto, the Producer agrees to assign 40% of any recovery to Equity to the extent necessary for the payment to the Actors of full contractual salary during any weeks for which such benefits may be paid. Any such recovery and payment to Equity shall fulfill all the Producer's obligations to the Actors resulting from such lay-off. It is understood that this paragraph does not require the Producer to secure such insurance.

Producer agrees to send to Equity a copy of the notice of claim filed with the insurer and, in advance of accepting an offer to settle, to advise in writing of any proposed settlement and then to consult with the Executive Director of Actors' Equity Association. This consultation shall not deprive Equity of its right to employ grievance and arbitration as set forth in Rule 4.

(2) If the lay-off shall not be followed immediately by at least one week's employment, each Actor shall receive (except as provided in (3) below) at least one week's contractual salary upon closing in addition to any payments received in accordance with (1) above.

(3) Should the Producer, within 48 hours after the beginning of any lay-off of a company caused by such illness, furnish to Equity a certificate of a physician approved by the Producer and Equity that such illness will prevent the star or Actor playing a starring role from playing for three weeks, or should the Producer notify Equity that said star or Actor playing a starring role has died, the Producer may close the company forthwith without notice, provided that previously two weeks' contractual salary and all other sums due shall have been paid to the Actor.

(4) **Transportation**. When the company is laid off, the Actors shall have the option of receiving a round-trip ticket to the Place of Engagement or Point of Organization and back to the city where the production will re-open or remaining in the city where the lay-off occurs.

(5) In all cases under this Rule, the Actor's guaranteed period of employment must be fulfilled or salary paid in lieu thereof.

## 40. MEDIA PROMOTION AND PUBLICITY AND OTHER RECORDING AND BROADCAST PROVISIONS

For purpose of this rule, the term “Recording” shall refer to any taping, filming, digital recording or any other electronic or mechanical reproduction, in whole or in part, of any production (including any element of the production over which the Producer has the right to, or reasonably should have the right to, withhold consent to the use of said element) in which Actors are employed under the terms and conditions of this Agreement.

Televising, broadcasting, and visual or sound Recording may only be done under the following terms and conditions, which shall remain in effect from the beginning of employment until 19 weeks after the production has closed and shall apply to any production licensed, leased or authorized by the Producer, but shall not apply to motion picture filming for theatrical release.

Requests to Record beyond the following provisions must be submitted in writing to Equity at least 30 days in advance unless special circumstances do not permit such notice. Such requests will not be unreasonably declined.

If a dispute between Equity and the Producer arises under this Rule, it shall be subject to the Grievance and Expeditious Arbitration procedures set forth in Rule 4.

(A) **Promotion and Publicity**.

The Producer's goal in any and all promotion and publicity, including use of captured material, is to portray the show, including the Actors, the creative team and production elements in the most favorable light. The Producer will provide footage and permit its use consistent with that intent.

(1) **Capture**. The Producer (or a third-party hired directly by the Producer) may Record material from the production for the purposes of promotion and publicity and as described in (2) Uses. Outside news and media/entertainment companies may record material from the production that promotes and publicizes the production as described in (2) Uses.

(a) **Rehearsals**.

(i) Prior to and including the Official Opening at Point of Organization, or on Tour: the Official Opening of the first engagement or first paid public performance, whichever is later, the Producer may Record rehearsals at the average of one half-day per week, including all weeks of rehearsal and previews, but in no event more than three days in any one week. For example, a six week rehearsal period with an additional rehearsal/preview period of two weeks permits the capture of four days of rehearsal, three of which could be used in one week.

(ii) After the Official Opening at Point of Organization or on Tour: the Official Opening of the first engagement or first paid public performance, whichever is later, the Producer may Record up to three full days, or six half-days per year. The applicable date shall serve as the anniversary date for additional Recordings.

(iii) Shows that opened prior to August 4, 2008 may use additional half-days of rehearsal Recording based upon the length of their initial rehearsal period.

A half-day shall constitute up to four contiguous hours. If less than four hours of a call are captured, it shall count as one half-day.

(b) **Performances**.

(i) An unlimited number of performances, promotional and publicity events may be Recorded.

(ii) A performance may be Recorded in its entirety.

(c) **Non-performance footage**.

(i) Non-performance activities (such as interviews or backstage interaction) in which an Actor is not performing, whether onstage or in rehearsal, may be Recorded on a voluntary basis.

(ii) Costume fittings, costume changes and warm-ups may also be Recorded on a voluntary basis, but shall require a signed consent form at the time of Recording.

(d) All Recording requires 24-hours' notice to the cast and Equity.

(2) **Uses**. Recordings done under Section (A)(1) above are for promotional and publicity purposes only. They may not be used for purposes of discipline. They may not be used for teaching nor as a replacement for rehearsal. However, these recordings may be viewed by Producer and creative teams (including Stage Managers and Dance Captains) in perpetuity for use for any Equity production of the Play produced by that original Producer. In no case may they be used to assist in staging a non-Equity production.

(a) Promotional and publicity recordings may be used in news, current affairs, documentary, informational and entertainment programs, talk shows (including captured material without interview), opening night specials and promoting the Tony Awards. In order to be considered a use for promotion or publicity, the featured production must be currently running, or announced to run, under an Equity-League contract at the time of anticipated initial broadcast. The Producer shall request mention of same in the program.

The above may be delivered through the following platforms and any substantially similar delivery platforms currently available and as they evolve: broadcast and cable television, websites, (including third-party hosting sites and pages on which tickets are sold), podcasts, wallpaper, video e-blasts, presenter displays to promote tours, mobile marketing, movie trailers, "bonus material" on DVDs, video billboards, in-flight videos, in-house hotel videos, educational videos, tour bus videos, sales kiosk videos, in-store videos, lobby loops, group sales videos, corporate videos, and press reels.

(b) For broadcast and cable television (including documentaries for broadcast and cable television) up to 15 minutes of captured footage of rehearsals and performances may be used per program at any one time and Producer can change this footage as often as desired, as long as no single episode contains more than 15 minutes of this captured footage. There is no restriction on the use of other captured material (e.g., non-performance activities and interviews) on broadcast and cable television.

For all other delivery platforms (e.g., websites, mobile phones, non-broadcast uses and other outlets) up to 15 minutes of captured footage of dress rehearsals and performances may be used at any one time (individual website defined as entire site, not page) and Producer can change footage as often as desired as long as no single distribution point contains more than 15 minutes of this captured footage. Other than dress rehearsal and performances, there is no restriction on the use of captured material in any of these platforms.

An entire number or scene may be used for promotional and publicity purposes delivered through the above platforms.

(c) All productions will be identified by cast and date (e.g. "Original Broadway Cast 2010") at the end of any broadcast or exhibition of a documentary or Opening Night Special created hereunder.

(d) The original Producer may use footage in perpetuity for any Equity production of the Play produced by that Producer. If the original Producer licenses the Play for production under an Equity-League agreement by another Producer, that Producer may license the material for promotional and publicity purposes provided that an additional payment to each Actor is negotiated with Equity.

(e) Material may not be used to promote a non-Equity production. Captured material used on presenter websites that promote an entire season and also feature material promoting the non-Equity productions shall indicate which productions employ Actors and Stage Managers represented by Equity.

(f) Equity, the League, and non-profit entities that promote the theatrical industry (e.g., American Theatre Wing, Theatre Development Fund, NYC & Co. and similar travel and tourism bureaus) may obtain and use footage from any production (including closed productions) for purposes of promoting and branding Equity, the League, and the industry. Disney may use footage from its own productions to celebrate its theatrical heritage.

(g) If captured material is used to promote a different production, the material will identify the production from which it was captured (e.g. "Original Broadway Cast.").

(h) Recordings captured under prior Agreements may be used in accordance with the provisions of this Agreement and prior specific agreements that permitted additional use are not limited by this Agreement.

(3) **Payment**.

(a) A weekly "Media Payment" shall be made to Actors as compensation for the capture and use detailed above. This shall be required in all musical productions. Dramatic productions may opt-in to Rule 40 at any time. If a dramatic production opts in to use the media terms of this Rule, all Actors in the production shall be paid the Media Payment from the first day of Actor's rehearsal. Dramatic productions that do not elect to utilize the provisions of this Rule will be governed by the media provisions as set forth in the Addendum to this Agreement and will not be required to make the payments set forth herein. This payment is in addition to contractual salary and shall be paid for Actor's entire employment period whether or not the Actor appears in any captured material. The payment is subject to pension and dues. This media fee can be incorporated into overscale for Actors earning in excess of $4000 per week.

(i) Actors working under the terms of the standard Production Contract shall receive 2% of the minimum Actor salary as set forth in Rule 63(A). Effective October 16, 2019, Actors working under the terms of the standard Production Contract shall receive 2.5% of the minimum Actor salary as set forth in Rule 63(A).

(ii) Actors working under the terms of the Production Contract Tiered tours shall receive 2% of the Tier's applicable minimum Actor salary. Effective October 16, 2019, Actors working under the terms of the Production Contract Tiered tours shall receive 2.5% of the Tier's applicable minimum Actor salary.

(b) The Producer may request an Actor to perform new material for webisodes and mobisodes and shall pay Actors rehearsal overtime rates for such performance. All other material from performances, rehearsals, and interviews shall be for promotional use above.

(c) Music videos and infomercials shall be made under the appropriate SAG-AFTRA contract, except no payment shall be required for use of Recordings for the purpose of promotion and publicity.

(d) Performances on reality programs shall be done under the appropriate SAG-AFTRA contract if that program is covered by a collective bargaining agreement. No payment shall be required for promotional use of captured material from a production currently running under an Equity-League contract. See Rule 40(A)(2)(a).

(e) Recording may take place for the purpose of promotion and publicity without additional compensation during a scheduled rehearsal, dress rehearsal or performance. It is understood and agreed, however, that enhanced lighting and multiple takes may occur during such rehearsal, dress rehearsal or performance provided that in the event an excessive number of takes transform the rehearsal into a "session," then the applicable SAG-AFTRA session fee shall be due every Actor at the call. Further, in the event that particular Actors are requested to come

in early or stay later for retakes or special shots, or if work additional to Actor's normal duties in rehearsing or performing for the stage production is required of the Actor to accommodate the Recording, the Actor will be paid the appropriate Equity hourly rehearsal overtime rates for such additional work plus any fees which may be required by SAG-AFTRA.

(f) A Producer who receives revenue in exchange for allowing captured material to be used shall negotiate with Equity appropriate compensation for Actors.

(g) Live television promotional or publicity performances, e.g. the Tony Awards ceremony, Thanksgiving Day Parade, Today Show, etc. shall continue to be done under the appropriate SAG-AFTRA contract.

(B) **Cast Albums**. Cast albums may be made under the provisions of the Original Cast Album Rider. The Producer agrees that any Actor who sings or verbalizes in the production in any number, plus the Stage Manager, shall be employed on the appropriate SAG-AFTRA Contract for the Recording of said album and shall receive not less than one week's contractual salary for up to eight hours so employed, which may be scheduled by the Producer over no more than four days. Such cast album shall accord credit to each Actor appearing in the production at the time the Recording is made, whether or not the Actor performs on the Recording. In addition:

(1) If an Actor works more than eight hours, the Actor shall be paid an additional one-eighth of contractual salary up to a cap of 250% of Production Contract minimum for each hour or part thereof.

(2) Terms for Actor participation in the Producer's 15% of monies derived by the Producer are identified in the Original Cast Album Rider.

