UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
KIM MOORE,

               Plaintiff,

                                  Case No.: 23-CV-04837 (LAP)

   -against-

HADESTOWN BROADWAY LIMITED
LIABILITY COMPANY,

               Defendant.
------------------------------------------------------------------x

---

## DEFENDANT HADESTOWN BROADWAY LIMITED LIABILITY COMPANY'S
## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

---

Vincent Toomey
Heather P. Harrison
LAW OFFICE OF VINCENT TOOMEY
*Attorneys for Defendant*
3000 Marcus Avenue, Suite 1W10
Lake Success, New York 11042
(516) 358-5690
vtoomey@vtlawoffice.com
hharrison@vtlawoffice.com

# TABLE OF CONTENTS

Page No

TABLE OF AUTHORITIES…………………………………………………………...ii

PRELIMINARY STATEMENT .................................................................................... 1

PROCEDURAL HISTORY........................................................................................... 5

BACKGROUND……………………………………………………………………….6

ARGUMENT ................................................................................................................. 7

   I: STANDARD OF REVIEW...................................................................................... 7

     A.  Rule 12(b)(6) Standard ..................................................................................... 7

     B. Employment Discrimination Pleading Standards and Jurisdiction…………………..9

   II: PLAINTIFF'S CLAIM IS BARRED BY THE FIRST AMENDMENT ............................. 9

     A.  The First Amendment Bars Civil Claims That Intrude Upon And Regulate Protected Speech ..................................................................................................................... 9

     B.  Entertainment And Artistic Expression Are Protected ................................................. 10

     C.  Plaintiff May Not Use Anti-Discrimination Laws to Modify the Content of *Hadestown* the Musical or the Message It Conveys…………………………………………..11

   III: PLAINTIFF FAILED TO STATE OF CLAIM DISCRIMINATION .............................. 15

   IV: PLAINTIFF FAILED TO STATE A CLAIM OF RETALIATION................................... 17

     A.  Plaintiff Did Not Engage In Protected Activity ............................................................ 18

     B.  Plaintiff Did Not Suffer An Adverse Employment Action ............................................. 20

     C.  There Is No Nexus Between Alleged Protected Activity and Decision Not To Extend Plaintiff's Employment ................................................................................................... 21

   V: THE AMENDED COMPLAINT IS BARRED BY PLAINTIFF'S FAILURE TO SEEK ARBITRATION OF HER CLAIM PURSUANT TO THE CBA………………..……22

   CONCLUSION........................................................................................................... 24

<u>**TABLE OF AUTHORITIES**</u>

<u>Page No.</u>

**Cases**

*Ashcroft v. Iqbal,*
     556 U.S. 662, 678, (2009)……………………………………………………5, 7, 8

*Bell Atl. Corp. v. Twombly,*
     550 U.S. 544, 570 (2007)……………………………………………………….7

*Bery v. City of New York,*
     97 F.3d 689, 696 (2d Cir. 1996)……………………………………………….11

*Brown v. Entm't Merchs. Ass'n,*
     564 U.S. 786, 790 (2011)……………………………………………………...10

*Buon v. Spindler*
     65 F.4th 64, 79-82 (2d. Cir. 2023)……………………………………………..20

*Cardwell v. Davis Polk & Wardwell LLP,*
     No. 2020 WL 6274826, at *16 (S.D.N.Y. 2020)………………………………..9

*Carnegie-Mellon Univ. v. Cohill,*
     484 U.S. 343, 350, n. 7 (1988)…………………………………………………..9

*Carrington v. New York City Hum. Res. Admin.,*
     2020 WL 2410503, *6 (S.D.N.Y. 2020)……………………………………..21, 22

*Charles v. Mount Pleasant Police,*
     2011 WL 3251503 (S.D.N.Y. 2011)……………………………………………..8

*Claybrooks v. American Broadcasting Companies, Inc.,*
     898 F.Supp.2d 986 (M.D.Tenn. 2012)……………………………….4, 11, 12, 15

*Coleman v. City of Mesa,*
     284 P.3d 863, 869–70, 872 (Ariz. 2012)……………………………………….11

*Concord Assocs., L.P. v. Ent. Props. Tr.,*
     817 F.3d 46, 51 n.2 (2d Cir. 2016)……………………………………………...8

*Corrales v. Montefiore Medical Center,*
     2023 WL 2711415, (S.D.N.Y. 2023)…………………………………………...7, 8

ii

*Cressman v. Thompson,*
    798 F.3d 938, 952–53 (10th Cir. 2015)………………………………………………11

*Delaney v. Bank of America Corp.,*
    766 F.3d 163, 169 (2d Cir. 2014)………………………………………….………14

*Ellis v. New York City Department of Education,*
    2020 WL 1166056, *2 (S.D.N.Y. 2020)……………………………………16, 17, 18

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc,*
    547 F.3d 1095, 1101 (9th Cir. 2008)…………………………………………………10

*Ezekwo v. New York City Health & Hosps. Corp.,*
    940 F.2d 775, 781 (2d ir.1991)……………………………………………………..19

*Figueroa v. City of New York,*
    2022 WL 799551, *3 (S.D.N.Y. 2022)……………………………………………....9

*Garnes v. Pritchard Industries, Inc.,*
    2023 WL 3980693 (20Civ. 2843) (PAE)(SLC) (May 23, 2023 S.D.N.Y.)…………....24

*Garvey v. Face of Beauty* LLC,
    2022 WL 5246665 (S.D.N.Y. 2022)…………………………………………………8

*Goel v. Bunge, Ltd.*
    820 F.3d 554, 559 (2d. Cir. 2016)…………………………………………………....8

*Gordon v. N.Y. City Bd. of Educ.,*
    232 F.3d 111, 117 (2d Cir.2000)……………………………………………………21

*Heckman v. Town of Hempstead,*
    568 F. App'x 41, 43 (2d Cir. 2014)………………………………………………..8

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995)…………………………………………………………4, 5, 11, 12

*Hustler Magazine, Inc. v. Falwell,*
    485 U.S. 46, 50-51 (1988)…………………………………………………….…10, 11

*Int'l Healthcare Exh., Inc. v. Global Healthcare Exch., LLC*
    470 F.Supp.2d 345, 357 (S.D.N.Y. 2007)…………………………………………19

*Isbell v. City of New York,*
    316 F. Supp. 3d 571, 592-93 (S.D.N.Y. 2018)………………………………………17

*Johnson v. Tishman Speyer Properties, L.P.,*
No. 09 CIV. 1959 (WHP) (2009) WL 3364038, at *3 (S.D.N.Y.
Oct.2009)……………………………………………………....................................22, 23