(3) Producer shall give Equity not less than 72-hours' notice (inclusive of at least two business days) prior to such Recording.

(4) If, during the Recording of a cast album, one or more singers who are not members of the Equity cast are engaged, then Swing singers and Understudies assigned to singing parts who are not engaged to Record the cast album shall share equally in an amount equal to the average contractual salary of said Swings and Understudies multiplied by the number of employment days of such supplementary singers.

(5) For cast album Recordings only, there shall be not less than a 10-hour rest period between an evening performance and a morning Recording call. There shall be a break of one and one-half hours (one hour if a meal is provided) between the Recording session and rehearsals or performances scheduled under the Equity Agreement. Recording sessions may not be scheduled on two-performance days. Application of this rule may not reduce breaks or rest periods required by the SAG-AFTRA Contract.

(6) Without additional payment, cast album recordings may be used for promotional and publicity purposes and for underscoring of television or radio commercials of the production.

(7) If: (a) songs are recorded by Actors before the creation of a cast album; (b) said Actors are paid for those prior recordings under another applicable agreement; and (c) those songs are included on the cast album without further recording work by said Actors, then a credit equal to the amount of the payments in (b) shall be applied against any payments due to those Actors for the Cast Album recording under Rule 40(B)40(B). Actors shall also be credited for any hours spent making such recordings against the eight hours set forth in 40(B)(1).

(C) Audio-visual release of the entire production in any medium shall be permitted, provided:

(1) Each Actor (including Swings, Understudies, Dance Captains and Stage Managers) called for the Recording shall be paid pursuant to the terms of the appropriate SAG-AFTRA contract. In no case will Actors be paid less than the rates customarily applied to such releases under a SAG-AFTRA contract, including any residuals due for

exploitation in supplemental markets. The work rules under the SAG-AFTRA contract applicable to a comparable release must also be met, as well as the required benefit contributions (made to Equity Funds if no other Funds are applicable) and procedures necessary to administer payments. In addition to the payments above, each Actor who is called, and any Actors replaced for the Recording, shall receive a payment of no less than one hundred fifty percent (150%) of applicable Production Contract minimum salary as stated in Rule 63(A), SALARIES. Contributions for Equity Pension and 401(k) shall be paid on these monies and Equity Dues shall be deducted on behalf of the Actors.

(2) Stage Managers employed for the Recording will receive the same terms and conditions as the Actors. Stage Managers shall be paid the equivalent of the On-Camera Principal Performer rate for each day of Recording. Contributions for Equity Pension and 401(k) shall be paid on Stage Managers' salaries in lieu of SAG-AFTRA benefits.

(D) **Commercials: Television and Radio Spot**.

(1) **Television Commercials**. If an Actor is called to make a television commercial of three minutes or less duration, the Actor shall sign the applicable SAG-AFTRA Contract and the following terms and conditions shall apply:

(a) **Session Fees**. Session Fees shall be payable as set forth below:

(i) **Special Call**. Each Actor, Stage Manager and Dance Captain who is called when the commercial is Recorded shall be paid not less than the then-current session fee for an on-camera principal performer, whether or not the Actor is seen or heard in the commercial. If a Stage Manager or Dance Captain is not called for the session, but is required to render services in connection with the production of the commercial, the Producer shall pay not less than the applicable session fee for an on-camera Principal performer.

(ii) **Performance and/or Captured Material**. If a commercial is Recorded at a performance and/or made from captured footage, each Actor, Stage Manager and Dance Captain who was called when the footage was taken shall be paid the applicable session fee for an on-camera Principal performer, whether or not the Actor is seen or heard in the commercial.

(iii) **Hiatus Between Use Cycles**. If there is a hiatus between use cycles, a session fee shall be paid, in accordance with this paragraph (D)(1)(a), in addition to the use fee when a new use cycle commences after the hiatus.

(b) **Use Fees**. In addition to the session fee set forth above, each Actor seen or heard in the commercial, and each Stage Manager and Dance Captain who performed their function during the Recording shall be paid in accordance with the following:

(i) **One Year Use Fee**. A use fee of not less than the applicable New York Wild Spot on-camera Principal rate, which shall constitute payment in full for up to fifty-two (52) weeks of use of the commercial on broadcast television, cable and the Internet; or,

(ii) **Six-Month Use Fee**. A use fee of $797 which shall constitute payment in full for up to twenty-six (26) weeks of use, of the commercial on broadcast television, cable and the Internet. (Note: This use fee shall increase by the same percentage, and at the same time, that the use payment in (b)(i) above increases.)

(iii) **Re-Use Fees**. The applicable use fee as set forth above in (b)(i) or (b)(ii) shall apply for re-use. If there is a hiatus after a use cycle, a session fee shall also be paid in accordance with paragraph (a)(iii) above.

(c) **Still Photographs**. If a television or other commercial is made from still photographs of persons in the cast, each Actor contained within the photograph,

whether recognizable or not, shall be signed to the applicable SAG-AFTRA contract and the terms of this agreement shall apply.

(2) **Radio Commercials**. If an Actor is called to make a radio commercial of three minutes or less duration, the Actor shall sign the applicable SAG-AFTRA Contract and the following terms and conditions shall apply:

(a) **Session Fees**. Session Fees shall be payable as set forth below:

(i) **Special Call**. Each Actor, Stage Manager and Dance Captain who is called when the commercial is Recorded shall be paid not less than the SAG-AFTRA Principal session fee, whether or not the Actor is heard in the commercial. If a Stage Manager or Dance Captain is not called for the session, but is required to render services in connection with the production of the commercial, the Producer shall pay not less than the session fee due to the Actor.

(ii) **Performance and/or Captured Material**. If a commercial is Recorded at a performance and/or made from captured material, each Actor, Stage Manager, and Dance Captain who was called when the material was captured shall be paid the applicable session fee, whether or not the Actor is heard in the commercial.

(iii) **Hiatus Between Use Cycles**. If there is a hiatus between use cycles, a session fee shall be paid, in accordance with this paragraph (D)(2)(a), in addition to the use fee when a new use cycle commences after the hiatus.

(b) **Use Fees**. In addition to the session fee set forth above, each Actor heard in the commercial and each Stage Manager and Dance Captain who performed their function during the Recording shall be paid in accordance with the following:

(i) **One Year Use Fee**. A use fee of not less than the applicable New York Wild Spot Principal rate, which shall constitute payment in full for up to fifty-two (52) weeks of use of the commercial on radio and the Internet; or,

(ii) **Six-Month Use Fee**. A use fee of $284 which shall constitute payment in full for up to twenty-six (26) weeks of use, of the commercial on radio and the Internet. (Note: This use fee shall increase by the same percentage, and at the same time, that the use payment in (2)(b)(i) above increases.)

(iii) **Re-Use Fees**. The applicable use fee as set forth above in (2)(b)(i) or (2)(b)(ii) shall apply for re-use. If there is a hiatus after a use cycle, a session fee shall also be paid in accordance with paragraph (2)(a)(iii) above.

(3) **Provisions applicable to Television and Radio Commercials**.

(a) **Holding Fees**. There will be no holding fees.

(b) **Actors Employed Outside of the Production**. Actors who are not in the production and are hired to render services which are in SAG-AFTRA jurisdiction (e.g. voiceovers, testimonials and additional singers) will be engaged in accordance with the SAG-AFTRA commercials contract.

(c) **Multi-Show Commercial**. Commercial footage and/or voice tracks from different shows produced under this Agreement, or any 4A's Agreement, may be combined into a single "multi-show" commercial for purposes of promoting a season or series of shows. Actors seen or heard in the spot shall be paid in accordance with the terms set forth below:

(i) If the source commercial is already in cycle for which the Actors are being paid, no additional compensation shall be due; or,

(ii) If the source material is not in cycle, Actors shall be paid in accordance with the terms set forth herein.

(d) **Standard SAG-AFTRA Terms Option**. In lieu of the terms set forth herein, the Producer may elect to use standard terms of the applicable SAG-AFTRA agreement.

(e) **Other Promotional Uses**. Producer may, without payment of additional compensation, use a commercial in cycle for:

(i) video billboards;

(ii) taxi videos;

(iii) elevators;

(iv) movie trailers;

(v) group sales video presentations;

(vi) in-flight videos;

(vii) in-house hotel videos;

(viii) tour bus videos;

(ix) lobby loops, kiosks, in-store videos and other such similar uses under (A)(2)(a) above.

(f) **Stars**. When using an existing commercial to incorporate new stars, payment shall be due to Actors in the new star commercial only if they have not been paid for the existing commercial.

(g) **Notice**. There must be at least 24-hours' notice to the Actors and Equity prior to any Recording for a commercial. Where practicable, Producer shall give advance notice of use of a commercial created from captured material.

(h) The Producer shall be permitted to make any number of commercials from captured material using the same Actors. In such event, no additional session or use fee shall be due except as indicated here. If the Producer uses an Actor in one commercial in a lesser payment category and then uses the Actor in a subsequent commercial in a higher category, Producer will pay to the Actor the difference in the session fee as well as the adjustment in the use fee as may be required under the Equity or the SAG-AFTRA Agreements.

(i) All other terms of the SAG-AFTRA commercial agreement and Rule 40, in the Equity/League Agreement not otherwise identified or modified herein shall remain in full force and effect.

(E) **Documentary**.

(1) In addition to providing captured material as provided herein, Producer may permit outside news and media/entertainment companies to capture material to make a television documentary, including unlimited exhibition throughout the world on all television and for the period defined in the SAG-AFTRA Agreement. This permission is conditioned on payment of not less than the applicable SAG-AFTRA rates and provided no more than 21 minutes of combined rehearsal/performance footage is used.

(a) "Performance footage" and/or rehearsal shall mean footage acquired from captured material, documentaries (produced after October 1, 1996 provided Actor has given consent to such use) or news footage with no individual clip exceeding three minutes in duration.

(b) "Non-performance footage" involving Actors in non-performance activities (such as interviews, costume fittings and other elements where the performer is not performing whether in rehearsal or on stage) shall not be included in the calculation of running time (the aforementioned 21 minutes).

(c) If work additional to the Actors' (including Stage Managers) normal duties during rehearsal or performance for the stage production is required to accommodate the Recording, the Actor will be paid the appropriate Equity hourly rehearsal overtime rates for such additional work plus any fees which may be required by SAG-AFTRA.

(d) Producer must obtain Equity's consent to allow Recording of more than a total of three days of rehearsal and/or performance. Equity agrees that it shall not unreasonably withhold its consent to such additional shooting.

(2) **Clip Use in Other Documentaries**. Clips of performers from one or more productions in a different documentary may be used with an aggregate limit of an average of three minutes "performance and/or rehearsal" clips per half-hour provided that the Actors seen are paid no less than the applicable SAG-AFTRA rate in accordance with the formulas identified above.

All Actors (including Stage Managers) shall receive billing at the end of any broadcast of the documentary created hereunder.

(F) **Session Fees**. Whenever session fees are applicable, Producer shall be required to pay a session fee to any Actor who is called to be present at the theater or rehearsal space when Recording is taking place. Stage Managers shall be paid the on-camera Principal rate.

(G) **Payment for Live Television Promotional Appearances**. Whenever an Actor appears in costume on a news, talk or entertainment show, said Actor shall be paid not less than the applicable SAG-AFTRA rate. If the Stage Manager is requested to attend the television appearance, they will be paid not less than the actors.