*Joseph Burstyn v. Wilson,*
343 U.S. 495, 50 (1952)…………………………………………………………….10

*Lenzi v. Systemax, Inc.,*
944 F.3d 97, 107 n.7 (2d Cir. 2019)……………………………………………….9

*Littlejohn v. City of New York,*
795 F.3d 297, 311 (2d Cir. 2015)………………………………………………...16

*Marcus v. Barilla America NY, Inc.,*
14 F.Suppp.3d 108, 116 (W.D.N.Y.2014)……………………………………….19

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792, 802 (1973)………………………………………………………20, 21

*NAACP v. Claiborne Hardware Co.,*
458 U.S. 886, 916, n.51 (1982)………………………………………………….10

*New York County Bd. of Ancient Order of Hibernians v. Dinkins,*
814 F.Supp. 358 (S.D.N.Y. 1993)……………………………………………….13

*New York Times Co. v. Sullivan,*
376 U.S. 254, 277–78, 1964)……………………………………………………10

*Pani v. Empire Blue Cross Blue Shield,*
152 F.3d 67, 74 (2d Cir. 1998)……………………………………………………9

*Redgrave v. Boston Symphony Orchestra, Inc.,*
855 F. 2d 888, 904, n.17 (1st Cir. 1988)……………………………………......13

*Ruiz v. Cty. of Rockland,*
609 F.3d 486, 492 (2d Cir. 2010)……………………………………………….16

*Sanders v. Grenadier Realty, Inc.,*
367 F.App's 173, 175 (2d Cir. 2010)…………………………………………….17

*Schad v. Borough of Mount Ephraim,*
452 U.S. 61, 65, 101 S. Ct. 2176, 2181 (1981)………………………………….10

*Slattery v. Swiss Reinsurance Am. Corp.,*
248 F.3d 85 (2d Cir. 2001)……………………………………………………….22

iv

*Snyder v. Phelps,*
    562 U.S. 443, 451 (2011)……………………………………………………………..10

*Tamkin v. CBS Broad., Inc.,*
    193 Cal. App. 4th 133, 143 (2011)…………………………………………...10, 11

*Windsor v. The Tennessean,*
    719 F.2d 155, 162-63 (6th Cir. 1983)……………………………………………….9

*303 Creative LLC v. Elenis,*
    143 S.Ct.. 2298 (2023)…………………………………………………...5, 11

*14 Penn Plaza LLC v. Pyett,*
    556 U.S. 247 2009)……………………………………………………...22,23

**Statutes**

42 U.S.C. § 1981……………………………………………………………*passim*

42 U.S.C. § 2000e, et seq………………………………………………,,,*passim*

N.Y. Executive Law § 296………………………………………………*passim*

New York City Administrative Code§ 8-107(1)(a) and (v)………………………...*passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)………………………………………………….*passim*

Plaintiff Kim Moore's Amended Complaint alleges she was subjected to discrimination and/or retaliation in her employment in violation of federal, state and local law.[1] By this motion, Defendant Hadestown Broadway LLC ("Hadestown") seeks dismissal of the Amended Complaint in its entirety pursuant to Fed.R.Civ.P. 12(b)(6).

## PRELIMINARY STATEMENT

*Hadestown* is a Broadway musical written by Anaïs Mitchell ("Mitchell") that intertwines two tragic tales from Greek mythology in a modern industrial apocalyptic time: the young lovers, Orpheus (a creative and earnest optimist) and Eurydice (a fearful loner); and the merciless tyrant, King Hades, and his world-weary wife, Persephone, goddess of the seasons. King Hades rules over a hellish underworld, Hadestown, where workers (*i.e.,* the "Worker Chorus") are forced into misery and must give up their lives and identities, working in brutal conditions to escape the poverty, hunger and cold of the world above. Eurydice, desperate and tired, is coaxed down the road to hell, Hadestown, leaving her love, Orpheus. The tragedy that follows is Orpheus's powerlessness against the world created by Hades and the utter lack of agency and control the Workers have over their lives. With one chance to make it out, Orpheus is overcome with doubt, condemning Eurydice and the Worker Chorus to Hadestown – a sad but hopeful tale that will be told again and again with the hope that it may turn out differently.

Originally premiering at a small theater in Barre, Vermont in 2006, the production closed in 2007. In 2010, *Hadestown* was reimagined by Mitchell and released as a concept album, performed by renowned artists, including Ani DiFranco and Justin Vernon. *Hadestown* later re-emerged with additional songs and a deepened plot, premiering at New York Theatre Workshop

---

[1] Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law § 296 ("NYSHRL"), the New York City Administrative Code §8-107(1)(a) and (v) ("NYCHRL"), and 42 U.S.C. § 1981 ("Section 1981"). *See Amended Complaint,* ¶1.

in 2016. After limited runs in Edmonton, Canada and London, England, *Hadestown* made its Broadway debut at the Walter Kerr Theatre on March 22, 2019, with a now legendary cast, including Andre De Shields, Patrick Page, Reeve Carney, Eva Noblezada and Amber Gray. Since then, *Hadestown* received fourteen Tony nominations, winning eight, including Best Musical and Best Original Score. *Amended Complaint ("AC),* ¶2. From its inception, *Hadestown* sought and achieved extraordinary diversity in its cast, welcoming performers of all backgrounds, races, ethnicities, gender identities and body types.[2] *See AC, Ex. B, C.*[3]

Plaintiff Moore, a member of the Actors' Equity Association union ("AE")(*AC*¶37), was first hired as a "Temporary Singer/Dancer, [understudy] Persephone" in the Worker Chorus from February 14, 2020 through August 2, 2020. Plaintiff worked less than one month, through March 12, 2020, when all Broadway shows were closed due to the COVID-19 pandemic.[4] *See Declaration of Heather P. Harrison ("Decl."), Ex. 1.* Defendant was hired for another temporary singer/dancer role that did not include work as an understudy for Persephone from September 2, 2021 through December 5, 2021. *Decl. Ex. 2.* Plaintiff was aware by October 8, 2021 that Defendant would not seek to hire her after the expiration of her contract. *Id. Ex. 3.* Despite this knowledge and indisputable documentary evidence, Plaintiff incredulously alleges in the Amended Complaint that Defendant decided to "terminate" her employment on December 5, 2021 because of a complaint she allegedly made or about November 23, 2021. *AC* ¶¶*32, 36, 37, 43.*

Plaintiff's allegations of race discrimination and retaliation, which are conclusory and/or demonstrably false, are a thinly veiled attempt to have the federal judiciary impermissibly

---

[2] *See https://www.broadwayworld.com/shows/Hadestown-332678/cast.*
[3] Although Plaintiff did not attach exhibits to the Amended Complaint, it is presumed for purposes of this motion that she is referring to those attached to the Complaint.
[4] https://www.nytimes.com/2020/03/12/theater/coronavirus-broadway-shutdown.html.

intervene in creative decisions and free speech protected by the First Amendment. This is not a case of racial discrimination or retaliation. This is also not a case of whether Plaintiff met or exceeded Defendant's expectations. *AC* ¶ 17. Rather, this lawsuit is about whether the government can, as urged by Plaintiff, interfere on her behalf into the casting and creative process of a musical, play or any other type of artistic performance.