(H) **Use of Footage After Expiration Date of Contract**. Any footage produced under Rule 40 shall continue to be governed by the terms of this Agreement without regard to the expiration of this Agreement and without regard to the amendment of this Agreement except to the extent that such amendment shall so provide.

(I) **Reference Recordings**. Notwithstanding any Rule in this Agreement to the contrary, Producer may make Reference Recordings during rehearsal and performance under the following conditions:

(1) The cast shall be given at least 24 hours advance notice of the capture of Reference Recordings.

(2) Actors' time spent in such Recordings shall be considered as regular rehearsal or performance time. No additional compensation will be paid to the Actors except when overtime is payable for rehearsal under provisions set forth in this Agreement.

(3) These recordings may be used solely for the purpose of reviewing design elements, staging, lighting, technical, or choreographic elements. Reference Recordings shall not be used for promotional, publicity, commercial, or disciplinary purposes and shall be held strictly as a record by the Producer and may be viewed by the Producer, designers, director and/or choreographers or their expressly authorized employees.

(4) Producer may make the Reference Recordings available to Actors.

(J) **Opening Night Specials**. Opening Night Specials shall be subject to the following terms:

(1) Opening night specials may be either a one or two-hour documentary-style news program, which will combine Recorded portions with live coverage about the creation and opening night of the production;

(2) To include excerpts from the show, the television production may Record portions during regularly scheduled performances and rehearsals, the number to be mutually determined between the needs of the television production and the Producer and director so as not to intrude upon the creative process. In no event shall the television crew Record more than five rehearsals and/or two performances. Up to 45 minutes of each such rehearsal and 30 minutes of each such performance may be Recorded upon 24-hours' notice to the cast before each call;

(3) The Producer may include the terms of such Recording by rider to the Actor's contract, including an honorarium of not less than $350 for a two-hour program, and $200 for a one-hour program to be paid to all Actors employed by the production. If any employee

of the Producer or Theatre Owner is paid a higher honorarium for this event, the Actors shall be paid the higher amount;

(4) Up to a total of 45 minutes of rehearsal and performance footage may be included in the final edited two-hour program. Up to a total of 20 minutes of rehearsal and performance footage may be included in the final edited one-hour program. It is understood that an entire self-contained number or scene may not be broadcast. All Recorded footage shall be used exclusively for the opening night telecast and promotional spots for the telecast. In addition to the permitted minutes of footage, a portion of the curtain call may be broadcast; and,

(5) Producer will ensure that every Actor employed by the production will receive a screen credit on the Opening Night Special program.

(K) **Benefits**. Contributions on behalf of the Actors shall be made pursuant to the applicable SAG-AFTRA Agreement except for Stage Managers whose benefits shall be paid in accordance with Rule 49, PENSION FUND AND 401(k) PLAN.

(L) **Notice to Broadcast Media and Press Agents**. Press Representatives will send to all broadcast media in the major cities and to all ATPAM press agents a letter outlining the provisions of the contract which govern the use and/or reuse of any Recording of productions under this Agreement. This letter will be sent to the broadcast media in these cities and to the ATPAM press agents every year. The League further agrees to advise by letter any other broadcast media who request permission to do such Recording or to use existing Recordings of those contract provisions. Failure to comply with those provisions may subject the Producer to penalties as outlined above. The League will copy Equity on all pro forma letters, indicating the parties contacted, pursuant to this Agreement.

## 41. MILITARY SERVICE; OF THE ACTOR

If the Actor is called to report for Military Service, the Actor may cancel Actor's contract by giving the Producer as much notice as the circumstances will permit and the Producer agrees to pay the Actor's transportation to the Point of Organization of the Company or to the Actor's Place of Engagement if it was outside the Point of Organization and the Actor shall not be obligated for the payment of the fare of Actor's successor.

## 42. NO LOCKOUTS OR STRIKES

(A) Notwithstanding any other provisions contained in this Agreement to the contrary, no Actor shall be subject to discharge, discipline, or replacement by the Producer: (1) for refusal to cross a picket line or enter upon the picketed premises if employees of the Producer other than those covered by this Agreement are on strike or are picketing the Producer; or (2) for refusal to cross a picket line or enter upon the premises of an employer other than the Producer if the employees of such employer are engaged in a strike ratified by a representative of such employees, which such employer is required by law to recognize. Provided, however, that in either instance, such strike or picketing must enjoy the sanction of and be ratified by the relevant parent national or international union and provided further that the Council of Equity endorses and supports the strike or picketing and directs its members to honor such picket line or strike and further provided that the strike or picketing is not in violation of law.

(B) The Producers shall not lock out any of the Actors and neither the Actors nor Equity will call, sanction, or participate in a strike during the period of the Agreement between Equity and the League except as provided above. In no event shall any Actor be required to perform, or to enter the theatre for such purpose, if such performance or entrance would endanger the Actor's safety.

(C) Should a strike by the Actors occur during the period of the Agreement, Equity will be deemed not to have violated the terms of this Rule if Equity refrains from assisting, encouraging, or condoning and in good faith takes every reasonable means to terminate

the strike at once and in addition thereto, promptly declares publicly that the strike is unauthorized and directs the Actors to cease such conduct.

(D) The provisions of this Rule shall not be deemed to effect the express rights of Equity or the Actor under Rule 10, BREACHES BY PRODUCER; Rule 20, DEFAULTING PRODUCERS; Rule 41, MILITARY SERVICE; OF THE ACTOR; or Rule 55, PRODUCTION PROSECUTED.

**43. NON-DISCRIMINATION (See also Rule 23, DIVERSE AND INCLUSIVE CASTING)**

(A) The parties hereto affirm their commitment to the policy that employment hereunder shall be without discrimination on the basis of race or ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status, or political persuasion or belief. Consistent with the foregoing and with the procedure set forth in Rule 5(E)(4), it is the intention of the parties that the casting of productions will be conducted in a manner which provides equal and fair consideration to all Actors including, but not limited to the aforementioned Actors.

Quarterly meetings will be held between representatives of Equity and the League to assure that this fair employment policy is being observed and to monitor its implementation.

This provision is also applicable to applicants for employment.

(B) **Definitions**.

(1) Sexual harassment constitutes unlawful discrimination in violation of Rule 43. Sexual harassment includes, but is not limited to, sexual or physical assault, unwelcome physical contact of a sexual nature, repeated unwelcome sexual advances or overtures, promises in exchange for sexual favors, sexual jokes, the unwanted sharing of pornographic or sexualized pictures, and other verbal, written, or physical harassment of a sexual nature which are offensive, unwanted or objectionable to the recipient.

(2) Bullying constitutes conduct in violation of Rule 43. Bullying includes, but is not limited to, repeated, verbal or physical conduct that denigrates or shows hostility or aversion towards an individual. Examples of bullying include, but are not limited to, repeated infliction of verbal abuse, threatening, intimidating or hostile acts, verbal or non-verbal conduct that a reasonable person would find threatening, intimidating or humiliating by one or more persons against another or others, at the workplace, in work-related activities and/or in the course of employment.

(C) **Prohibited Conduct.**

Discriminatory conduct, harassment and bullying are strictly prohibited whether committed by supervisory or non-supervisory personnel, management, employees, or third parties.

(D) **Training and Education.**

All employers covered by this agreement re-affirm their commitment to provide mandatory anti-sexual harassment training to their respective employees and to create and maintain anti-harassment policies. Such training and policies provided shall be designed so as to satisfy the obligations imposed by New York City and/or New York State law.

(E) **Non-Retaliation.**

Retaliation against an employee for reporting alleged prohibited conduct in good faith, or for participating in an investigation of such conduct, is strictly prohibited.

(F) **Claims**. Any claimed violation of this policy shall promptly be submitted for settlement to the Grievance Committee, pursuant to Rule 4, ARBITRATION AND GRIEVANCE.

(1) The Actor or applicant shall submit to Equity any claimed violation of these provisions within 28 days of the time when the claim arose or when the Actor became aware of the alleged discrimination, whichever is later. Equity shall send written notice of the claim to the League and the Producer, in accordance with Rule 4(A)(2) within five business days thereafter. Any claim for which timely notice is not given shall be barred unless unusual circumstances can be shown for such delay. The Grievance Committee shall meet to consider the claim immediately thereafter.

(2) If the dispute is not decided by the Grievance Committee, the claim may then be submitted directly to arbitration in accordance with Rule 4. The Arbitrator may provide such remedies as in their discretion shall be deemed appropriate.

(G) Notwithstanding Rule 42, NO LOCKOUTS OR STRIKES, the cast shall not be required to perform in any theatre, public or private institution, or other place of performance, where discrimination is permitted or practiced because race or ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status or political persuasion or belief. As between Equity and the Actor or cast, Equity shall determine whether discrimination exists at the place of performance.

(H) In order to insure equal employment opportunities for all Actors, the Producer shall hold Principal and Chorus Interviews and Auditions pursuant to Rule 5.

(I) The parties hereto agree to continue their joint efforts toward and reaffirm their commitment to the policy of non-discrimination and to an ongoing policy of furthering the principles of equal employment opportunity. It is the desire of the parties that employment opportunities for Actors with disabilities, ethnic minorities, seniors and women be improved and that the stage reflect a multi-cultural society. In furtherance of this policy, with due regard for the requirements of and suitability for a job and with the understanding that there can be no interference with the contractual rights or artistic discretion of the Playwright, Director, or Choreographer, the Producer shall endeavor to engage Actors of all/any race and ethnicities (including but not limited to American Indian or Alaska Native, Black, African-American, Asian or Asian-American, Pacific Islander, Hispanic/Latino/a/x, Native American, Middle East and North Africa (MENA), Native Hawaiian, mixed-race, and/or multicultural), gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status, or political persuasion or belief.

## 44. NON-EQUITY THEATRES

In no case may the Producer require the Actor to work in any theatre or other place presenting a production in which non-Equity companies regularly appear, without the express consent of Equity. In any case where the Producer requires the Actor to work where non-members of the AFL-CIO are employed, the Actor may, Equity consenting, cancel the contract forthwith.

## 45. NOTICES

(A) It is the essence of all employment contracts that all notices hereunder, company and individual, must be in writing. Copies of all notices must be filed with or mailed to Equity forthwith by the party (Actor or Producer) giving notice. Full power is reserved to the Council of Equity to grant relief from this Rule where, in its opinion, the person or persons to whom notice is given has not or have not been misled or injured.

(B) All notices given by the Actor to the Producer may be given in writing to the Producer, the Company Manager, or Stage Manager. Individual notice to the Actor must be given to Actor personally in writing unless the Producer has procured the address of the Actor as registered with Equity, in which case, unless otherwise provided, it may be given by mail or fax. Notice of termination may not be given to the Actor while Actor is on a vacation approved by Producer under terms of Rule 76.

(C) Notices of termination or closing given at or before the end of the performance on Monday night, effective at the end of Saturday night following, shall be deemed one week's notice; and such notice effective at the end of the Saturday week following shall be deemed two weeks' notice. If the playing schedule is Tuesday through Sunday, notice given on Tuesday will be effective at the close of the Sunday performance. Except as provided above, a week's notice shall be seven calendar days and two weeks' notice shall be 14 calendar days. Notice of closing shall remain posted for the entire notice period as specified above unless initialed by each member of the cast. A closing notice posted after the half-hour call shall be promptly called to the attention of the cast.

(D) All communications which refer to the company in general shall be posted upon the Call Board.