Plaintiff's claims rest solely on the allegation that Hadestown's management believed there were "too many" black people on stage and that the appearance of an exclusively black group of actors in the Workers Chorus perpetuated an unintended "white savior story." *AC* ¶¶29-31. Without any specifics, Plaintiff also alleges that throughout her employment (five months), "Defendant's staff sought to replace [her] solely due to her race and generally complained of having 'too many' African American and black cast members performing in Hadestown Musical." *AC* ¶ 28. Rather than articulating a plausible claim of discrimination and/or retaliation, at most, Plaintiff has alleged a disagreement with the show's artistic vision/choice and, specifically David Neumann ("Neumann"), the show's choreographer who expressed regret over a performance during which all of the members of the Workers Chorus were African American and/or black performers. *AC. ¶¶29-38.*

As alleged in the Amended Complaint, Neumann emailed the cast on November 23 2021 to address concerns about a "white savior" narrative that could have been conveyed due to the fact that all members of the Workers Chorus on a particular night were black and/or African American. *Id.; Decl. Ex. 4.* Specifically, there was discussion about the appearance of Orpheus, played by a white actor, trying to save Eurydice (played by a mixed-race actor) and the Worker Chorus (who were all played by black and/or African American actors) from the hellish underworld. *Id.* The concern was whether such casting distracted or even undermined the story

they were seeking to tell because it could be misinterpreted that black people were the only ones forced into horrible labor conditions and could only be saved by a free white man. *Id.* Neumann openly discussed this casting concern in his November 23 email:

> Greetings from Rachel, Liam and David. We wanted to send you a note to express our commitment to open dialogue regarding ongoing casting decisions and the ramifications of what that looks like in our particular story.
>
> We are aware that in certain arrangements of actors on stage (a white Orpheus, a white Hades, and a Worker Chorus of all Black performers), there can be an unintended and harmful 'white savior' story being told. We do not view Orpheus as a white savior, but we know that this past weekend this story was present on stage. The 'text' of Hadestown may not speak about race, but we know that you, the storytellers, bring your selves, your voices, your bodies to that stage each night, and that becomes the story in all its layers. We are sorry for putting you in that position. We've been engaged in a long term conversation on this topic and are sorry that this message is coming after performances where this potentially harmful storytelling has already occurred.
>
> We invite you to reach out if you'd like to talk more, either directly or through Colette and Heather. We want this to be a continuation and expansion of the type of dialogue we all want to see happen more openly and more frequently.

*Id., Ex. 4.* Neumann clearly welcomed dialogue from anyone to discuss concerns related to the show's casting. Any complaint Plaintiff alleges to have made "in response" to Neumann's email (*AC* ¶32), however, had no bearing on Defendant's decision not to extend Plaintiff's temporary contract. Neumann's email was sent on November 23, 2021; and the decision not to keep her beyond her contract term was made well before that date: October 8, 2021. *Decl., Ex. 3.*

This lawsuit is an unconstitutional vehicle to complain about the casting decisions made at *Hadestown*. Defendant's creative choices concerning content and casting are protected acts of expressive association. Broadway plays and musicals are core protected speech, and Defendant's expressive choices regarding both the message the production conveys, and the individuals who convey it, are entitled to broad protection. *See, e.g., Claybrooks v. American Broadcasting Companies, Inc.,* 898 F.Supp.2d 986 (M.D.Tenn. 2012)*; see also Hurley v. Irish-American Gay,*

*Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995)(rejecting discrimination claim on First Amendment grounds because the government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a favored one, however enlightened either purpose may strike the government"). "All manner of speech—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections." *303 Creative LLC v. Elenis*, 143 S.Ct.. 2298 (2023).

In addition to its constitutional deficiencies, the Amended Complaint should be dismissed because Plaintiff does not "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).   Rather than facts, Plaintiff has asserted the kind of conclusory allegations that the Supreme Court has deemed insufficient, as a matter of law, in discrimination cases. *Id.* Indeed, documentary evidence, including Plaintiff's employment agreements and email correspondence with Plaintiff's agent, utterly refute both the substance and the timeline of the factual allegations that Plaintiff was "terminated" because of her race and/or because she complained.

Finally, if the Court does not dismiss Plaintiff's claims for these reasons, it must dismiss them because they are barred by the applicable Collective Bargaining Agreement ("CBA") which governed Plaintiff's employment with Hadestown.

Accordingly, the Court should dismiss the Amended Complaint with prejudice.

## PROCEDURAL HISTORY[5]

Plaintiff was first employed on a temporary basis for less than one month, from February 14 through March 12, 2020. *Decl., Ex. 1.* Plaintiff was hired again by Defendant for approximately

---

[5] The factual allegations excerpted herein from Plaintiff's Amended Complaint are accepted as true for the purposes of Defendant's motion to dismiss only, and do not constitute an admission of any kind. However, certain facts are demonstrably false and refuted by documentary evidence integral to the Amended Complaint, as noted herein.

four months as a "Temporary Singer/Dancer" from September 2, 2021 through December 5, 2021. *Id., Ex. 2.* Ten months after the expiration of her contract, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). *Id., Ex. 2, AC, ¶7.* Prior to receiving a determination on the charge, Plaintiff requested a right to sue letter from the EEOC, which was issued on March 16, 2023. *AC, ¶8.* Plaintiff commenced this action on June 8, 2023 and filed an Amended Complaint on June 21, 2023. *DE, 1, 9.*

## BACKGROUND

Plaintiff Moore, who is black (*AC ¶10*), was hired to her second stint as a temporary performer in *Hadestown* on September 2, 2021, when Broadway reopened from an eighteen-month closure due to the COVID-19 pandemic.[6] *Decl., Ex. 1, 2.* Plaintiff signed an employment contract, which explicitly defined her position as temporary and limited her employment to a four-month term, from September 2 to December 5, 2021. *Id.., Ex. 2.* Plaintiff was paid union-scale wages based on eight performances per week. *Id., p. 2.*[7]