(E) The posting of the Agreement and Rules Governing Employment under the Equity/League Production Contract, herein adopted, in a conspicuous place in the outer offices of Equity in the Borough of Manhattan, City of New York, or at or in the main entrance thereto, shall be full, adequate and final notice to both Producer and Actor of said Rules.

**46. NUDITY**

(A) **Interviews/Auditions**.

(1) SEX ACTS SHALL NOT BE PERMITTED.

(2) Nudity shall not be permitted at Principal Interviews.

(3) Nudity at Auditions (Principal and/or Chorus Auditions) shall not be permitted except with the express written permission of Actors' Equity and shall be subject to the following guidelines:

(a) Actor shall not disrobe, in whole or in part, until after the Actor has been auditioned as a Principal Actor or Chorus Singer and/or Chorus Dancer; and,

(b) A Stage Manager or an official Equity representative must be present; and,

(c) The direct professional and artistic capacity of all persons present must be attested to by the Producer in writing to Equity at the time the written permission is requested (i.e., Producer, Director, Choreographer).

(B) **Rehearsals/Performances**.

(1) SEX ACTS DURING REHEARSAL OR PERFORMANCE SHALL NOT BE PERMITTED.

(2) Actor shall not appear nude or perform acts of a sexual nature in the course of a stage presentation unless the Actor has been advised and gives written consent by the time of the Actor's signing the contract. The script shall be submitted for review if the Actor so requests.

(3) Actor shall not pose for nude photographs or appear nude for any motion picture filming, videotaping or other forms of visual recording without the Actor's prior written consent. The applicable consent form will be provided by Equity.

(4) Photographs in which any Actor appears nude or performs an act of a sexual nature shall not be used in any way without the prior written consent of each Actor appearing in the photograph, or copy of the photograph, on a fully executed Equity Nude Photograph/Video Release form. The Actor's written consent must also appear on a copy of the photograph release. Such request to utilize the photograph must specify the specific use for the photograph. The signed, released photograph and release form shall be filed with Equity. The Producer and the Actor shall keep duplicate records.

(a) Prior to release or use of any film or video tape, video cassette, or any electronic or mechanical reproduction in which any Actor appears nude, each Actor appearing in the scene shall be given an opportunity to view the film or tape. Use or release shall not be permitted without the prior written consent of each Actor

participating in a scene where any Actor appears nude, or performs acts of a sexual nature, on a fully executed Equity Nude Photograph/Video Release form. The Producer shall file a copy of the fully executed release form for each Actor with Equity.

(b) An authorized Actors' Equity Association representative must be present at all such photographing, filming or videotaping.

(5) Actor shall not, while nude, mix with the audience or leave the stage, backstage or performance area. The Producer shall take all necessary measures to insure that no member of the audience will be permitted to enter the stage, performance area or backstage while any Actor is nude.

(6) Artists' renderings of nude Actors shall not be permitted without the Actor's prior written consent.

(C) IF THE PRODUCER BREACHES ANY OF THE ABOVE PROVISIONS THE PRODUCER SHALL BE ASSESSED DAMAGES OF NO LESS THAN ONE WEEK'S CONTRACTUAL SALARY FOR EACH VIOLATION OF ANY OF THE PROVISIONS SET FORTH ABOVE IN PARAGRAPHS (A) OR (B) FOR EACH ACTOR INVOLVED.

(D) All of the above shall not preclude the Actor or Equity from instituting any civil action in addition to the damages set out in this rule.

## 47. NUMBER IN CAST

(A) The number of Chorus employed on the first day of rehearsal may not be reduced in number under any circumstances.

(B) The number of Principals and Stage Managers employed may not be reduced in number under any circumstances after the Official Opening at the Point of Organization, or after the first paid public performance of a Road Tour.

(C) The Producer may employ Stage Managers beyond those required by Rule 68, STAGE MANAGERS, on temporary contracts, without affecting the provisions of Rule 47, NUMBER IN CAST. The additional Stage Managers may be employed until four weeks after the Official Opening at the Point of Organization, or four weeks after the first paid public performance of a Road Tour.

## 48. ORGANIZATION POINT

(A) The Producer shall have the right to designate the Point of Organization as either New York, Los Angeles, San Francisco, or Chicago, which Point of Organization shall be designated on the face of the contract. In the case of any other city, Equity shall have the right to designate the Point of Organization.

(B) Once designated, the Point of Organization shall remain the same for the life of the company. The Producer shall have the right to designate New York, Los Angeles, San Francisco, or Chicago as the Point of Organization of other Companies of the same production.

(C) The Company shall cease to exist upon the expiration of the period set forth in Rule 59, REOPENING OF A PLAY.

See also Rule 70, TOURS, for tours performing at the city designated as the Point of Organization.

## 49. PENSION FUND AND 401(k) PLAN

(A) The Producer acknowledges that the collective bargaining agreement effective June 1, 1960 between Equity and the League provides for the establishment of a jointly administered Pension Fund. The Producer agrees to abide by all provisions of said agreement with respect to said Pension Fund, including the obligation to make the contributions called for therein and to execute all necessary documents accepting the Agreement and Declaration of Trust establishing said Pension Fund and to be bound by

all rules and regulations of said Pension Fund now or hereafter adopted or which may from time to time be adopted by those administering said Fund.

(B) The agreements applicable to the establishment and administration of the Equity-League Pension Fund are renewed and extended for the duration of the collective bargaining agreement between Equity and the League, as amended by the Amendments to the Equity-League Pension Agreement effective June 28, 1971. The terms and conditions contained in the Arbitration Award of Burton Turkus dated April 23, 1963 are continued except as amended and modified in accordance with the recommendations contained in the letter of Morris Tarshis, Chief Labor Mediator for the City of New York, dated February 15, 1965 and as amended by the parties hereto.

(C) The Producer shall pay to the Equity-League Pension Fund 6% of all monies received weekly, exclusive of minimum out-of-town expense reimbursement and up to a maximum of $7,500, by all employees hereunder. In lieu of the foregoing, and in addition to the contribution provided for in Rule 49(F), for Canadian Actors whose primary designated fund is the Canadian Actors' Equity Association Registered Retirement Savings Plan, the Producer shall contribute to the Equity-League 401(K) Trust Fund 6% of all monies received weekly, exclusive of the minimum out-of-town expense reimbursement and up to a maximum of $7,500.

(D) The Producer shall continue to allocate for pension purposes, for the benefit of the employees hereunder, that share of the net tax relief from the repeal of the New York City Amusement Tax on theatre ticket admissions that has heretofore been determined. The allocation shall be used to satisfy the obligation of Producer to make the payments specified in paragraph (C) of this Rule, provided, however, that the amounts so allocated are equal to, or in excess of, the payments required under paragraph (C). It is distinctly understood and agreed that in no event shall Producer pay less than the amounts specified in paragraph (C).

(E) It is understood and agreed that the Producer's obligation to pay the allocation shall be deemed also an obligation of the theatre owner or operator and that this obligation is in no way reduced, modified, or limited by the fact that such theatre owner or operator may or may not be a charitable foundation or other organization ordinarily exempt from payment of taxes. It is further understood and agreed that the theatre owner or operator shall make suitable contractual arrangements when leasing the theatre to a Producer of an attraction, to see that the intent and purpose hereof is carried out, i.e., that the full allocation of the net tax relief, ordinarily available by reason of the repeal of the New York City Amusement Tax on theatre ticket admission, shall be paid without any exception resulting from a possible claim of a Producer or theatre owner that it should not make such payments by reason of the fact that it would not have been subject to the tax because of the status of the Producer or theatre owner as a Charitable Foundation or other exceptional entity.

(F) Effective October 1, 2019, the Producer shall contribute 4% of all monies received weekly, exclusive of minimum out-of-town expense reimbursement and up to a maximum of $7,500, by all employees hereunder to the Equity-League 401(k) Trust Fund on behalf of each such employee. This contribution for Producers able to utilize tax relief shall be made as follows:

(1) A contribution equal to 1% of all monies received weekly, exclusive of minimum out-of-town expense reimbursement and up to a maximum of $7,500, by all employees hereunder shall be made by the Producer; and

(2) Effective October 1, 2019, a contribution equal to 3% of all monies received weekly, exclusive of minimum out-of-town expense reimbursement and up to a maximum of $7,500, by all employees hereunder shall be made by allocating an equivalent amount of the net tax relief surplus in excess of the Producer's pension obligations under (C) above to the 401(k) Fund.

The specific terms and conditions of the Plan will be made available to all eligible Actors.

(G) The annual net tax relief surplus in excess of the pension and 401(k) contributions required under this Rule, to a maximum of $3,325,000 per year, shall be allocated to the Equity-League Health Fund, and shall be designated as current income to the Health Fund to defray actual operating expenses and not for reserves.

(H) In addition, annual net tax relief surplus in excess of the amounts in (F)(2) and (G) will be applied to defray the per-participant administrative charge of the Equity-League 401(k) Trust Fund, subject to a maximum of $50,000 per month. Such use shall be monitored by the League and Equity along with the Fund's trustees, and shall be reduced (or eliminated) to the extent the administrative expenses of the Fund are offset by reimbursements from the Fund's vendor.

(I) The Producer agrees to be bound by the Agreement and Declaration of Trust establishing the Equity-League 401(k) Trust Fund, including all its rules and regulations and any and all amendments and modifications thereto that may be adopted by its Trustees during the term of this Agreement.

## 50. PERFORMANCES

(A) **Number of**.

(1) A maximum of eight performances shall constitute a week's work which may be given during a period of not more than six out of seven consecutive days. A week's compensation shall be paid even if less than eight performances are given in any week, provided that if the first paid public performance is on any night but Monday, payment to the Actors for that part of the week in which the first public performance occurs shall be for such number of performances actually performed. In no event shall an Actor receive less than the minimum performance salary for the week (inclusive of any rehearsal salary an Actor receives for the period preceding the first paid public performance). In the week of a production's closing, Actor shall be paid no less than one-sixth of contractual salary for each day employed, excluding the day off, but in no event less than one-eighth per performance so long as the proper closing notice has been given. (See Rule 45, NOTICES.)

(2) Not more than five performances may commence in any three consecutive calendar day period without the consent of Equity, which consent will not be unreasonably withheld. (See Rule 70(F)(3), TOURS, regarding the number of performances in three days on tour.) However, six performances may commence in any three consecutive calendar days under the following conditions:

(a) A six-in-three day schedule may not occur more than 12 times during each 12-month period beginning with the first six-in-three day schedule, without the consent of Equity, which consent shall not be unreasonably withheld.

(b) At least six weeks' notice must be given to the company, with a copy to Equity, unless the Producer obtains the consent of Equity for a shorter notice period, which consent shall not be unreasonably withheld.

(c) Actors shall receive one day off in addition to the required day off. Either the additional day off or the required day off must occur immediately following the third day of the six-in-three schedule. In the event the six-in-three day schedule occurs over two workweeks, there shall be at least two days off in one of the two affected workweeks, but in all instances, there shall be one day off immediately following the six-in-three day schedule. Should there be more than two consecutive weeks with a six-in-three day schedule, the Actor must receive two consecutive days off immediately following the second and each subsequent six-in-three day schedule, except that there need only be one day off immediately following the six-in-three day schedule when the performance schedule reverts to no more than five performances in any three consecutive days.

(d) The Producer shall use best efforts not to schedule promotional or publicity calls on the days off.

(e) The Producer shall not schedule a rehearsal call on the day before the six-in-three day period begins, except for replacement rehearsals or in emergencies.