Defendant did not consider Plaintiff for work beyond her temporary term of employment. In fact, this information was clearly communicated to Plaintiff's agent, Dave Secor ("Secor"), On October 8, 2021. Secor emailed Defendant's general manager, Beverly Edwards ("Edwards"), that day because the show had asked Plaintiff whether she was interested in the role of understudy for the one of the principal roles, Persephone. Secor specifically asked Edwards if

---

[6] *See* Sept. 3, 2021 *Playbill,* https://playbill.com/article/a-look-inside-the-reopening-of-hadestown-on-broadway#:~:text=Photos%20A%20Look%20Inside%20the,Walter%20Kerr%20Theatre%20Se ptember%202.&text=After%20an%2018%2Dmonth%20hiatus,Walter%20Kerr%20Theatre%20 September%202.

[7] Plaintiff's allegations that she earned an annual salary (*AC ¶13, 16*) are misleading and, again, ignore the fact that Plaintiff was a temporary employee, with limited terms of employment, totaling approximately five months. *Decl., Ex. 1, 2.* Moreover, her employment agreements clearly show that she was paid union scale rates based on a certain number of performances, not an annual rate. *Id.*

Defendant planned to keep Plaintiff past December 5, 2021, *i.e.* the end of her temporary contract, because, if there was no such plan, Plaintiff did not want the understudy role. Edwards responded the same day, advising "[t]here are no plans to keep [Plaintiff] past December 5th at this time, as the worker tracks are fully contracted and covered. I have let the team know that [Plaintiff] will therefore not be an understudy for Persephone." *Decl., Ex.3.*[8] This email communication is integral to the Amended Complaint and directly rebuts Plaintiff's allegation that it was not until "November 27, 2021, [Edwards]…indicated to [Plaintiff] that Defendant would be moving in a 'different direction' and would be terminating her employment in the near future." *AC ¶38.*[9] Plaintiff cannot dispute that she knew after her first month of post-COVID-19 temporary employment that she would not be hired beyond the term of her contract.

## ARGUMENT
### I.  STANDARD OF REVIEW
#### A.  Rule 12(b)(6) Standard

Dismissal under Rule 12(b)(6) is warranted where a plaintiff fails to state a claim upon which relief can be granted. The United States Supreme Court has held that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face". *Ashcroft v. Iqbal* ("*Iqbal*"), 556 U.S. 662, 678 (2009)(*quoting Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 570 (2007)(holding that a complaint must do more than posit "naked assertions devoid of further factual enhancement"); *see also Corrales v. Montefiore Medical Center,* 2023 WL 2711415, (S.D.N.Y. 2023)(employment

---

[8] The October 8, 2021 email between Secor and Edwards is integral to the Amended Complaint and shows that Plaintiff knew after her first month of her post-Covid-19 temporary employment that she would not be hired to stay beyond the term of her contract.

[9] This email, wherein Plaintiff turns down the opportunity to work as Persephone's understudy, also rebuts Plaintiff's allegation that "[t]hroughout her employment, Moore was vocal about her commitment to the effective production and performance of the Hadestown Musical in addition to her desire to advance her career and take on additional responsibilities and roles for Defendant." AC ¶20. Plaintiff clearly refused additional responsibilities.

discrimination claim must be plausible on its face). Likewise, a pleading fails if it alleges no "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, at 678. As such, a plaintiff must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*citing Twombly*, at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient to survive a motion to dismiss. *Id.* Thus, "a plaintiff is obliged to amplify a claim with some factual allegations to allow the court to draw the reasonable inference that the defendant is liable for the alleged conduct." *Charles v. Mount Pleasant Police*, 2011 WL 3251503 (S.D.N.Y. 2011)(*citing Iqbal*).

"When evaluating a Rule 12(b)(6) motion, a district court's consideration is confined to the 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Corrales*, at *4. However, "in some instances, a document that is not expressly incorporated by reference in the complaint may be considered on a motion to dismiss where that document is 'integral.'" *Id., quoting Goel v. Bunge, Ltd.* 820 F.3d 554, 559 (2d. Cir. 2016)(*quoting Concord Assocs., L.P. v. Ent. Props. Tr.* 817 F.3d 46, 51 n.2 (2d Cir. 2016). "The Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014). "[I]f 'a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true.'" *Garvey v. Face of Beauty* LLC, 2022 WL 5246665 (S.D.N.Y. 2022)(*internal citations and quotes omitted*).

It is well established that "[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). "This principle applies to First Amendment defenses at the pleading stage: when a plaintiff's allegations establish that the First Amendment bars the plaintiff's claims as a matter of law, federal courts may dismiss those claims. *See Windsor v. The Tennessean*, 719 F.2d 155, 162-63 (6th Cir. 1983) (finding that dismissal of plaintiff's § 1985(1) claims against certain defendants was appropriate pursuant to Rule 12(b)(6), because, inter alia, defendants had "agreed to engage in constitutionally protected speech").

## B.  Employment Discrimination Pleading Standards and Jurisdiction

Employment discrimination claims brought under § 1981, Title VII and NYSHRL are all generally subject to the same pleading standards, while NYCHRL is subject to a more liberal standard. *Figueroa v. City of New York*, 2022 WL 799551, *3 (S.D.N.Y. 2022); *Cardwell v. Davis Polk & Wardwell LLP*, No. 2020 WL 6274826, at *16 (S.D.N.Y. 2020). Title VII and the NYSHRL claims are generally considered "analytically identical" and "addressed together." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 n.7 (2d Cir. 2019).[10]

## II.  PLAINTIFF'S CLAIM IS BARRED BY THE FIRST AMENDMENT
### A.  The First Amendment Bars Civil Claims That Intrude Upon And Regulate Protected Speech

The First Amendment provides: "Congress shall make no law…abridging the freedom of

---

[10] In the event Plaintiff's Title VII and NYSHRL claims are dismissed, the Court may decline to exercise discretion of the remaining NYSHRL claims. Section 1367(c)(3) and title 28 of the U.S. Code states that a district court "may decline to exercise supplemental jurisdiction over a claim under subjection (a) if…the district court has dismissed all claims over which it has original jurisdiction." "[I]n the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine…will point toward declining jurisdiction over the remaining state law claims." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, n. 7 (1988).

speech." U.S. Const. Amend. I. The First Amendment shields protected speech and expression from private litigation as well as statutory restrictions and criminal penalties. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277–78, (1964) ("What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law."). Thus, "[a]lthough this is a civil lawsuit between private parties, the application of [anti-discrimination laws]...in a manner alleged to restrict First Amendment freedoms constitutes" prohibited government action and is barred." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916, n.51 (1982)(applying First Amendment to state action pursuant to the Fourteenth Amendment); *see also E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1101 (9th Cir. 2008)("[T]he First Amendment defense applies equally to [plaintiff's] state law claims as to its Lanham Act claim"); *Snyder v. Phelps*, 562 U.S. 443, 451 (2011)("[t]he Free Speech Clause of the First Amendment...can serve as a defense")(*citing Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988)).