(f) There shall be no rehearsal on any of the two-show days in the six-in-three day period.

(3) In the event a regular performance schedule of a show at the Point of Organization includes one performance on Friday, two performances on Saturday, two performances on Sunday, and one performance on Monday, Producer shall not schedule rehearsals other than put-in rehearsals or promotional events other than television appearances and press interviews on the Monday of said schedule. In addition, Producer shall make best efforts not to schedule put-in rehearsals, or television appearances or press interviews on the Monday of said schedule. If any rehearsal other than a put-in rehearsal takes place on that Monday, each Actor called to the rehearsal (other than replacement Actor(s)), including the Stage Manager(s) and Dance Captain(s), shall be compensated at one and one-half times the overtime rate for the first hour, and at such rate in half-hour increments thereafter.

(4) Not more than two performances may commence in one calendar day without the consent of Equity, which consent will not be unreasonably withheld.

(5) When a schedule change results in fifteen or more consecutive performances, a nine-performance week cannot be scheduled either immediately before or after that period of consecutive performances, even if there is a day off at the beginning or end of the consecutive performances.

(6) Two weeks' notice (copy to Equity) must be given to the company to change the performance schedule. (See Rule 70(F)(5), TOURS and Rule 51, PERFORMANCES LOST, for National and Tiered Tour notice provisions.)

(B) **Breaks**.

(1) There shall be a recess of one and one half-hours after a period of not more than five consecutive hours of rehearsal and/or performance combined. In addition, there shall be a break of five minutes after not more than 55 minutes or 10 minutes after not more than 80 minutes of rehearsal for each Actor. (See also Rule 58(D)(2), REHEARSALS and Rule 61, REST PERIODS AND DAYS OFF.)

(2) If the break between performances is less than one and one half-hours (excluding the half-hour call), the Producer shall make a meal available to the Actor at the Producer's expense. If the Actor makes a request in advance for a hot or cold meal and if practicable, the Producer shall accommodate the Actor's request. If no meal is provided, Producer shall pay to the Actor $22.50 in lieu thereof. In no event shall said break be less than one hour (excluding the half-hour call). In those cases where Actors are required to report to the theatre earlier than half-hour because of special circumstances such as make-up, costumes and warm-ups, Producer shall provide meal to Actor at Producer's expense.

(C) **Payments to Actor**.

(1) All performances or rehearsals for which admission is charged (except bona fide Benefits endorsed by the Theatre Authority or Equity) are to be counted and considered as performances for which the Actor is to be paid.

(2) Except as otherwise provided, a sum equal to two-eighths of the Actor's weekly compensation shall be paid for each performance worked by the Actor in excess of eight in each week. However, nine or more performances per week may not be scheduled on a regular basis without Equity's prior written consent, which consent will not be unreasonably withheld.

(a) During a two-week period, which shall include Christmas Eve and/or Christmas Day, if a schedule change results in nine performances in one of those weeks and seven performances in the other contiguous week, no additional compensation will

be required for the ninth performance provided that Actors have a day off on either December 24 or December 25.

(b) When a production is playing at its own Point of Organization and a schedule change results in nine performances in one week and seven performances in a contiguous week, no additional compensation will be required for the ninth performance provided there is a full day off between the two weeks.

(c) During the week of Official Opening, performances in excess of eight shall be paid for at the rate of one-eighth of contractual salary.

(d) **Tours**. (See also Rule 70)

(i) A National tour may schedule seven performances in one week and nine performances in a contiguous week of an engagement of two-weeks or longer provided, however, that there is a "Golden Day" between the two weeks and a "Golden Day" immediately following the nine-performance week. No additional compensation will be required for the ninth performance. (See Rule 61(C)(1), REST PERIODS AND DAYS OFF for the definition of "Golden Day".)

(ii) A Tiered tour may schedule seven performances in one week and nine performances in a contiguous week as above or in two different engagements provided that there is a "Golden Day" between the two weeks and a "Golden Day" immediately following the nine-performance week and that there is an additional daylight day of rest during the nine-performance week. These Golden Days, when the engagements are in more than one city, may not be "bought back" under Rule 70(C)(1). No additional compensation will be required for the ninth performance.

(3) If more than two performances, each with a running time of more than 100 minutes, are commenced in any one calendar day, the third performance shall be paid for as an extra performance even though the total number of performances given during the week is eight or less.

(4) Any performance begun prior to 1:00 p.m. or subsequent to 11:00 p.m. shall be counted as an extra performance within the meaning of this section and shall be paid for at the rate of two-eighths of the Actor's weekly salary. (See Rule 70(F)(6) for tours.) However, a performance may be scheduled as early as 11:00 a.m. without additional compensation provided that:

(a) It is not the first performance of the week;

(b) Curtain down of the previous evening's performance is no later than 11:00 p.m.;

(c) The show call (inclusive of normal make-up, warm-up or other pre-show prep) is the first call of the day (i.e., there can be no rehearsal or publicity calls prior to ½ hour).

(5) On New Year's Day, July Fourth, Labor Day, Thanksgiving and Christmas, an Actor whose contractual salary is less than $5,000 per week shall receive holiday pay in addition to Actor's weekly contractual salary as follows: (a) if one performance is scheduled on that holiday, 1/16th minimum salary for Actor's own category; (b) if two performances are scheduled on that holiday and Actor performs both, 3/32$^{nds}$ of said minimum salary; and (c) if two performances are scheduled on that holiday and Actor performs only one, 1/32nd of said minimum salary. Actors on paid vacation are entitled to these holiday increments. No rehearsals shall be permitted on the recognized holidays, except for emergency, rehearsals as provided in Rule 70(C)(2) TOURS, and during the final two weeks prior to the first paid public performance. All other rehearsals on the recognized holidays prior to the first paid public performance shall require that all Actors shall receive 1/16th of minimum salary for Actor's own category in addition to Actor's weekly salary.

(D) **Curtain Call**. Subject to the Director's artistic discretion, every on-stage performing member of the company shall be entitled to participate in the curtain call at the conclusion of each performance.

(E) **Pre-Point of Organization Tour Provisions**.

(1) For any performance in excess of eight performances in any week, Actor shall be paid two-eighths of Actor's contractual salary. However, in no event may more than eight performances be scheduled on a regular basis without Equity's prior written consent.

(2) No more than five performances shall be given in any three-day period unless the Actor is paid one-eighth of Actor's contractual salary for any performance in excess of five in said three days in addition to Actor's weekly contractual salary. If two or more performances are given on the next succeeding day (or days) the Actor shall be paid said additional salary for each such performance.

(See Rule 70, TOURS, for provisions applicable to National and Tiered tours.)

(F) **Food and Beverages**. In New York City, the Producer shall use best efforts to ensure that neither food nor beverages will be brought to the ticket holder's seat. In all other locations, the Producer shall advise the Presenter of Equity's concern in this regard.

(G) **Lateness**. If Actor is late for "half-hour" more than twice within any six-month period, Actor will be fined the following amounts for each lateness commencing with Actor's third lateness:

(1) $75 for Actors earning $2,500 per week or less;

(2) $150 for Actors earning more than $2,500.

All fines will be remitted by the Producer to the Actors' Equity Foundation and will be deducted from Actor's salary on a pre-tax basis. An official and accurate clock will be designated. Written notice of lateness will be given to both Actor and Equity. This rule shall apply uniformly. If it is determined in grievance or arbitration that the rule has not been applied uniformly, Producer must remit all fines assessed within the six months prior to the fine that is challenged.

It is understood that this will not affect Producer's right to send Actor home and reduce salary accordingly. However, if Producer does send Actor home, Producer cannot also fine Actor. The foregoing does not waive or alter the Producer's right to terminate Actor for just cause in the event of chronic lateness, including any lateness for half-hour or rehearsal.

(H) Where practicable, Producer shall endeavor to provide advance notice to Actors of their required attendance at a rehearsal to be conducted during a performance. (See also Rule 58(D)(1)(i), REHEARSALS)

**51. PERFORMANCES LOST**

(A) If the company cannot perform because of fire, accident, strike, riot, Act of God, or the public enemy, which could not be reasonably anticipated or prevented, then the Actor shall not be entitled to any salary for the time during which Actor's services shall not for such reason or reasons be rendered, except:

(1) If the company is away from the Point of Organization, the Actor shall receive one-eighth of minimum salary plus one-seventh of minimum out-of-town expenses for the first day lost and one-seventh of minimum out-of-town expenses for each day on which performances are not given thereafter.

(a) The company may add a replacement performance in the same week as the canceled performance without any additional compensation provided the Actors receive no less than 24 hours' notice. If a performance is so scheduled, the Actors' salary and Per Diem will not be reduced for the canceled performance;

(b) The company may add a replacement performance in a subsequent week of the same engagement with no less than 72 hours' notice. If a performance is so

scheduled, each Actor will be due an additional one-eighth of Actor's contractual salary for that replacement performance and Actor's salary and Per Diem may be reduced for the canceled performance.

(c) If a replacement performance is scheduled after the scheduled final performance of the tour, the Producer will reimburse the Actor for any additional travel expenses caused by such scheduling.

(B) Should any of the foregoing conditions continue for a period of 10 days or more, either party may terminate the contract (except on a Term Contract, only the Actor may terminate) and the Producer will pay for all services to date and transportation back to the Point of Organization or the Place of Engagement. (See Rule 72 TRANSPORTATION AND BAGGAGE)

(C) If the production closes after 10 days, the six-week reopening provision shall not apply provided that all members of the cast at the time the production closed are offered re-employment in the production at not less than the terms prevailing on the date of closing.

(D) Lost performance due to illness or death of star. (See Rule 39(C), LAY-OFF.)

(E) To the extent there is a weather or other state of emergency declared by the civil authorities, a production may revise its performance schedule to reschedule up to two missed performances on any day in the same week or in the subsequent two weeks without incurring any penalty or premium, so long as no more than sixteen performances are given in any two-week period.

**52. PHOTOGRAPHS, PUBLICITY AND PROMOTION**

(A) Company picture calls, except those held during the authorized rehearsal hours of pre-Point of Organization tryout or dress rehearsals for replacement, shall be limited to four picture calls during the tryout. Thereafter, picture calls occurring outside of regular rehearsal hours (or outside of performance) must be compensated as overtime hours. (See Rule 70 for National and Tiered tours.)

(B) Picture calls may be scheduled after a performance on 24 hours' notice. Such calls may be regarded as rehearsal under terms of Rule 58, REHEARSALS. A picture call, once given, may be canceled on 24 hours' notice. Should such picture call be canceled with less than 24 hours' notice, available rehearsal time shall be reduced by two hours. This clause shall not be in effect during the tryout period.

(C) Subject to the limitations of paragraph (A) above, the Producer may require the Actor to pose not only for customary and usual photographs, but also for photographs to appear in magazines or newspapers for the sole purpose of publicizing and advertising the play, provided said photographing takes place immediately following the matinee or evening performance, during the authorized rehearsal hours of a pre-Point of Organization tryout, or dress rehearsals required for replacements. Notice of a picture call must be given at least 24 hours in advance and must be posted before the final half-hour of a performance. If the Producer desires to take pictures at the time auditions are held, such pictures may be taken with the written consent of the Actor, prior to or subsequent to the auditions, but in no event during auditions.