### B. Entertainment And Artistic Expression Are Protected

Defendant is a private entity that unquestionably engages in protected speech when it stages the Broadway production of *Hadestown*. It is well-settled that "[e]ntertainment, as well as political and ideological speech, is protected" fully by the First Amendment. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S. Ct. 2176, 2181 (1981). "[M]otion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works [all] fall within the First Amendment guarantee." *Id.; see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011)("[V]ideo games qualify for First Amendment protection."); *Joseph Burstyn v. Wilson*, 343 U.S. 495, 50 (1952)("[M]otion pictures...[are] included within the free speech and free press guaranty of the First and Fourteenth Amendments"); *Tamkin v. CBS*

*Broad., Inc.*, 193 Cal. App. 4th 133, 143 (2011) ("the creation, casting, and broadcasting of an episode of a popular television show" is an "an exercise of free speech").

The Supreme Court has held that expressive, original works of art—including the "painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll"—are "unquestionably shielded" by the First Amendment. *Hurley*, 515 U.S. at 569 (1995). "[P]aintings, photographs, prints and sculptures" are speech because they "always communicate some idea or concept." *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir. 1996). Music and film are pure speech because they "predominantly serve to express thoughts, emotions, or ideas." *Coleman v. City of Mesa*, 284 P.3d 863, 869–70, 872 (Ariz. 2012). The "animating principle" behind the First Amendment's pure speech protection is "safeguarding self-expression." *Cressman v. Thompson*, 798 F.3d 938, 952–53 (10th Cir. 2015).

## C. Plaintiff May Not Use Anti-Discrimination Laws to Modify the Content of *Hadestown* the Musical or the Message It Conveys

To permit governmental intrusion into the creative and artistic process would plainly violate the First Amendment's guarantees of free speech and free expression, and the prohibition against compelled speech. *See generally, 303 Creative.* The fact that Plaintiff has styled the Amended Complaint as a race discrimination complaint does not alter the analysis. Even laws which advance important and worthwhile social policy objectives, like anti-discrimination laws, may not, consistent with the First Amendment, be used to regulate the content of protected speech. In *Claybrooks,* the court held that: "casting decisions are part and parcel of the creative process behind a television program -- including [the *Bachelor* and the *Bachelorette*] – thereby meriting First Amendment protection against the application of anti-discrimination statutes to that process." 898 F.Supp.2d 986 at *993. While the factual circumstances in *Claybrooks* are not precisely analogous to those presented in this case (the plaintiffs there were not employees of the

show whereas Plaintiff here was employed by Defendant and therefore eligible to raise Title VII and related claims), the same general principle applies in both cases: "anti-discrimination statutes of general applicability must yield to the First Amendment." *Id.* The *Claybrooks* decision also makes clear that casting decisions are a form of creative expression: "[t]he producers of a television program, a movie, or a play could not effectuate their creative vision, as embodied in the end product marketed to the public, without signing cast members." *Id.* "Ultimately, whatever messages *The Bachelor* and *The Bachelorette* communicate or are intended to communicate -- whether explicitly, implicitly, intentionally, or otherwise -- the First Amendment protects the right of the producers of these Shows to craft and control those messages, based on whatever considerations the producers wish to take into account." *Id.*, *citing Hurley*, 515 U.S. at 573.

*Hurley* is also instructive here. In that case, the plaintiff was an organization known as "GLIB," which consisted of openly gay, lesbian and bisexual individuals of Irish heritage. *Id.* at 561. GLIB sued the organizers of the St. Patrick's Day parade in Boston under a Massachusetts public accommodations law to force the defendant to allow GLIB to march in the parade under its own banner. *Id.* In a unanimous decision, the Supreme Court held that the Massachusetts anti-discrimination law could not be used to force the organizers to grant GLIB a permit, as that would infringe on the organizers' right to free speech. *Id.* at 581. The Court explained that "the fundamental rule of protection under the First Amendment [is] that a speaker has the autonomy to choose the content of his own message." *Id.* at 573. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Id.* (*internal citations and quotations omitted*). This First Amendment right to determine "what not to say"

belongs not only to the press, but also to artists, business corporations and ordinary people, and, simply put, prohibits the government from forcing a person or organization to communicate a plaintiff's desired message: "[W]hatever the reason [for excluding GLIB from the parade], it boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control." *Id.* at 574-75. The positive or negative nature of the proposed message is irrelevant: "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Id.* at 579.

Here, Plaintiff wishes to use Defendant's speech to send her preferred message – purportedly that she should have been cast, beyond the term of her contract, instead of the white performer whom she believes was hired in her stead, because doing so would advance Defendant's diversity goals. *AC ¶23-38.* Without any evidence or specifics, Plaintiff conclusively alleges that the show's director "indicated to her staff that she had hired a white woman to replace Moore because she sought to avoid an all-black Workers Chorus." *AC ¶40.* Even if this threadbare allegation could be taken as true for purposes of a motion to dismiss, a choice to not have an "all black" Workers Chorus is protected creative expression. The First Amendment prohibits Plaintiff from using this lawsuit to restrict Defendant's casting decisions and expression. *Redgrave v. Boston Symphony Orchestra, Inc.,* 855 F. 2d 888, 904, n.17 (1st Cir. 1988) ("We do not think it at all obvious, as do our dissenting brethren, that liability should attach if a performing group replaces a black performer with a white performer (or vice versa) in order to further its expressive interests.").

In *New York County Bd. of Ancient Order of Hibernians v. Dinkins*, 814 F.Supp. 358

(S.D.N.Y. 1993), a sponsor of the St. Patrick's Day parade brought an action challenging the City of New York's decision to require the organization to allow a gay organization to march in the parade as a condition of its parade permit. The City argued that the condition was appropriate because the parade is purportedly a public accommodation.  The court, however, rejected that argument:

> The main problem with [that] logic…is that it starts the analysis at the wrong end. The first question that should have been considered is not whether the [Parade] is a public accommodation, but whether the Parade and its message constitutes speech protected by the First Amendment guarantee of Freedom of Speech. Insofar as a parade constitutes protected free speech, it cannot be a public accommodation.