(1) The time during which said photographs may be taken shall not exceed three hours in the case of a dramatic play or four hours in the case of a musical, revue, or spectacular production. The Actor shall have not less than one hour for supper after matinee or the Producer shall, at Producer's own expense, provide the Actor with a meal. If the call takes place after the evening performance, the photo call shall commence within 30 minutes of curtain down and a meal shall be made available to the Actor at the Producer's expense. If the Actor makes a request in advance for a hot or cold meal and if practicable, the Producer shall accommodate Actor's request.

(2) If the photographs are taken at a time other than hereinabove specified, or if the limit of hours herein specified is exceeded, or if the limitation of Paragraph (A) above is exceeded, Actor shall be paid not less than the rehearsal overtime rate (see Rule 58(D)(3)) for each hour or part thereof employed on such photographing.

(D) In the event the Producer requests a picture call for the purpose of replacing a photograph required to be removed under the provisions of Rule 7(E) or for other reasons resulting from the replacement of an Actor and such picture call involves three or fewer performers, the time and place of such picture call shall be mutually arranged between the Producer and the Actors and such a call shall not be considered a Company picture call under the above Rule.

(E) In all cases the Actor's name shall be properly credited in the publicity whenever and wherever the photographs are used.

(F) The Producer must obtain the Actor's prior written authorization before the Actor's picture may be used in conjunction with a commercial product and said authorization must specify the commercial product involved.

(1) If the Actor consents to the use of Actor's name, voice, or photographic likeness, as aforesaid, Actor shall be paid not less than $300 for said use. Actors called to a picture call for the purpose described above, whether said call is at the theatre or elsewhere, shall be paid not less than $200 per hour for said call, but shall be paid no additional sums for the use of pictures taken during said call. (See Rule 40(D)(1)(c) where still photos are utilized to make a commercial.)

(2) This requirement shall not apply to the so-called institutional ads similar in type to the department store ads on file at the offices of Equity and the League.

(G) No Actor may be required to pose for nude photographs without Actor's written consent. No nude photographs of an Actor may be used in any way without the written consent of the Actor. (See Rule 46, NUDITY.)

(H) It is understood and agreed that it is part of the Actor's job to participate in reasonable promotional and/or publicity appearances, as requested by Producer.

(I) **Rehearsal for Promotional Events**. When Actors are required to rehearse a significant amount of new material for publicity or promotional events (e.g. the Mayor's Inner Circle Benefit) all Actors participating in such rehearsals shall receive not less than the rehearsal overtime rate for each hour or part thereof. If the event is being paid under the terms of another Union's contract (e.g., AFTRA), this rule shall not apply.

(J) The Producer shall reimburse the Actor for all reasonable personal expenses incurred in connection with personal and publicity appearances initiated or required by the Producer.

(K) **Non-Broadcast Publicity/Promotional Appearances by Actors in the Production**.

(1) **In Costume**. When Actors participate in live publicity appearances in costume, the Actors shall be paid not less than one-eighth of the weekly minimum salary;

(2) **No Costume**. When Actors participate in live publicity appearances without costumes, no payments shall be required. T-shirts, caps and show jackets shall not be considered a costume for purposes of this provision. However, any clothing purchased by the Producer to be worn by Actor(s) in promotional events, other than T-shirts, caps or show jackets, shall be considered a costume for purposes of this provision. Producer may reasonably request that an Actor appear in Actor's own clothing, excluding "black tie," without incurring a payment under this provision;

(3) If the Stage Manager is requested to attend the live event the Stage Manager will be paid not less than the actors;

(4) See also Rule 40(G)40(G), Payment for Live Television Promotional Appearances.

(L) **Cross Promotions**. When Actors employed in a production are asked to do publicity for another production of the same show, they shall be covered by the terms and conditions identified below. It is understood that this paragraph (L) will be applicable only for events

that take place outside the Point of Organization and where the event is intended for local press only.

(1) Actor will be paid not less than one-eighth of the Production Contract minimum for each seven out of eight and one-half hour day that the Actor is so engaged. Overtime shall be at the standard overtime rate;

(2) All monies paid to Actor (exclusive of minimum Per Diem) are subject to dues payments and contributions as required by Rule 49, PENSION FUND AND 401(k) PLAN. No additional Health contribution is required;

(3) When Actor engages in such publicity outside the production's Point of Organization, the Actor shall be provided with single occupancy hotel room at no cost to the Actor plus $45 for food and incidental expenses. Producer shall pay for and arrange all travel. If the publicity engagement is outside the U.S., in addition to hotel and travel at no cost to the Actor, the Actor shall be reimbursed up to $65 for food and incidental expenses;

(4) The terms of this provision will be applicable as of the first paid public performance of the production.

(M) **Publicity Appearances By Actors Not Employed in Any Production of the Show**. An Actor not employed in any production of the show may perform in a publicity appearance promoting said production in accordance with the terms of (L) above; however, this provision is also applicable at the Point of Organization. In addition, after three days engaged in such publicity, a Health contribution will be made on the Actor's behalf as of the fourth day employed. Thereafter, a Health contribution will be required after every six days worked. Said Health contributions will be due whether or not the days worked are consecutive. The Producer will contribute to the Equity-League Pension Fund 8% of all monies (exclusive of minimum Per diem) paid to the Actor.

(N) **Use of Photographs**. See also Rule 7(E).

## 53. PRESS RELEASES

The Producer shall use reasonable care that Producer's press department shall remove the name of the Actor from advertising and publicity matter as soon as is possible after the Actor leaves the company. The Actor is at liberty to announce an engagement when or after entered into. However, if the Actor is engaged under a Standard Minimum Contract, neither the Producer nor the Actor shall make any public announcement of the engagement until rehearsals have begun. (See also Rule 7, BILLING.)

## 54. PREVIEWS

(A) Where paid previews are given immediately preceding the opening performance; that is, where there are no intervening days, rehearsals, or unpaid previews, the Producer, if the company shall close within two weeks of said opening, may claim the pro-rata salaries paid to the Actors for said previews as a credit and off-set against the minimum guarantee provided for in the Contract of Employment.

(B) Any sums paid to the Actor for rehearsals, whether at full salary or as Rehearsal Salary, or any sums paid to the Actor for unpaid previews or for paid previews not immediately preceding the opening performance, shall not be a credit against the minimum guarantee specified in the Contract.

(C) When a Company does not go out-of-town on a pre-Point of Organization tour and gives paid previews at Point of Organization prior to the Official Opening, rehearsal provisions set forth in Rule 58(D)(1)(c) shall apply. However, once the production has used all of the rehearsal hours during the weeks set forth in Rule 58(D)(1)(c), Actors shall be paid the applicable overtime premium for rehearsals on the day after the day off, as set forth in Rule 61(B)(2)(c).

**55. PRODUCTION PROSECUTED**

(A) Should the production in which the Actor is engaged be complained of as being in violation of any statute, ordinance, or law of the United States, or any State or any municipality in any State and should a claim or charge be made against the Actor on account of Actor being engaged in such production, either civil or criminal, the Producer shall defend the Actor at Producer's own expense, or shall pay any and all reasonable charges laid out or incurred by the Actor in Actor's defense and indemnify the Actor against any loss or damage which Actor may suffer on account of being engaged in any such production.

(B) It is specifically agreed and understood between the Actor and the Producer that the language, business and costuming of the play are under the control and direction of the Producer and author, who according to custom, can at any time erase or amend the scenes and lines and that consequently the Actor has no certain method of knowing during rehearsals, whether in its final presentation the play is susceptible of being considered immoral or indecent. Therefore the Producer represents to the Actor that the play as produced shall not violate any law or give offense which is punishable by any law and expressly agrees that should Producer or the author be arrested or summoned on such charges, that (Equity consenting) the Actor may end and terminate the engagement forthwith. Upon such termination the Producer shall pay to the Actor forthwith all sums due under this Agreement plus one week's salary, as compensation for the termination of the engagement without notice, but in no event shall the Actor receive less than a total of two weeks' contractual salary.

(C) This rule shall not apply to any case or any set of conditions where its enforcement would be illegal or against public policy. In the case of an arrest on account of the nature of the play or its production, the Producer shall forthwith furnish bail for the Actor; and, in the event of Producer's failure to do so, or for any breach of this rule, the Producer shall pay to the Actor (Equity consenting) the sum of $2,000. After an arrest, the Actor may demand a suspension of performance pending a determination and such suspension shall not terminate or otherwise affect the terms of the agreement unless Equity shall otherwise order.

**56. PROPERTY; REIMBURSEMENT TO ACTOR FOR LOSS OR DAMAGE**

(A) The Producer shall reimburse the Actor for all loss of or damage to: (1) Actor's property used and/or to be used in connection with the play or plays covered by Actor's agreement; (2) the personal clothing worn by the Actor to the theatre and the personal clothing, personal effects, or property worn or carried by the Chorus to Chorus auditions; (3) the personal effects of the Actor, including Actor's baggage, while such property is wholly or partly in the possession, control, or under the supervision of the Producer, or under that of any of Producer's representatives, or when said property is in any theatre, building, or other place in which the play or plays covered by Actor's agreement has been given, is being given, or is to be given; or when said property or personal effects has been in any way shipped, forwarded, or stored by the Producer or any of Producer's representatives, agents, servants, or employees, up to a limit of $10,000 for the Actor's personal effects and/or clothing; up to a limit of $3,000 on the Actor's furs; up to a total limit of $3,000 for the Actor's jewelry. Notwithstanding the aforesaid, however, the Producer shall be liable up to a limit of $3,000 for the Actor's personal effects and/or clothing at auditions and during rehearsals prior to the pre-Point of Organization tryout or road tour.

(B) The Producer shall be liable as herein above provided whether or not the act, fault, or negligence of the Producer, Producer's agents, servants, or representatives, caused or contributed to such loss or damage. The Producer, however, shall not be liable for any loss of or damage to the property of the Actor while said property is under the sole and exclusive control and supervision of the Actor.

(C) Except as above provided, the Producer shall not be responsible for any loss of or damage to the personal property of the Actor over and above the limitations herein set forth and

where, as to such property, it is the duty of the Actor, if Actor desires to protect themselves against loss, to insure the same. The Producer may meet the foregoing obligation by maintaining adequate and sufficient insurance coverage which shall provide the same protection as the Producer hereby assumes. Upon the direct payment of any loss or damage to the Actor by the Producer, the Producer or the Insurer shall be subrogated to all rights of the Actor to the extent of such payment.

**57. RECORDINGS**

Electronic reproductions of voice may be used for sweetening, voice overs, to supply dialogue, singing, chanting, or business, except in cases where the electronic reproduction is needed due to vigorous choreography or in order to emulate the sound of a cast size larger than the actual complement, in which case the Producer must obtain the written consent and permission of Equity, which will not be unreasonably withheld. Should Equity deny the use of such Electronic reproductions, and if Producer believes that such denial is unreasonable, the Producer may file for Expeditious Arbitration in accordance with Rule 4(C). Video, projection or other use of visually recorded material shall be permitted under this Rule.

The following payments shall be due for recordings:

(A) For Actors engaged in the production at the time of the recording:

(1) When the Actor performs in a recording that is deemed a part under Rule 12(A)(1), if the Actor leaves the production and the Producer elects to continue to use the recording in the production thereafter, a payment of the SAG-AFTRA non-broadcast day rate is due to the Actor.

(2) If the Producer elects to use the recording covered by the provisions of 57(A)(1) in a subsequent company of the production, a payment of 50% of the of the SAG-AFTRA non-broadcast day rate is due to the Actor for each subsequent company.

(B) For Actors engaged solely for the recording and not engaged to otherwise perform in the production:

(1) A payment of the SAG-AFTRA non-broadcast day rate is due to the Actor at the time of the recording.