*Id. at 366.* Similarly in this case, Plaintiff's analysis starts at the wrong end.  Rather than starting with the first question of whether Defendant's casting decision is protected speech under the First Amendment, Plaintiff mistakenly frames her claim solely as a question of employment discrimination, or does so intentionally to circumvent the obvious First Amendment implications.

Allowing litigants to petition courts to control the casting decisions of Broadway productions would call into question the legality of a host of other productions that are mindful of race and/or sex of the actors telling their stories.[11] For example, *Hamilton* is a Broadway musical created and written by Lin-Manuel Miranda. It is well-known that Mr. Miranda wrote the roles of Aaron Burr, Thomas Jefferson and George Washington – all white men – to be played by non-white actors.[12] The decision to cast non-white actors is at the core of *Hamilton's* artistic expression.

---

[11] Litigating casting decisions would also put courts in the position of sitting as a super-personnel department. The Second Circuit has noted that, although a court "must ensure that employers do not act in a discriminatory fashion," it should "not sit as a super-personnel department that reexamines an entity's business judgment."  *Delaney v. Bank of America Corp.*, 766 F.3d 163, 169 (2d Cir. 2014).

[12] *See e.g.,* https://www.theatlantic.com/entertainment/archive/2016/03/hamilton-casting/476247/.

Should this Court make a determination on who must be cast in *Hadestown* based on race, then there is nothing stopping a white performer or applicant for a role in *Hamilton* from asking a federal court to cast him as George Washington, even if such casting would completely undermine the creative vision of the show. The *Claybrooks* decision highlighted similar threats to content if courts could intervene in casting decisions, *e.g.* "the Black Entertainment Channel (targeted to African-Americans), Telemundo (targeted to Latinos)" among many other targeted programs and networks. *Claybrooks*, 898 F.Supp.2d at 998.[13] Such a dangerous precedent would often work to the detriment of famed black playwrights, such as August Wilson and Lorraine Hansberry, whose great works chronicle the experiences of the African American community. The extension of Plaintiff's premise in this case is that white actors who are not offered roles in Hansberry's *Raisin in the Sun* or who are excluded from Wilson's *Fences* or *The Piano Lesson*, could force theater producers and directors to cast them instead of black actors. That proposition is both absurd and unconstitutional.

The Amended Complaint impermissibly seeks to regulate a casting decision, and therefore expression of the show in violation of the First Amendment and, accordingly, fails to state a legally cognizable claim.

### III. PLAINTIFF FAILED TO STATE OF CLAIM OF DISCRIMINATION

"In cases alleging discrimination in the employment context, a plaintiff need not provide "substantial evidence of discriminatory intent' at the initial stage of the litigation but still has the

---

[13] This is not to say that Broadway shows or other forms of artistic expression are exempt from employment discrimination statutes entirely. Broadway productions are large employers with numerous categories of employees, including stage hands, ushers, sales representatives, among others. These types of employment which do not involve artistic or creative vision, as do members of the cast, make up the bulk of employees in Broadway shows, including *Hadestown*. Racially based employment discrimination in those non-creative categories is, of course, subject to scrutiny under Title VII and other employment discrimination laws.

'minimal burden of showing facts suggesting an inference of discriminatory motivation' to satisfy his prima facie requirements." *Ellis v. New York City Department of Education*, 2020 WL 1166056, *2 (S.D.N.Y. 2020) *citing Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). "Consequently, a plaintiff may establish these requirements under [Title VII] by showing that '(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination.'" *Ellis*, at *2, *citing Ruiz v. Cty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).

Here, Plaintiff has failed to meet her minimal burden of showing facts suggesting discriminatory intent. The factual allegations in the Amended Complaint do not even endeavor to differentiate her claims of discrimination against her claims of retaliation, *i.e.*, ¶¶ 29-54, which fall under a single heading: "Defendant Discriminated and Retaliated Against Moore..." *AC*, p. 5.[14] In fact, Plaintiff's race discrimination claim rests solely on the alleged discussions regarding the casting of the Worker Chorus on or about November 20, 2021 and her belief that this discussion constituted "anti-black sentiment by management with respect to the members of the Workers Chorus." *AC*, ¶¶29-32. These allegations offer no facts to suggest that Defendant's casting of the Worker Chorus was discriminatory. Rather, these allegations on their face show

---

[14] Although the Amended Complaint states in Paragraph 3 that Plaintiff was subjected to a hostile work environment, it does not actually allege facts in support of such a claim. "To establish a hostile work environment under [Title VII], a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, at 320-321 (2d Cir. 2015). Indeed, the Amended Complaint is devoid of any factual allegations showing a severe or pervasive work conditions. However, even if a hostile work environment claim could be read into the Amended Complaint, the alleged discussions relating to the casting of the Worker Chorus do not demonstrate a workplace that permeated with hostility based on race. As a result, a hostile work environment claim is not plausible.

that there was a creative discussion surrounding the casting of the Worker Chorus on a single night and that Defendant was sensitive to how the appearance of an exclusively non-white cast might appear in the context of the story.

Moreover, to the extent Plaintiff attempts to bolster her threadbare claim of discrimination by alleging that on November 24, 2021 Timothy Reid, the show's dance captain, told her that Defendant "was seeking to replace Moore with a 'white woman'" only after she complained in late November (*AC*, ¶¶ 31-32), this allegation is demonstrably false. The record evidence shows that Defendant had decided well before November 24, 2021 that Plaintiff would not be asked to stay beyond her contracted term. *Decl, Ex 3.* Plaintiff was notified on October 8, 2021 that she would not continue to work for the show past December 5, 2021.  *Id.*  The same is true with regard to Plaintiff's demonstrably false allegation that Edwards only told her on November 27, 2021 "that Defendant would be moving in a 'different direction' and would be terminating her employment in the near future." *AC*, ¶38; *Decl. Ex. 3.*

The Amended Complaint is too conclusory and devoid of specific facts to meet Plaintiff's minimal burden with respect to discrimination. Plaintiff's attempt to cure this lack of specificity by combining her discrimination claim with her retaliation claim is insufficient and cannot withstand a motion to dismiss. *See Ellis*, at *3 (dismissing discrimination claim that merely asserted a discriminatory policy without pointing to any specific facts)(*citing Sanders v. Grenadier Realty, Inc.*, 367 F.App's 173, 175 (2d Cir. 2010).