(2) If the Producer elects to use the recording covered by the provisions of 57(B)(1) in a subsequent company of the production, a payment of 50% of the of the SAG-AFTRA non-broadcast day rate is due to the Actor for each subsequent company.

**58. REHEARSALS**

(A) **Beginning of**. Rehearsals begin with the date when the Actor is first called. If the Producer chooses to start with a reading to or by the Company or a part thereof, said reading is a part of and shall begin the rehearsal period. If the Producer wishes to employ an Actor for such a reading and the Actor's contracted rehearsal period has not yet commenced, the Producer may offer the Actor the opportunity to participate in the reading provided the Actor is paid not less than two-sixths of minimum rehearsal salary and the Actor's participation is strictly voluntary. It is expressly understood that the Actor's participation in the reading may not be a condition of employment. (For requirement of Stage Managers at rehearsals see Rule 68, STAGE MANAGERS.)

(B) **Rehearsals Continuous**. It is agreed that rehearsals shall be continuous from the date of the first rehearsal to the date of the first public performance of the play as stated on the face of the Contract of Employment.

(C) **Rehearsal Salary, Payment of**.

(1) **Number of Weeks**.

(a) Beginning with the first day of rehearsal the Producer agrees to pay the Actor rehearsal salary as set forth in Rule 63, for a period of up to eight weeks for Principal Actors and Chorus in dramatic productions; up to nine weeks for Principal Actors in musical productions and revues; and up to 10 weeks for Chorus in musical productions and revues. For partial weeks, one-sixth of weekly rehearsal salary shall be paid for each day of rehearsal or part thereof except that the last seven days of any rehearsal period (See Rule 61(B)(1)(a)) shall be at the rate of one-seventh for each day or part thereof.

(b) The Actor, if engaged for a production which is already on tour outside of the Point of Organization, may give no more than four weeks' rehearsal at rehearsal salary except that Swings may give no more than three weeks' rehearsal at rehearsal salary and Understudies no more than two weeks' rehearsal at rehearsal salary. Such rehearsal period shall be deemed to begin on the date the Actor commences rehearsals or on the date of the Actor's arrival out-of-town to be available for rehearsals, whichever is earlier. During any such rehearsal period when the Actor is required to be out of town, the Actor shall be paid out-of-town expenses according to Rule 63 in addition to the Rehearsal Salary provided herein.

(c) In the event that an Actor who has previously performed or understudied a role is on leave from a production for any reason for a period of four (4) consecutive weeks or more, and upon return the appropriate members of the production's creative team (e.g., Director, Choreographer, Dance Captain, and/or Stage Manager) after either a review rehearsal or the Actors' first performance, determine that such Actor requires rehearsals in order adequately to perform Actor's role, then the production shall be permitted to place Actor in rehearsal for up to one week, payable at rehearsal salary, inclusive of the review rehearsal.

(2) Rehearsal salaries are to be paid before noon on the day before the last banking day of the week, but no later than Thursday. (See Rule 63(J) for option to shift payroll week.)

(3) During any week in which there are rehearsals and performances and in which performance salary is paid pro-rata, the Actor shall be paid no less than one week's minimum salary.

(4) Compensation subsequent to permitted rehearsal periods shall be at not less than full contractual salary.

(D) **Rehearsal Hours, Breaks and Overtime**. (See also Rule 50(A)(3), PERFORMANCES, and Rule 61, REST PERIODS AND DAYS OFF.)

(1) **Rehearsal Hours**.

(a) **Prior to First Paid Public Performance**. Except as provided in 58(D)(1)(b) below, rehearsal hours shall not exceed seven out of eight and one-half consecutive hours per day (including breaks required by Rule 58(D)(2)(a) below). However, Producer may elect, at Producer's sole option, to rehearse eight out of nine and one-half consecutive hours per day in lieu of the seven out of eight and one-half hour schedule provided the Actors receive two days off in each week. These days off need not be consecutive. If the Producer elects a five-day schedule, pro-rated calculations shall be made in fifths for partial weeks. The Producer will be entitled to switch schedules only twice during the permitted rehearsal period. The Actors must receive at least one week's notice for any such change in schedule.

(b) **10 out of 12 days prior to First Paid Public Performance**. There shall be up to seven days of rehearsal in the theatre prior to the day of the first paid public performance that may be scheduled as 10 out of 12 days, at the discretion of the

Producer, during which rehearsals shall not exceed 10 out of 12 consecutive hours per day (including breaks required by Rule 58(D)(2)(a) below). On the day of the first paid public performance, rehearsals and performance may exceed 10 hours and may encompass more than 12 consecutive hours so long as applicable rest period and breaks requirements are met. If a pre-Point of Organization tryout does not use all seven days of the "10 out of 12" hour rehearsal days provided for in this paragraph, it may, when it returns to the Point of Organization, use the remainder of those seven days prior to the first paid public performance at Point of Organization. On a day of travel, rehearsal and travel time combined shall not exceed 10 hours excluding rest periods.

(c) **Rehearsal and Performance Hours During Tryout Away from Point of Organization and Previews at Point of Organization**. For any 10 out of the first 12 weeks after the first paid public performance during tryout away from Point of Organization and/or Previews at Point of Organization but before the Official Opening at the Point of Organization, rehearsal, travel and performance shall not exceed 10 out of 12 consecutive hours in any one day, except as follows:

(i) Once per week during any five of the 10 "10 out of 12 hour" weeks, each Actor may be called for 10 out of 13 consecutive hours. This may not be done on a two-performance day.

(ii) If the Actor is called as provided in (i) above, there shall be a rest period of not less than 11 hours between the end of the Actor's employment on the preceding day and the Actor's call on the "10 out of 13 hour" day.

(iii) It is understood that the "10 out of 13 hour" day, if used, need not be on the same day for all Actors, but that each Actor may be called for no more than five such days.

In the event of lay-off(s) under Rule 39, LAY-OFF, the 12-week period may be extended by the number of the weeks of the lay-off(s), up to a maximum of three weeks.

During the remaining two weeks of such 12-week period, rehearsal, travel and performance may not exceed seven hours out of eight and one-half consecutive hours in any one day (including breaks required by Rule 58(D)(2)(a) below).

(d) Following the first 12 weeks after the first paid public performance, rehearsal hours shall be governed by Rule 58(D)(1)(e) below, with the following exception:

If Producer uses "10 out of 12 hour" days (as described in (c) above) during no more than nine out of the first 12 weeks (or up to 15 weeks in case of lay-off(s)) after the first paid public performance, up to a maximum of six such days may be used within any single week before the Official Opening at Point of Organization, provided that in special circumstances the Producer may use them within a two week period with the consent of Equity, which consent will not be unreasonably withheld.

If Producer uses "10 out of 12 hour" days during no more than eight out of the first 12 weeks (or up to 15 weeks in case of lay-off(s)) after the first paid public performance, an additional six such days may be used within any seven-day period at the Point of Organization before the first paid public performance at the Point of Organization.

(e) **After Official Opening at Point of Organization or First Paid Public Performance on Tour**.

(i) Rehearsals after Official Opening at Point of Organization or first paid public performance on Tour shall be limited to eight hours weekly, except that Actors signed to understudy may be called to rehearse their own understudy assignments for an additional four hours per week. Rehearsals shall be limited

to two hours on two-performance days; however, absent special circumstances, there shall be no rehearsal between the matinee and evening performances except for understudy rehearsal and/or emergency cast replacements.

(ii) Notwithstanding the above, during the first engagement of a tour, Actors may be required to rehearse and/or perform seven hours out of an eight and one-half hour day for a maximum of two weeks beginning with the first paid public performance and ending at the Official Opening.

(f) Overtime shall be paid for all rehearsal hours in excess of those permitted for Actors, Stage Managers, and Dance Captains, however, the time such individuals rehearse during performances shall not be charged against regular rehearsal hours. Further, paid rehearsal calls on a day after the day off, as well as any other paid rehearsal hours, shall not be charged against regular rehearsal hours. These terms shall apply for all productions covered by these Rules, including all tours.

(g) **Rehearsals after Performance**. Rehearsals shall not be scheduled after an evening performance. However, notes may be given for a period not to exceed one hour after curtain, such time to be chargeable as rehearsal hours.

(h) Rehearsal hours for each Actor shall be computed from the time of rehearsal call for that Actor. If an Actor appears at a rehearsal call as scheduled, and is released from the call before the full length of time for which the actor was scheduled, the Actor shall receive credit for all hours for which they were scheduled to attend the call.

(i) Absent special circumstances, rehearsals may be called only upon 24 hours' written notice. For notice for rehearsals during performances, see Rule 50(H), PERFORMANCES.

(j) For rehearsal on holidays, see Rule 50(C)(5).

(2) **Breaks**.

(a) Except as specified in (b) below, there shall be a recess of one and one-half hours after a period of not more than five consecutive hours of rehearsal and/or performance combined. In addition, there shall be a break of five minutes after each 55 minutes of rehearsal or 10 minutes after each 80 minutes of rehearsal for each Actor. All Actors rehearsing aerial stunts shall be on the ground and unclipped prior to the commencement of their breaks. These break requirements are also applicable during technical rehearsals except for the last three days prior to the first preview. However, during that period, Producer shall use best efforts to comply with these requirements. (See also Rule 61, REST PERIODS AND DAYS OFF.)

(b) Where rehearsal is consecutive with the half-hour call, the time from the call for rehearsal and the end of the performance shall not exceed five consecutive hours. However, if the rehearsal is on stage, the duration of the call may be extended to not more than five and one-half consecutive hours. All other breaks specified in (a) above shall be observed.

(3) **Overtime**. Should the Actor rehearse more than the hours stipulated in this Rule, the Producer shall pay the following overtime rates for each hour or any part thereof for each instance of such overtime rehearsal:

Effective September 30, 2019: $46

Payment for such overtime shall be made no later than the week following the week in which such overtime occurred.

(E) **Attendance at Rehearsal**. After the Official Opening at the Point of Organization, or during road engagements of one month or more, the Actor, if Actor has a firm commitment of other employment on a given day under contract within the jurisdiction of the 4 A's, shall not be required to attend a rehearsal on that day, provided that when on the road,

employment must be within the same city as the engagement. Upon request, Actor shall identify said contract employer in the 4 A's jurisdiction.

(F) **Absence Due to Illness**. When the Actor shall have been absent from rehearsal for seven days by reason of illness, the Producer may terminate Actor's contract at the end of said seven days. Equity may, in its discretion, upon appeal by the Producer, reduce this period.

(G) **Rehearsals Lost**. If a Producer is prevented from giving rehearsals because of fire, accident, riot, strike, illness of more than seven consecutive days, or death of star or prominent member of the cast, Act of God or act of public enemy which could not reasonably be anticipated or prevented, then the time so lost shall not be counted as part of the rehearsal period herein provided. During such a lay-off, the Actor shall be paid a per diem of one-seventh of the amount deemed to be out-of-town living expenses set forth in Rule 63, SALARIES, for a maximum period of two weeks. Should the lay-off continue, the Producer shall pay one-half contractual salary for two further weeks at the end of which time the Actor may terminate Actor's contract, without payment or penalty, unless the Producer continues the services of the Actor by paying full salary therefor.

(H) **Rehearsals Discontinued or Play Abandoned**. If a play for which the Actor is engaged is discontinued or postponed, or if a production is abandoned before or during rehearsals, the Producer shall pay the Actor not less than two weeks' contractual salary plus all rehearsal salary due.