## IV. PLAINTIFF FAILED TO STATE A CLAIM OF RETALIATION

To state a retaliation claim, plaintiffs must allege, among other things, that they engaged in a protected activity and suffered an adverse employment action that was causally connected to the protected activity. *See Isbell v. City of New York*, 316 F. Supp. 3d 571, 592-93 (S.D.N.Y. 2018);

*see also Ellis,* at *4. Plaintiff alleges "Defendant retaliated against [her] by terminating her employment" and that "[t]he reason [Plaintiff] was terminated by Defendant was because she was an African American, black woman that complained internally regarding racial discrimination." *AC ¶¶43-44.* Plaintiff's retaliation claim fails because (1) complaining about the show's casting is not protected activity; (2) she did not suffer an adverse employment action; and (3) there is no nexus between the alleged retaliatory action and any decision not to extend her employment. Here, Plaintiff's scant allegations do not rise to the level of a plausibility required by federal, state or local law.

### A.  <u>Plaintiff Did Not Engage In Protected Activity</u>

Plaintiff alleges that she complained to a human resources employee about race discrimination "in response" to Neumann's November 23, 2021 email regarding the casting of the Worker Chorus for the show's performance on or about November 20, 2021. *AC ¶¶32, 37.* She also alleges she "complained a second time, this time to her union representative" on or about November 24, 2021.[15] *Id.* ¶37. These alleged complaints, as stated in the Amended Complaint, do not constitute protected activity because they relate solely to the casting of the Worker Chorus, the narrative impact of such casting, and the creative vision of show. As discussed *supra*, casting the Worker Chorus was a creative expression and decision; and while Plaintiff was certainly welcome to voice her opinion, doing so did not constitute protected activity. The Amended Complaint does not plausibly allege that Plaintiff's disagreement or complaint about casting put Defendant on notice that she was complaining about unlawful

---

[15] Plaintiff's complaint to her union representative is not protected activity because the union is not her employer. *AC ¶37.* Moreover, Plaintiff has not presented any evidence that the union communicated her alleged complaint to Defendant. Therefore, Defendant cannot be deemed to have knowledge of Plaintiff's complaint to her union representative. Her complaint to her Union representative appears to acknowledge that her mechanism to address her concerns or seek redress were under her collective bargaining agreement.

18

discrimination. *Marcus v. Barilla America NY, Inc.,* 14 F.Suppp.3d 108, 116 (W.D.N.Y. 2014). "Naturally, a retaliation claim also requires that the employer be aware of the employee's protected activity: thus, while complaints about discriminatory conduct need not mention discrimination or use any particular verbiage, "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity. *Id., citing Int'l Healthcare Exh., Inc. v. Global Healthcare Exch., LLC* 470 F.Supp.2d 345, 357 (S.D.N.Y. 2007). "The onus is on the speaker to clarify to the employer that [she] is complaining of unfair treatment due to [her] membership in a protected class and that [she] is not complaining merely of unfair treatment generally." *Marcus v. Barilla America NY, Inc.,* 14 F.Suppp.3d at 116 (*quoting Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir.1991).

Here, Plaintiff fails to plausibly allege that Defendant had a reasonable belief that her one complaint about Neumann's November 23, 2021 email pertained to an unlawful employment practice, rather than a complaint about the creative vision and casting decisions related to the Workers Chorus. Moreover, Plaintiff does not provide any specificity about the nature of her complaint; instead, she vaguely alleges that the complaint was "regarding discrimination against her and the 'Workers Chorus' in the form of hostility and anti-black sentiment by management with respect to the members of the Workers Chorus." *AC ¶32.*

Plaintiff neglects to provide the full context of Neumann's November 23, 2021 and November 28, 2021 emails, in all likelihood because they show management wrestling with the story that may have been communicated during a performance when the entire Worker Chorus consisted of black and/or African American performers. This was the creative and artistic process being discussed in real time – a dialogue about the story being told and how it was being

conveyed. *Decl., Ex. 4, 5.* While Defendant does not dispute that Plaintiff may have participated in this discussion, the documentary evidence clearly shows that it revolved around the storytelling related to casting. Defendant, therefore, could not reasonably believe that Plaintiff's "complaint" was related to unlawful discrimination. Should such a complaint/disagreement about casting be deemed protected activity, it would serve as an improper back door means to control content, which, as discussed *supra*, would set a dangerous precedent.

Accordingly, Plaintiff has not plausibly alleged that she engaged in protected activity.

**B.  Plaintiff Did Not Suffer An Adverse Employment Action**

Even if Plaintiff could establish that the she engaged in protected activity, she cannot establish that an adverse action occurred. Notwithstanding the fact that Plaintiff repeatedly mischaracterizes basic facts about her terms of temporary employment, including her dates of employment and compensation, the second employment agreement clearly shows that she was hired to work for four months – from September 2, 2021 to December 5, 2021. *See Decl, Ex. 2.* Plaintiff cannot refute that she completed the full term of her contract. There was no promise or expectation that Plaintiff would continue to work after the term of her contract. In fact, Plaintiff was told as early as October 8, 2021 that there was no plan to extend her beyond the term of her contract. *Id., Ex. 3.*

While the Second Circuit recently set forth an expansive list of examples of adverse employment actions in the *Buon v. Spindler*, it notably did not include the circumstances in the case at hand as adverse, *i.e.,* where a temporary, short-term employee who completes the term set forth in her employment contract and is not re-hired for an additional term. 65 F.4th 64, 79-82 (2d. Cir. 2023). The completion of her employment term also sets Plaintiff apart from a job applicant who was not hired while the position remains open. *See McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802 (1973)(noting that a failure to hire may constitute an adverse employment action.

Plaintiff was hired on a temporary basis; worked for the full term of the agreement; and was told within approximately the first of her four months of post-COVID employment that she would not be asked to work beyond the four-month term of her contract. Given these irrefutable facts, Plaintiff has not alleged a plausible adverse action.