(I) **Rehearsals Outside Organization Point**. If company rehearsals are held before opening at a place different from that of Point of Organization, the Producer shall pay the Actor a per diem payment of one-seventh of the amount deemed to be out-of-town living expenses as set forth in Rule 63 in addition to any Rehearsal Salary to which the Actor is entitled. If company rehearsals for New York Point of Organization productions before the first paid public performance are held in Newark, New Jersey; Purchase, New York; or Stamford, Connecticut; payment of Per Diem will not be required, provided that:

(1) Actors will be provided with bus or van transportation from Shubert Alley to the rehearsal. Reasonable additional pick-up points along the most direct route to the rehearsal will be added for the Actors' convenience;

(2) Travel time will be part of allowed rehearsal hours. Rehearsal time shall commence and will be computed from the time the bus or van is scheduled to depart from Shubert Alley and will end when the bus or van returns to Shubert Alley;

(3) When rehearsals are in Purchase, New York, the Producer must provide a meal. If the Actor makes a request in advance for a hot meal or a cold meal and if practicable, the Producer shall accommodate Actor's request.

(J) **Special Additional Provisions**.

(1) The Producer shall provide piano rehearsal for Understudies and replacements (both Principals and Chorus). Replacements shall be afforded at least eight hours of rehearsal with piano. If not conducted on stage, rehearsals shall be conducted in an area or room suitable for rehearsals.

(2) Whenever a troupe or unit rehearsed by a troupe master, subcontractor, or by anyone other than the Producer or any of Producer's employees is used in a production, chorus members of such unit shall be deemed to have rehearsed at least as long as the time elapsing from the first general rehearsal call for the balance of the Chorus to the opening of the production and shall be paid Rehearsal or Contractual Salary accordingly by the Producer.

(3) Understudies must be called to rehearse in each part assigned at least once every four weeks after the first paid public performance for dramatic productions and at least once every six weeks after the first paid public performance for musical productions.

(K) Adequate technical rehearsal, as shall be deemed necessary, will be provided for all Understudies, Swings and replacements before they are required to perform in front of an

audience. Such technical rehearsal shall include, but not be limited to, rehearsal on the set with such props, lighting effects, mechanical or pyrotechnical devices, weapons, costumes and other cast members as shall be deemed necessary to insure the safety of replacements, Understudies, Swings and the other performing members of the cast.

(L) See Rule 70, TOURS, for the substitution of performance with rehearsal on tour.

(M) **Absences and Latenesses**.

(1) In the event the Actor is absent from rehearsals without good and sufficient cause the Actor's salary will be reduced by the applicable portion of the Actor's salary for the time missed. Should the Actor be absent for rehearsals without good and sufficient cause on more than two occasions within 12 months, in addition to having their salary reduced by the applicable portion of their salary for the time missed, the Actor will lose a Personal Day as defined in Rule 33(H). The dollar amount of the reduction shall be based on the Actor's rehearsal or contractual salary, as applicable, (up to triple the applicable weekly minimum) and the total number of working hours contracted for the Actor in the week. The reduction will be assessed in no less than quarter hour increments.

(2) If an Actor is up to 30 minutes late for rehearsal without good and sufficient cause on more than two occasions, or the Actor is more than 30 minutes late without good and sufficient cause to any rehearsal, the Actor’s salary will be reduced by the applicable portion of the Actor’s salary for the time missed. The above calculation shall be used in determining this amount.

(3) Where lateness is at issue, the Producer may determine, based on the rehearsal requirements of the day, whether the Actor shall be permitted to commence rehearsing immediately, at the next quarter hour, or at the start of the next hour. If an Actor is more than one hour late to the Actor's rehearsal call, the Producer may determine whether the Actor shall be dismissed for the entire call. In that event, the Actor's salary will be reduced by the applicable portion of the Actor's salary for the Actor's entire rehearsal call.

(4) In the event a Producer determines that an Actor's salary should be reduced, the Actor must receive written notification, with a copy to Equity, within two business days of the lateness or absence. The Actor may appeal the determination in writing to the Producer, with a copy to Equity, within two business days of receipt of Producer's notice. If the matter cannot be satisfactorily resolved informally among the Actor, the Producer, the League and Equity, the matter will be resolved in accordance with the procedures set forth in Rule 4, ARBITRATION AND GRIEVANCE.

(5) If the Actor is absent and/or late and subject to salary reduction pursuant to Rule 58(M)(1) and (2), respectively, after the fourth occurrence of salary reduction within 12 months under this provision, the Actor may be subject to termination for any subsequent unauthorized absence or lateness from rehearsal. Absences and lateness shall count collectively for the purposes of this Rule 58(M)(5).

(6) It is understood that for purposes of calculating the contractual work week in paragraph (1) above, performances, including half-hour, will be deemed to be three hours. Notwithstanding the above, however, missed performances shall still be calculated in eighths. In no event may the Actor's salary be reduced by more than one week's contractual salary in any one week.

(7) A daily record of latenesses and absences, excused or unexcused, shall be part of the Stage Manager's records. An Actor's daily record will be available to the Actor and Equity upon request.

(8) A half-hour Equity meeting between the cast and an Equity representative will be scheduled during the rehearsal period to discuss this rule. The entire cast will be required to attend and the meeting will be considered a part of the permitted rehearsal hours for the week.

(9) IT IS THE INTENT OF THIS RULE THAT IT SHALL BE APPLIED UNIFORMLY.

(N) The Company Manager shall be accessible at pre-tour rehearsals. (See Rule 72(E) for additional provisions relating to Company Managers.)

**59. REOPENING OF A PLAY**

A play, once closed, shall not be reopened for rehearsal or performance within six weeks of its closing under any Equity contract without the consent of Equity except as provided in Rule 51, PERFORMANCES LOST. Such consent, upon equitable terms and conditions, shall not be unreasonably withheld.

**60. REPLACEMENT OF ACTOR**

(A) Unless Equity shall otherwise order, an Actor may not be required to alternate with an Understudy or successor and if replaced by either, Actor may not thereafter be required (unless Equity otherwise orders) to act again in the role or to report at the theatre for that purpose. Payments, however, shall continue to be made to Actor according to the terms of Actor's individual employment contract except that the Producer shall receive credit for all monies earned by the Actor under another Equity contract during the balance of the term of Actor's original contract.

(1) If the Actor is late for "half-hour" or appears at the theatre unable to perform due to intoxication or similar cause, the Producer, subject to the provisions of Rule 4, ARBITRATION AND GRIEVANCE, may determine that the Actor should not perform. If the Actor is temporarily replaced for a single performance for reasons set forth herein, the above provisions shall not apply and the Actor may be required to perform thereafter, provided the Producer notifies Equity in writing of such action and the reasons therefor within 24 hours. Should such temporary replacement be determined to be without just cause by the Grievance Committee, by an arbitrator or by other mutually agreeable means, the Actor shall be paid full salary for any performance not played as a result of the Producer's action and Actor shall continue to perform under Actor's original contract.

(2) Should the Producer dismiss an Actor for inability to perform due to intoxication or similar cause and so notify the Actor and Equity in writing of such action and the reasons therefor within 24 hours, the provisions of Paragraph (A) above shall not apply. In such event, Equity may institute Expeditious Grievance and Expeditious Arbitration procedures in accordance with Rule 4(A)(1), (C), (E) and (F). If it should be determined by the Grievance Committee, by the Arbitrator, or by other mutually agreeable means that the dismissal was without just cause, the Actor shall be paid full salary for any performances not played as a result of the Producer's action and shall be required to immediately resume Actor's performances when notified to do so by the Producer. Payment for the missed performances must be made prior to the Actor resuming performances under Actor's contract. Pending the determination, the Actor need not report to the theatre.

(B) Should the Term Contract of an Actor initially engaged for the production terminate, according to its terms, within five months of the opening date specified in said contract, the Producer may not reengage the Actor for the same part at a lesser salary than the highest salary in the original contract for Point of Organization and on tour respectively (not counting the salary for the pre-Point of Organization engagement), without the written consent of Equity through its "Cuts Board" under the same rules and procedures covering "Cuts."

(C) **Role or Part Cut Out**. If the role of an Actor signed to a Term Contract is cut out either: (1) before the first paid public performance at Point of Organization for a production which has an out-of-town tryout or, (2) for a production that does not have an out-of-town tryout, two weeks after the first paid public performance at the Point of Organization or the Official Opening, whichever is first, the Producer may terminate said contract by the payment of

a sum equal to two weeks' contractual salary to the Actor, in addition to all sums due for services rendered, plus eight additional weeks' salary to the extent that the play runs more than two weeks after the Actor's part is cut out or terminated as herein provided. In no event shall the Actor receive less than the guarantee period specified in the Actor's contract of employment.

If such Actor is specifically contracted to play two or more parts and a part is withdrawn or cut out, Actor, immediately upon giving notice, may terminate Actor's contract without penalty.

## 61. REST PERIODS AND DAYS OFF

(A) **Rest Periods**. Except on the final day before the first paid public performance or in accordance with Rule 58(D)(1)(c), there shall be a rest period of not less than 12 hours (10 hours on days before matinee days for Principal Actors) between the end of employment on one day and the beginning of employment or call for transportation on the next day. The rest period preceding the call on the day of the first paid public performance shall be not less than nine hours. (See Rule 72 for turn-around rest periods when traveling. See Rule 68(K) for Stage Manager rest periods.)

(1) In the event there should be a major cast replacement (i.e., a star, major featured principal, or any three or more Chorus) or a move from one theatre to another in the City of the Point of Organization, the Producer may call the cast for rehearsal from 3:00 p.m. to 6:00 p.m. (but if there is a 7:00 p.m. curtain, from 2:00 p.m. to 5:00 p.m.) In these two instances only, the recess (break) may be for one hour instead of one and one-half hours as set forth in Rule 58(D)(2).

(a) The replacement rehearsal or the rehearsal for the move from one theatre to another in the City of the Point of Organization must take place on the actual day of the first replacement performance or the first performance in the theatre to which the production has been moved, except as provided in 61(B)(2)(c) below.

(b) Notice of scheduling of a replacement rehearsal, or rehearsal for theatre move, must first be given to Equity.

(2) There shall be a three hour rest period in any city after Actor arrives at hotel or other accommodation, except when transportation is directly to the Actor's hotel and does not exceed three hours from point of departure, in which case two hours shall comprise the aforesaid.

(B) **Days off**.

(1) **Days off during rehearsal**.

(a) The Actor shall be entitled to one day off in each calendar week of the rehearsal period at rehearsal salary, with the exception of the last seven days prior to the first public performance when no day off is required. (Note: See Rule 58(D)(1) which requires two days off each week if Producer elects to rehearse eight out of nine and one-half hours per day each week.)

(b) Rehearsals may only commence with a day off if the day off does not change more than once during the entire rehearsal period. In the first week of rehearsal, no day off will be required if rehearsals begin on or after Thursday. If rehearsals begin prior to Thursday, a day off in that week will be required.

(c) If the first day of "10 out of 12's" (per Rule 58(D)(1)(b)) is before Thursday, then no day off will be required in that week ending Sunday. If "10 out of 12's" begin on Thursday or after, then a day off will be required in that week.

(d) In the week of first paid public performance, no day off will be required if the first paid public performance is on or after Tuesday.

(e) Notwithstanding the above, seven days of "10 out of 12's" may not be followed by 16 consecutive performances without a day off.