### C. There Is No Nexus Between Alleged Protected Activity and Decision Not To Extend Plaintiff's Employment

Above all else, Plaintiff's retaliation claim must be dismissed because the indisputable documentary evidence shows that Defendant decided on October 8, 2021, if not sooner, that it would not extend Plaintiff's temporary employment beyond the agreed upon term. *Decl.,* Ex. 3. "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000). Here, Plaintiff cannot show that her alleged complaint about the casting of the Workers Chorus was closely followed by discriminatory treatment, disparate treatment, or retaliatory animus. On the contrary, integral and clear documentary evidence shows that the decision not to hire Plaintiff to work after her temporary term was made and communicated to her agent well before the Worker Chorus casting issue even arose. *Decl., Ex. 3.*

"The Court of Appeals has observed that where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Carrington v. New York City*

*Hum. Res. Admin.*, 2020 WL 2410503, *6 (S.D.N.Y. 2020); *citing Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 85 (2d Cir. 2001). "If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory." *Carrington, at *6.*

On October 8, 2021, Plaintiff's agent specifically emailed Beverly Edwards, inquiring whether Defendant planned to keep her beyond December 5, 2021. *Decl., Ex. 3.* Beverly Edwards advised Plaintiff's agent that there was no plan to do so. *Id.* The purported adverse action, therefore, occurred long before Plaintiff alleges she engaged in protected activity. Plaintiff has, therefore, failed to show a causal link between the time she claims to have complained about the casting of the Worker Chorus, *i.e.,* November 23, 2021, and the October 8, 2021 email to Plaintiff's agent advising that Defendant would not seek to keep her beyond December 5, 2021. *AC* ¶¶31-32; *Decl., Ex. 3.* Plaintiff has, therefore, failed to allege a plausible retaliation claim.

## V.  THE AMENDED COMPLAINT IS BARRED BY PLAINTIFF'S FAILURE TO SEEK ARBITRATION OF HER CLAIM PURSUANT TO THE CBA

Here, it is unquestionable that Plaintiff is bound by the CBA. *Decl. Ex. 6.* Plaintiff acknowledges that she is a member of the union and alleges she complained to her union representative about discrimination on the basis of race on November 24, 2021. *AC* ¶37. However, notwithstanding her recognition that her claims are governed by the CBA, Plaintiff failed to pursue her claims in the appropriate forum.

In *14 Penn Plaza LLC v. Pyett,* the Supreme Court held that "a collective bargaining agreement that clearly and unmistakably requires union members to arbitrate [age discrimination] claims is enforceable as a matter of federal law." 556 U.S. 247 (2009).  As the Court explained, "nothing in the text of Title VII or the ADEA precludes contractual arbitration". *Id., at* 267, n. 9; *see also Johnson v. Tishman Speyer Properties, L.P.*, No. 09 CIV. 1959 (WHP),

2009 WL 3364038, at *3 (S.D.N.Y. Oct. 16, 2009) (holding that plaintiff's Title VII race discrimination claims are within the scope of the arbitration clause) (*citing 14 Penn Plaza.*)

Here, the CBA requires that all employee claims, specifically including but not limited to claims of discrimination related to race, be pursued through the grievance and arbitration process of the CBA.  Specifically, Section 4 of the CBA states in relevant part: "Except as otherwise expressly provided in these Rules, any dispute between a Producer and/or the League and the Actor and/or Equity relating to the interpretation or application of the Collective Bargaining Agreement between Equity and the League shall be submitted to the Grievance Committee at the request of either Equity, the Producer, or the League and, if not decided by the Grievance Committee, may be submitted to arbitration as provided below."  Section 43 expands on Section 4, providing a specific process for members who wish to complain about discrimination based on race, or other protected categories:

> The parties hereto affirm their commitment to the policy that employment hereunder shall be without discrimination on the basis of sex, race, color, creed, national origin, age, disability, sexual orientation, gender identity and/or expression or political persuasion or belief. Consistent with the foregoing and with the procedure set forth in Rule 5(E)(4), it is the intention of the parties that the casting of productions will be conducted in a manner which provides equal and fair consideration to all Actors including, but not limited to: Actors with disabilities, ethnic minorities, seniors and women.
> [...]
> (B) Claims. Any claimed violation of this policy shall promptly be submitted for settlement to the Grievance Committee, pursuant to Rule 4, ARBITRATION AND GRIEVANCE.
>
> (1) The Actor or applicant shall submit to Equity any claimed violation of these provisions within 28 days of the time when the claim arose or when the Actor became aware of the alleged discrimination, whichever is later. Equity shall send written notice of the claim to the League and the Producer, in accordance with Rule 4(A)(2) within five business days thereafter. Any claim for which timely notice is not given shall be barred unless unusual circumstances can be shown for such delay. The Grievance Committee shall meet to consider the claim immediately thereafter.

> (2) If the dispute is not decided by the Grievance Committee, the claim may then be submitted directly to arbitration in accordance with Rule 4. The Arbitrator may provide such remedies as in his discretion shall be deemed appropriate.

Sections 4 and 43[16] of the CBA both clearly unmistakably require a member to seek arbitration of all claims raised in the Amended Complaint. Because Plaintiff complained to her union representative on November 24, 2021, this demonstrates her awareness that the CBA governed her claims. Additionally, her alleged complaint to her union representative demonstrates AEA's knowledge of the circumstances and obvious conclusion that a grievance was not appropriate because it involved casting and creative decisions within Defendant's discretion.[17]

Plaintiff failed to pursue arbitration under either provision of her CBA. The Amended Complaint must, therefore, also be dismissed on the grounds of failure to pursue arbitration of her claims under Sections 4 and 42 of the CBA. *See Garnes v. Pritchard Industries, Inc.*, 2023 WL 3980693 (20 Civ. 3843) (PAE)(SLC) (May 23, 2023 S.D.N.Y.).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion to dismiss the Amended Complaint, that the Amended Complaint be dismissed in its entirety with prejudice, that the relief requested in the Amended Complaint be denied in all respects, that judgment be entered for Defendant, and that Defendant be granted costs, fees, and disbursements together with such other and further relief as this Court deems just and proper.

---

[16] Section 43(E) of the CBA provides an anti-retaliation provision, which would also be subject to the grievance and arbitration procedure, and bar Plaintiff's retaliation claims.

[17] While Plaintiff does not have any plausible claims against Defendant, any dispute she has with AEA about its decision not to act on her alleged complaint, would be a separate breach of duty of fair representation against the union.

Dated:          Lake Success, New York
                August 21, 2023

                                        Respectfully submitted,
                                        LAW OFFICE OF VINCENT TOOMEY


                                        Vincent Toomey
                                        Heather P. Harrison
                                        *Attorneys for Defendant*
                                        3000 Marcus Avenue, Suite 1W10
                                        Lake Success, New York 11042
                                        (516) 358-5690
                                        vtoomey@vtlawoffice.com
                                        hharrison@vtlawoffice.com

25