UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KIM MOORE,

                    Plaintiff,

-against-

HADESTOWN BROADWAY LIMITED
LIABILITY COMPANY,

                    Defendant.

---

No. 23-CV-4837 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Hadestown Broadway Limited Liability Company's ("Defendant" or "Hadestown") motion to dismiss Plaintiff Kim Moore's Amended Complaint ("Am. Compl."), (see dkt. no. 9), pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Plaintiff opposes the motion.[2] For the reasons set forth below Defendant's motion to dismiss is GRANTED in part and DENIED in part.

---

[1] (See Notice of Motion, dated Aug. 21, 2023 [dkt. no. 16] ["Notice of Mot."]; Declaration of Heather P. Harrison in Support of Motion to Dismiss, dated Aug. 21, 2023 [dkt. no. 16-1] [the "Harrison Declaration" or "Harrison Decl."]; Defendant's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Amended Complaint, dated Aug. 21, 2023 [dkt. no. 16-9] ["Def. Br."]; Defendant's Reply Memorandum in Support of its Motion to Dismiss, dated Sept. 12, 2023 [dkt. no. 20] ["Def. Reply"].)

[2] (See Memorandum of Law in Opposition to Defendant's Motion, dated Sept. 5, 2023 [dkt. no. 19] ["Pl. Opp."]; Declaration of Joseph Myers in Opposition to Defendant's Motion, dated Sept. 5, 2023 [dkt. no. 18] [the "Myers Declaration" or "Myers Decl."].)

I.  **Background**[3]

    **A. Factual Background**

    Plaintiff Kim Moore is a black woman who works as an actress. (See Am. Comp. ¶¶ 13-14.)  Defendant is a company that produces and stages "Hadestown," a musical that runs on Broadway (the "Musical" or the "Production").  (See id. ¶¶ 2, 11, 15.)  On or about January 30, 2020, Defendant hired Plaintiff to perform as an actress in its production of the Musical.  (See id. ¶¶ 13, 15.) Plaintiff played the role of "Worker #1" as part of the Musical's "Workers Chorus," as well as other parts in the Musical.  (See id. ¶ 21.)  In the Musical, the Workers Chorus consists of several actors who perform their roles as "Workers" within the Workers Chorus.  (See id. ¶¶ 21-22.)

    As of November 2021, the Workers Chorus consisted exclusively of black cast members, including Plaintiff.  (See id. ¶ 30-31.) As a result, on November 23, 2021, David Neumann, a choreographer and supervisor for Defendant, emailed the entire cast of the Musical to apologize for the fact that the Musical was conveying a "white savior story" due to the exclusively black Workers Chorus. (See id.; see also Exhibit 4 to the Harrison Decl., dkt. no. 16-5 ["Ex. 4"].)

---

[3] The facts in this opinion are drawn primarily from Plaintiff's Amended Complaint as well as the exhibits attached to the Harrison Declaration which are integral to the Amended Complaint, (see infra at 20-22).

In his email, Mr. Neumann stated that he, director Rachel Chavkin, and Liam Robinson, another Hadestown executive, were "commit[ted] to open dialogue regarding ongoing casting decisions and the ramifications of what that looks like in our particular story." (Harrison Decl. Ex. 4 at 1.)  Specifically, Neumann noted that "certain arrangements of actors on stage (a white Orpheus, a white Hades, and a Worker Chorus of all Black performers)" may have told "an unintended and harmful 'white savior' story." (Id.) Neumann wrote that, although he, Chavkin, and Robinson did not "view Orpheus as a white savior" in the Musical and "[t]he 'text' of Hadestown may not speak about race," the particular arrangement of the Hadestown cast on stage had nonetheless expressed a "white savior story" because the actors are the Musical's "storytellers" who "become[] the story" on stage each performance through their selves, voices, and bodies.  (Id.)

In response to Mr. Neumann's email, Plaintiff complained to Colette Luckie, an employee of Defendant's responsible for human resources, regarding the discrimination that she and other cast members in the Workers Chorus faced on the basis of their race. (See Am. Compl. ¶ 32.)  Other black actors in the Workers Chorus separately complained to Defendant about the racial discrimination they perceived in the Production.  (See id. ¶ 33.)

On or about November 24, 2021—the day after Mr. Neumann emailed the entire cast of the Musical to apologize for the

Musical's "white savior story"—Timothy Reid, a supervisor and dance caption for the Musical, informed Plaintiff that Defendant was seeking to replace her in the cast with a white woman.  (See id. ¶ 36.)  That day, Plaintiff lodged a second complaint about the racial discrimination she faced from Defendant.  (See id. ¶ 37.)  Plaintiff made this second complaint to Walt Kiskaddon, her union representative.  (See id.)

On November 27, 2021, Beverly Edwards, a senior manager for Defendant, informed Plaintiff that Defendant would soon terminate Plaintiff's employment.  (See id. ¶ 38.)

The following day, Mr. Neumann sent an email only to the black cast members of the Musical indicating that Defendant was now seeking to avoid having the Workers Chorus consist solely of black cast members.  (See id. ¶ 39.)  Neumann offered "a more specific apology" to the black Hadestown cast members for having to "tell[] a 'white savior' story" on stage, which, Neumann said, was never the story Hadestown executives intended to tell.  (Exhibit 5 to the Harrison Decl., dkt. no. 16-6 ["Ex. 5"] at 1.)  Neumann said he and other Hadestown executives intended to consider "all future possible combinations of actors on stage" to avoid telling a "white savior story" again.  (Id.)

Three days after Mr. Neumann sent his second email, Ms. Chavkin, the director of the Musical, indicated to Defendant's employees that, in furtherance of Defendant's goal to avoid an

4

entirely black Workers Chorus, Chavkin had hired a white actor to replace Plaintiff in the Workers Chorus.  (See id. ¶ 40.)  The following day, Beverly Jenkins, Defendant's stage manager and supervisor, stated in an email to Defendant's employees that "there [were] too many Black people on stage."  (Id. ¶ 42.)  The same day Ms. Jenkins sent her email, Defendant excluded another black cast member, Khalia Wilcoxon, from performing in the Workers Chorus to avoid an entirely black Workers Chorus.  (See id. ¶ 41.)

Defendant terminated Plaintiff on December 5, 2021.  (See id. ¶ 43.)  On December 7, 2021, a white actress replaced Plaintiff in the role of Worker #1.  (See id. ¶ 45.)

**B.  Procedural History**

Plaintiff filed her initial complaint in this case on June 8, 2023.  (See dkt. no. 1.)  She filed her Amended Complaint thirteen days later.  (See Am. Compl.)  In her Amended Complaint, Plaintiff asserts against Defendant four claims of racial discrimination arising out of four different statutes:  (1) Count One alleges a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"); (2) Count Three alleges a violation of § 296(1)(a) of the New York State Human Rights Law ("NYSHRL"); (3) Count Five alleges a violation of § 8-107(1) of the New York City Human Rights Law ("NYCHRL"), and (4) Count Seven alleges a violation of 42 U.S.C. § 1981 ("§ 1981").  (See Am. Compl. ¶¶ 55-59; 66-71, 78-81, 86-88.)  Plaintiff also brings four claims for

retaliation:  (1) Count Two alleges retaliation under Title VII, (2) Count Four alleges retaliation under the NYSHRL, (3) Count Six alleges retaliation under the NYCHRL, and (4) Count Eight alleges retaliation under § 1981.  (See id. ¶¶ 60-65; 72-77; 82-85; 89-93.)

On August 21, 2023, Defendant moved to dismiss the Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (See Notice of Mot.)  In its memorandum of law, Defendant argues Plaintiff failed to put forth plausible allegations of discrimination or retaliation in her Amended Complaint.  (See Def. Br. at 15-22.)  Defendant further contends that Plaintiff's Amended Complaint fails to state a "legally cognizable claim" because it seeks to use anti-discrimination laws in a way that would infringe Defendant's First Amendment right to free speech by regulating the content of the artistic expression Defendant conveys when staging performances of the Musical.  (Id. at 9-15.)  According to Defendant, enforcing anti-discrimination laws through Plaintiff's lawsuit would violate Defendant's constitutional right to decide whom to cast for roles in the Musical—including its right to make such decisions based upon the race of the actors.  (See id. at 11-13.)

In addition, Defendant argues in its memorandum of law that Plaintiff's Amended Complaint is barred, and should be dismissed, because she failed to pursue arbitration as she was required to do

by the terms of the Collective Bargaining Agreement to which her union is a party.  (See id. at 22-24.)  However, Defendant does not seek to compel arbitration of Plaintiff's claims.

Plaintiff filed her opposition to Defendant's motion on September 5, 2023.  (See Pl. Opp.)  In the alternative to the arguments she makes in opposition to Defendant's motion, Plaintiff requests leave to file a Second Amended Complaint to "address Defendant's constitutional affirmative defense and to clarify the circumstances of the end of Plaintiff's employment" at Hadestown.  (Id. at 14-17.)  Plaintiff attached her proposed Second Amended Complaint as Exhibit A to the Myers Declaration.  (See dkt. no. 18-1.)

## II.  **Legal Standards**

### A.  **Pleading Standard Under Rule 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  In re Actos End-Payor Antitrust Litig., 848 F.3d 89, 97 (2d Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  That "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." <u>Palin v. N.Y. Times Co.</u>, 940 F.3d 804, 810 (2d Cir. 2019). Evaluating "whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Iqbal</u>, 556 U.S. at 679.

When considering a motion to dismiss, the Court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences" in the plaintiff's favor. <u>Dane v. UnitedHealthcare Ins. Co.</u>, 974 F.3d 183, 188 (2d Cir. 2020) (cleaned up). The Court is not required, however, "to credit conclusory allegations or legal conclusions couched as factual allegations." <u>Id.</u> (ellipsis omitted). "Accordingly, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Nielsen v. Rabin</u>, 746 F.3d 58, 62 (2d Cir. 2014) (cleaned up).

### B. Incorporation of Extrinsic Documents

In support of its motion to dismiss, Hadestown attaches six documents that it asks the Court to consider when deciding the motion. (<u>See</u> Harrison Decl. ¶ 6.; <u>see also</u> dkt nos. 16-2—16-8.)

In determining the sufficiency of a claim under Rule 12(b)(6), the court may review only the complaint, documents attached to the complaint or incorporated into it by reference, and documents "integral" to the plaintiff's allegations, even if not explicitly incorporated by reference. <u>Chambers v. Time Warner</u>,

<u>Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002).  The complaint "'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"  <u>Id.</u> at 152 (quoting <u>Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.</u>, 62 F.3d 69, 72 (2d Cir. 1995)).  The Court may therefore consider documents integral to the complaint or incorporated by reference into the complaint on a motion to dismiss under Rule 12(b)(6).  <u>See</u> <u>Williams v. Time Warner Inc.</u>, 440 F. App'x 7, 9 (2d Cir. 2011) (summary order).  However, a motion to dismiss must "be treated as one for summary judgment and disposed of as provided in [Federal Rule of Civil Procedure] 56" if the Court considers materials "outside the complaint" the parties have presented that are neither attached to the complaint, incorporated by reference, or integral to the complaint.  <u>Chambers</u>, 282 F.3d at 152 (citing Fed. R. Civ. P. 12(b)).

A document is "integral" to the complaint "when the complaint 'relies heavily upon its terms and effect.'"  <u>Palin</u>, 940 F.3d at 811 (quoting <u>Chambers</u>, 282 F.3d at 153).  However, for the Court to consider such a document, the plaintiff must have actually "<u>reli</u>[ed] [on] the terms and effect of [the] document in drafting the complaint . . . mere notice or possession is not enough" to merit the Court's consideration.  <u>Chambers</u>, 282 F.3d at 153 (emphasis in original).

9

## C.  Discrimination

Plaintiff's first, third, fifth, and seventh causes of action are claims for employment discrimination on the basis of race under Title VII, the NYSHRL, the NYCHRL, and § 1981, respectively.  (See Am. Compl. ¶¶ 55–59, 66–71, 78–81, 86–88.)  Plaintiff appears to assert the first, third, and fifth causes of action based upon theories of both disparate treatment and hostile work environment. (See id. ¶¶ 57, 68, 80).  Her seventh cause of action, brought under § 1981, contains no mention of an allegedly hostile work environment.  (See id. ¶¶ 86–88.)

The parties dedicated paltry space in their respective briefs on the hostile work environment component of Plaintiff's discrimination claims—with Defendant addressing it in a single footnote, (see Def. Br. at 16 n.14), and Plaintiff appearing to abandon the theory entirely in her opposition brief, in which she instead dedicates space to address the elements of a disparate treatment theory that are currently in dispute, (see Pl. Opp. at 8–9).  Nevertheless, the Court will review the law on each theory of discrimination and address Plaintiff's claims under each theory.

### 1.  Disparate Treatment

To assert a claim of employment discrimination under Title VII, a plaintiff must allege "'(1) the employer discriminated against [her] (2) because of [her] race, color, religion, sex, or national origin.'"  Buon v. Spindler, 65 F.4th 64, 78 (2d Cir.

2023) (quoting <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 85 (2d Cir. 2015)).  When faced with a Title VII discrimination claim, the Court must engage in a three-step burden shifting framework the Supreme Court laid out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>id.</u> (citing <u>Littlejohn v. City of N.Y.</u>, 795 F.3d 297, 312 (2d Cir. 2015)).

Under this framework, the plaintiff must first establish her <u>prima facie</u> case of discrimination.  <u>See</u> <u>id.</u> (citing <u>Vega</u>, 801 F.3d at 83).  If the plaintiff succeeds, the employer then bears the burden to "'articulate some legitimate, nondiscriminatory reason for the disparate treatment.'"  <u>Id.</u> (quoting <u>Vega</u>, 801 F.3d at 83).  Finally, if the employer succeeds in its articulation of a valid reason for its treatment of the plaintiff, the plaintiff must then "'prove that the employer's [given] reason was in fact pretext for discrimination.'"  <u>Id.</u> at 78-79 (quoting <u>Vega</u>, 801 F.3d at 83).

What Plaintiff must do to establish her <u>prima facie</u> case differs depending on the stage of the case.  <u>See</u> <u>Littlejohn</u>, 795 F.3d at 307.  At this early stage of the litigation, Plaintiff's <u>prima facie</u> requirements are "relaxed."  <u>Id.</u>  Specifically, at the pleading stage, the Court does not "'require a plaintiff to plead facts establishing a prima facie case.'"  <u>Buon</u>, 65 F.4th at 79 (quoting <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002)).  Instead, "absent direct evidence of discrimination," Plaintiff's

burden to survive a motion to dismiss is to plead facts sufficient to show that she "(1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) has at least minimal support for the proposition that the employer was motivated by discriminatory intent." Id. (cleaned up).

The pleading standards for discrimination claims brought under § 1981 are the same as those required for Title VII claims. See Cardwell v. Davis Polk & Wardwell LLP, 2020 WL 6274826, at *16 (S.D.N.Y. Oct. 24, 2020).  Accordingly, the Court will analyze the disparate treatment allegations of Plaintiff's first and seventh causes of action under the same pleading standard.

However, because the discrimination provisions under the NYCHRL are "uniquely broad," this Court must analyze Plaintiff's discrimination claim under the NYCHRL "'separately and independently' from . . . federal discrimination claims" she brings.  Miller v. Levi & Korinsky LLP, 2023 WL 6293940, at *4 (S.D.N.Y. Sept. 27, 2023) (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)).  To survive a motion to dismiss a claim for discrimination under the NYCHRL, a plaintiff must only plead that she was "'treated less well at least in part because of her [membership in a protected class].'"  Ruiz v. City of N.Y., 2015 WL 5146629, at *5 (S.D.N.Y. Sept. 2, 2015) (quoting Mihalik, 715 F.3d at 110).

Following the New York legislature's 2019 amendment to the NYSHRL, see N.Y. Exec. Law § 300, courts must now scrutinize discrimination claims brought pursuant to the NYSHRL under the same lenient pleading standard described above under which NYCHRL discrimination claims are analyzed.  See Doolittle v. Bloomberg L.P., 2023 WL 7151718, at *7 (S.D.N.Y. Oct. 31, 2023).

       2.  Hostile Work Environment

"To establish a hostile work environment under Title VII . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Littlejohn, 795 F.3d at 320-21 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  A plaintiff must satisfy both an objective and a subjective standard.  Id. at 321.  Accordingly, she must allege both that the employer's conduct was "severe or pervasive enough that a reasonable person would find it hostile or abusive" and that the plaintiff "subjectively perceive[d] the work environment to be abusive."  Id. (internal quotations and citations omitted).  In addition, the plaintiff must show a "specific basis for imputing the hostile work environment to her employer." Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001).

However, under the NYCHRL, there "are not separate standards" for hostile work environment and disparate treatment claims.

Johnson v. Strive E. Harlem Emp. Grp., 990 F. Supp. 2d 435, 445
(S.D.N.Y. 2014).   Instead, "the former is subsumed within the
latter."   Rothbein v. City of N.Y., 2019 WL 977878 at *9 n.12
(S.D.N.Y. Feb. 28, 2019).  Accordingly, the Court applies the same
lenient pleading standard to NYCHRL hostile work environment
claims that it uses to assess disparate treatment claims brought
pursuant to the NYCHRL.  See id.  Thus, as is the case for disparate
treatment claims, all a plaintiff must do to survive a motion to
dismiss a hostile work environment claim under the NYCHRL is allege
she was treated "less well" due do her "membership in a protected
class."  Bautista v. PR Gramercy Square Condominium, 642 F. Supp.
3d 411, 427 (S.D.N.Y. 2022) (internal quotations and citations
omitted); see also Santiago v. ACACIA Network, Inc., 634 F. Supp.
3d 143, 155-56 (S.D.N.Y. 2022) (allegations that black plaintiff
was paid less and received fewer opportunities for promotion than
her non-black comparators sufficed to allege plausibly she was
treated less well due, in part, to her race).

Similarly, pursuant to the 2019 amendments to the NYSHRL,
stating a hostile work environment claim under NYSHRL now requires
only that the plaintiff plead sufficient facts showing she was
"subjected to inferior terms, conditions, or privileges of
employment" due to her membership in a protected class.  Samuels
v. City of N.Y., 2023 WL 5717892, at *9 (S.D.N.Y. Sept. 5, 2023).

Plaintiff's pleading requirements are thus identical to those she bears to sustain her NYSHRL disparate treatment theory.

### D.   Retaliation

As with discrimination claims, the Court analyzes retaliation claims brought under Title VII and § 1981 under a uniform burden-shifting framework set forth by the Supreme Court in McDonnell Douglas.  See Littlejohn, 795 F.3d at 315 (citing Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)).

Under this standard, surviving a motion to dismiss requires that the complaint plausibly allege that (1) the plaintiff participated in a protected activity; (2) the defendant knew of the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) there is a causal connection between the plaintiff's protected activity and the adverse employment action she suffered.  See id. at 315–16.  Complaining to a supervisor, instituting litigation, or filing a formal complaint about the defendant's discriminatory conduct are each considered protected activities.  See Ruiz, 2015 WL 5146629, at *6.

A complaint to a supervisor need not have had merit to make it a protected activity.  See Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012).  Instead, an employee's complaint only must be "sufficiently pointed to be reasonably understood as a complaint [about] discrimination."  Cardwell, 2020 WL 6274826, at *31 (internal quotations and citations omitted).  Thus, a

plaintiff satisfies the second prong of the retaliation pleading standard if her complaint plausibly alleges that such protected activity put the defendant "on notice that [Plaintiff's] complaints were about . . . discrimination, not just general unsatisfactory or unfair conduct." Id. (internal quotations and citations omitted).

Adverse employment actions include "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega, 801 F.3d at 90 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). Termination qualifies as an adverse employment action. See, e.g., Cadet v. All. Nursing Staffing of N.Y., Inc., 632 F. Supp. 3d 202, 226-28 (S.D.N.Y. 2022) (plausible allegation of "an adverse employment action like termination" is sufficient to survive a motion to dismiss a retaliation claim). A plaintiff can plausibly allege her participation in a protected activity caused her adverse employment action either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Littlejohn, 795 F.3d at 319 (internal quotations and citations omitted).

As is the case for discrimination claims under the statute, Plaintiff shoulders a more relaxed burden to plead a sufficient retaliation claim under the NYCHRL and the NYSHRL.  See McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020) ("Retaliation claims under the NYCHRL are subject to a broader standard than under . . . Title VII."); see also Arazi v. Cohen Bros. Realty Corp., 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022) (noting the "NYCHRL's more liberal pleading standard applies" to NYSHRL retaliation claims following the 2019 statutory amendments).  A complaint alleging retaliation under this more lenient standard need not plead that the plaintiff suffered an adverse employment action.  McHenry, 510 F. Supp. 3d at 67. Instead, a plaintiff can survive a motion to dismiss if she "'show[s] that something happened that was reasonably likely to deter a person from engaging in protected activity.'" Id. (quoting Xiang v. Eagle Enters., LLC, 2020 WL 248941, at *9 (S.D.N.Y. Jan. 16, 2020)); see also Arazi, 2022 WL 912940, at *17 (same).  A plaintiff's burden to allege plausibly the other three prongs necessary to state a prima facie retaliation claim under Title VII remains the same for NYCHRL and NYSHRL claims.  McHenry, 510 F. Supp. 3d at 67 (citing Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012)); Arazi, 2022 WL 912940, at *17.

## III.   <u>Discussion</u>

### A.   **Defendant's Introduction of Extrinsic Documents**

Defendant attached six exhibits to its motion to dismiss: (1) Plaintiff's first employment contract with Hadestown, dated January 17, 2020 ("Exhibit 1"); (2) Plaintiff's second employment contract with Hadestown, dated July 19, 2021 ("Exhibit 2"); (3) an email exchange, dated October 8, 2021, between Hadestown senior manager Beverly Edwards and Plaintiff's agent, David Secor ("Exhibit 3"); (4) an email that David Neumann, whom Plaintiff identifies as a choreographer and supervisor for Defendant, sent to the cast of Hadestown on November 23, 2021 ("Exhibit 4"); (5) an email Neumann sent to the black members of Hadestown's cast on November 28, 2021 ("Exhibit 5"); and (6) the collective bargaining agreement ("CBA") governing members of the Actors Equities Association in their employment with members of The Broadway League ("Exhibit 6").

According to Defendant, Plaintiff "relies" on each of these documents in her Amended Complaint, which, Defendant asserts, "contradict the allegations" in the Amended Complaint. (Harrison Decl. ¶ 6.) Specifically, Defendant claims that because Plaintiff references Exhibits 1-5—and even "relies on" Exhibits 4 and 5—in her Amended Complaint, she had knowledge of the existence of each, making them "integral" to her claims. (<u>Id.</u> ¶¶ 7, 13, 15-16.) Defendant also appears to argue that the Court should consider

Exhibit 6, the CBA that governs Plaintiff's employment relationship with Hadestown, because it addresses the "arbitration and grievance procedure" the parties must undertake in a dispute, which Defendant argues Plaintiff mentions in her Amended Complaint. (Id. ¶¶ 20-25.)

The Court will address each proposed exhibit in turn.

Plaintiff neither references nor relies upon Exhibit 1 or Exhibit 2—her employment contracts—in the Amended Complaint. With respect to her hiring, firing, and terms of employment at Hadestown, Plaintiff mentioned in the Amended Complaint her date of hiring, her role in the play, her salary, her date of firing, and the informal performance review she received from the Production's founder. (See Am. Compl. ¶¶ 13, 16-21, 43.) The existence and terms of the employment contracts are completely absent from these allegations.

Without any such mention of the employment contracts, Plaintiff could not and did not incorporate them by reference into the Amended Complaint. Further, Plaintiff's knowledge or possession of these employment contracts is insufficient to make them integral to her Amended Complaint. Chambers, 282 F.3d at 153. Because she did not actually "rel[y] heavily upon [the] terms and effect" of the employment contracts to support her allegations, Plaintiff did not render Exhibits 1 and 2 "integral" to the Amended Complaint. Id.; see also Palin, 940 F.3d at 811. Accordingly,

the Court may not consider either Exhibit 1 or Exhibit 2 at this stage of the litigation.  <u>Chambers</u>, 282 F.3d at 153.

The Court  may not consider Exhibit 3 for precisely the same reason.  No matter how relevant Defendant asserts the October 8, 2021, email exchange between Ms. Edwards and Mr. Secor is to the merits of Plaintiff's claims, Plaintiff neither explicitly mentions it nor implicates its existence anywhere in her Amended Complaint.  And, even if Defendant demonstrated that Plaintiff possessed or at least knew of this exchange conducted entirely between two other individuals, that still would not suffice to render it "integral" to the Amended Complaint and merit the Court's consideration at this stage.  <u>Chambers</u>, 282 F.3d at 153.  Because Plaintiff does not rely on the terms of Exhibit 3, it is not integral to the Amended Complaint and the Court may not consider it.  <u>Id.</u>

The Court may consider Exhibits 4 and 5, however.  In Paragraph 31 of the Amended Complaint, Plaintiff specifically mentions and quotes from the email Mr. Neumann sent to the cast of Hadestown on November 23, 2021, noting that he "apologiz[ed] for the 'white savior story'" that resulted from "an exclusively black and African American group of actors for the Workers Chorus." (Am. Compl. ¶ 31.)  In the very next paragraph, Plaintiff notes that "[i]n response" to Mr. Neumann's November 23 email, she "complained to Colette Luckie, Defendant's human resources

employee, regarding discrimination against her and the 'Workers'
Chorus' in the form of hostility and anti-black sentiment by
management . . . ."   (Id. ¶ 32.)   Plaintiff alleges Defendant
terminated her, in part, in retaliation for Plaintiff's complaint
about Mr. Neumann's email.   (See, e.g., id. ¶¶ 32, 36, 38, 44,
62.)   Plaintiff therefore relies upon the terms and effects of
Mr. Neumann's November 23, 2021, email to support her claims of
retaliation against Defendant.   Accordingly, Exhibit 4 is
sufficiently integral to the Amended Complaint to warrant the
Court's consideration on Defendant's motion to dismiss. Chambers,
282 F.3d at 153.

Because Plaintiff also relies on Exhibit 5—the email
Mr. Neumann sent "exclusively to the African American cast members
of the Hadestown Musical" on November 28, 2021—to support her
discrimination claims, the Court may consider it in deciding
Defendant's motion to dismiss.   See id.; (see also Am. Compl.
¶ 39.)   In the Amended Complaint, Plaintiff points to Mr. Neumann's
November 28 email, in which he "indicat[ed] that Defendant sought
to avoid an 'all black' cast in the Workers Chorus," as one of
several incidents that occurred at Hadestown between November 23
and December 7, 2021, that, together, constituted a "campaign of
discriminatory conduct against Moore and other black cast
members . . . and subjected her/them to a hostile work environment
fraught with anti-black sentiment and criticism . . . ."   (Am.

Compl. ¶¶ 39-47.)  Plaintiff's citation to Mr. Neumann's November 28, 2021, email as factual support for several of her claims not only incorporates Exhibit 5 by reference but makes it integral to her Amended Complaint.  See Chambers, 282 F.3d at 153 n.4.  As such, the Court may consider it when deciding Defendant's motion to dismiss.  Id. at 153.

Finally, the Court may not consider Exhibit 6, the CBA, in its decision.  The only allegation in Plaintiff's Amended Complaint that comes anywhere close to mentioning the existence of the CBA is in Paragraph 37, in which she alleges that she complained to her union representative about racial discrimination during her employment with Defendant.  (See Am. Compl. ¶ 37.)  Beyond this passing reference to a union of which Plaintiff implies she is a member, Plaintiff neither explicitly mentions the CBA nor even states which union she is a member of that would be party to such CBA.  Without more than her minor reference to union membership, Plaintiff does not incorporate the CBA by reference into her Amended Complaint and certainly does not rely on its terms or effects such that she rendered it "integral" to the Amended Complaint.  Chambers, 282 F.3d at 153; see also Palin, 940 F.3d

at 811.  The Court will not consider it on this motion to dismiss Defendant makes pursuant to Rule 12(b)(6).[4]

**B.    Plaintiff's Discrimination Claims**

1. <u>Disparate Treatment</u>

Defendant appears to concede that Plaintiff is a member of a protected class and was qualified for her role as Worker #1 in the Musical.[5]  The primary element of Plaintiff's discrimination claims under Title VII and § 1981 that Defendant disputes is whether Plaintiff's termination was motivated by Defendant's discriminatory intent.  (<u>See</u> Def. Br. at 16-17.)   In addition, Defendant disputes that Plaintiff suffered an adverse employment action.  (<u>See</u> <u>id.</u> at 20-21; Def. Reply at 5-7.)   The Court will address each of Defendant's contentions in turn.

---

[4] Defendant has not moved to compel arbitration of Plaintiff's claims.  Although a court may properly consider evidence extrinsic to a complaint "when faced with a motion to compel arbitration," <u>see</u> <u>BS Sun Shipping Monrovia v. Citgo Petroleum Corp.</u>, 2006 WL 2265041, at *3 n.6 (S.D.N.Y. Aug. 8, 2006), that is not the motion presently before the Court.  Accordingly, the Court will not consider any document extrinsic to the Amended Complaint that it may not consider on a motion to dismiss under Rule 12(b)(6), which is the only motion Defendant has asked the Court to consider.

[5] The Amended Complaint alleges that Plaintiff is "black and an African American woman," whose "performance met or exceeded Defendant's expectations," as demonstrated by the comment Defendant's executive producer made to Plaintiff that "the entire creative team holds a great deal of affection for [Plaintiff] and the skills [she] bring[s] to the table[.]"  (Am. Compl. ¶¶ 14, 17-18.)  Plaintiff has thus plausibly alleged that she is a member of a protected class who was qualified for her position with Hadestown.  <u>See</u> <u>Buon</u>, 65 F.4th at 79.

Plaintiff alleges that Defendant terminated Plaintiff's employment on December 5, 2021. (See Am. Comp. ¶ 43.) Termination is perhaps the quintessential example of an adverse employment action that a plaintiff must plausibly allege to survive a motion to dismiss a racial discrimination claim. See Buon, 65 F.4th at 79.

Defendant does not argue that Plaintiff's employment ended on December 5, 2021. Defendant instead contends that Plaintiff had signed a temporary employment contract in which she agreed to conclude her employment on December 5, 2021. (See Def. Br. at 5-6, 20.) According to Defendant, Plaintiff was aware as early as October 8, 2021, that she would not continue her employment with Defendant past December 5, 2021. (See id. at 2.) Therefore, Defendant argues, the end of Plaintiff's employment as Worker #1 on December 5, 2021, cannot constitute an adverse employment action because Plaintiff had known months before that "she was not going to work beyond" that date. (Def. Reply at 6.)

Defendant's argument with respect to Plaintiff's termination relies entirely on Exhibits 1-3 to the Harrison Declaration, which the Court may not consider to decide Defendant's motion to dismiss. See supra at 19-20. Because Plaintiff has not attached these documents, incorporated them by reference, or made them integral to the Amended Complaint, the Court must "exclude the additional material and decide the motion on the [pleading] alone" or convert

it to a motion for summary judgment.  Safka Holdings LLC v. iPlay, Inc., 42 F. Supp. 3d 488, 491 (S.D.N.Y. 2013) (internal quotations omitted).  Because Plaintiff has not yet had the opportunity to take discovery, the Court will not convert the motion and will decide Defendant's motion to dismiss on the face of Plaintiff's Amended Complaint, as well as Exhibits 4 and 5.  See id.

On the face of the Amended Complaint alone, Plaintiff has plausibly alleged she suffered an adverse employment action through her termination on December 5, 2021.  The Amended Complaint contains no mention of a pre-ordained expiration of her employment term with Defendant or that such employment was only for a temporary period.  According to the Amended Complaint, Plaintiff was hired in January 2020 and Defendant did not end her employment until her firing on December 5, 2021.  (See Am. Compl. ¶¶ 13, 43.)  Accordingly, the Amended Complaint plausibly alleges that on December 5, 2021, Plaintiff was terminated, constituting an adverse employment action.  See Buon, 65 F.4th at 79, 82.

Plaintiff's Amended Complaint also plausibly alleges that Defendant was at least partially motivated by discriminatory intent when it terminated Plaintiff's employment.  The Court may make an inference of discriminatory intent based on various circumstances as pleaded, including, but not limited to "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the

25

employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." Littlejohn, 795 F.3d at 312 (internal quotations and citations omitted).  The Court may also infer discrimination "when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class."  Id. at 312-13 (collecting cases).

The Amended Complaint contains enough plausible allegations for the Court to infer Hadestown was at least partially motivated by discrimination when it terminated Plaintiff.  Most obviously, Plaintiff alleges that Defendant hired a white actress to replace Plaintiff—a black actress—as Worker #1 two days after it terminated Plaintiff.  (See Am. Compl. ¶ 45.)  According to the Amended Complaint, this replacement occurred soon after Hadestown dance captain Timothy Reid and director Rachel Chavkin had separately indicated to staff members in the two weeks prior to Plaintiff's termination that Defendant was seeking to hire a white actress to replace Plaintiff in the cast.  (See id. ¶¶ 36, 40.)

Plaintiff's allegation of an immediate replacement in the cast by an actress not in her protected class suffices to allege plausibly Defendant's discriminatory intent.  Littlejohn, 795 F.3d at 312-13.  The inference is buttressed by Plaintiff's allegation that two authority figures in the Musical had already separately

indicated that Defendant was seeking to replace Plaintiff with someone who was not in Plaintiff's protected class.

Based on the same allegations, the sequence of events also leads the Court to infer that Defendant was at least partially motivated by discriminatory intent when it terminated Plaintiff. See id. at 312.  Plaintiff alleges that Mr. Neumann apologized to the entire Hadestown cast on November 23, 2021, because the Musical was conveying a "white savior story" through an all-black Workers Chorus; that Mr. Reid told Plaintiff on November 24 that Defendant was seeking to hire a white actress to replace Plaintiff; that Mr. Neumann emailed the black cast members on November 28 to say Defendant was seeking to avoid an "all black" Workers Chorus; that on December 1, Chavkin indicated to her staff that Hadestown had hired a white woman to replace Plaintiff; that Defendant then terminated Plaintiff four days later; and Defendant finally replaced Plaintiff with a white actress on December 7.  (See Am. Compl. ¶¶ 31-45.)

Read together, these allegations create a plausible inference that after members of Defendant's leadership became worried in late November 2021 that the all-black Workers Chorus was conveying a white savior message that they did not want the Musical to convey, Defendant sought to replace Plaintiff with a white actress to change composition of the Workers Chorus and end the unintended white savior message.  Such a sequence implies that Plaintiff's

termination was based on her race and Defendant's desire to replace her with a white actress.  Accordingly, Plaintiff has sufficiently pleaded the minimal factual support necessary at this stage to allege that Defendant was motivated by discriminatory intent when it terminated her on December 5, 2021.  See Littlejohn, 795 F.3d at 312-13; Buon, 65 F.4th at 82-84.

Because Plaintiff has pleaded sufficient facts to allege plausibly that she suffered an adverse employment action motivated by discriminatory intent, she has stated claims for disparate treatment under Title VII and § 1981.  See Littlejohn, 795 F.3d at 313; Buon, 65 F. 4th at 79.

Plaintiff has also pleaded sufficient facts to show that she was "treated less well" because of her race.  See Ruiz, 2015 WL 5146629, at *5.  As discussed above, Plaintiff has alleged that she lost her job and was replaced by a white actress because Defendant wanted to get rid of her as a black member of the Workers Chorus.  (See Am. Compl. ¶¶ 31-45.)  Such allegations of race-based termination go beyond the mere inferior treatment needed to plead NYCHRL and NYSHRL claims.  See Ruiz, 2015 WL 5146629, at *5; Doolittle, 2023 WL 7151718, at *7.  Plaintiff has thus pleaded facts sufficient to support her NYCHRL and NYSHRL discrimination claims.

2.  Hostile Work Environment

To the extent Plaintiff maintains a claim of race discrimination based on a hostile work environment theory, her Amended Complaint lacks the factual allegations sufficient to sustain such a theory under Title VII.  For a plaintiff to allege adequately that the abuse or hostility of her work environment was objectively severe or pervasive, the complaint must plead facts sufficient to show either that a "single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  Alfano v. Costello, 294 F.3d 365, 374 (2d. Cir. 2002) (internal quotations and citations omitted).  Such incidents must "be more than episodic . . . to be deemed pervasive."  Littlejohn, 795 F.3d at 321 (internal quotations and citations omitted).  The Court evaluates the "case-specific circumstances in their totality [to] evaluate the severity, frequency, and degree of the abuse."  Alfano, 294 F.3d at 374 (citing Harris, 510 U.S. at 23).

The Amended Complaint does not plead facts sufficient to show Defendant perpetrated either a series of continuous and concerted abusive incidents or a single, "extraordinarily severe" incident of abuse.  Id.  The alleged incidents of racial hostility or abuse consist of (1) Mr. Neumann's November 23, 2021, email to the cast apologizing for the fact that the Musical expressed a "white savior

29

story" when it staged performances with an all-black Workers Chorus; (2) Mr. Neumann's second email on November 28, 2021, indicating that Hadestown sought to avoid the all-black Workers Chorus; (3) Ms. Chavkin's indication that she was replacing Plaintiff with a white actress; (4) Defendant's purposeful exclusion of black actress Khalia Wilcoxon from the Workers Chorus on December 2, 2021; and (5) stage manager Beverly Jenkins's December 2, 2021, email to the staff complaining that "there are too many Black people on stage." (Am. Compl. ¶¶ 31-45.) Plaintiff also alleges that certain documents prepared by Defendant in October 2021 indicated that "black women who bring concerns" to management were "seen/labeled as problematic." (Id. ¶ 34.) Considered together, these incidents are not sufficiently continuous or concerted to constitute a work environment with objectively severe or pervasive hostility or abuse.

The text of Mr. Neumann's emails indicates neither abuse nor hostility. Although Mr. Neumann states in his November 23, 2021, email to the Hadestown cast that he was aware the all-black Workers Chorus contributed to a "white savior story" that he and other of Defendant's wished to avoid, the rest of his email makes clear that he viewed the "white savior story" as both "unintended and harmful." (Harrison Decl. Ex. 4. at 1.) Mr. Neumann specifically apologized to the cast for "putting [them] in that position" and expressed his and the executives' "commitment to open dialogue

regarding ongoing casting decisions and the[ir] ramifications." (Id.)   In other words, Mr. Neumann did not abuse cast members or treat them with hostility; instead, he apologized and asked them for feedback.

Mr. Neumann repeated this apology in his November 28, 2021, email. (See Harrison Decl. Ex. 5.)  Mr. Neumann wrote his second email to Hadestown's black cast members "to offer a more specific apology" for being "placed in the position of telling a 'white savior' story . . . ." (Id. at 1.)  In furtherance of this apology, Mr. Neumann and the other executives promised to prioritize combinations of actors to prevent the "white savior story" from occurring on-stage again and facilitate an "open dialogue" between the black cast members and Hadestown management to "rebuild trust." (Id. at 2.)   Mr. Neumann's second email again demonstrates no hostility to or abuse of Hadestown's black cast members but rather an effort to apologize to those cast members for perceived transgressions and to rectify such transgressions.

While the other incidents of alleged hostility present more plausible indications of an objectively severe work environment— particularly Ms. Jenkins's complaint that Hadestown had "too many Black people on stage," and the documents allegedly indicating Hadestown management viewed black woman with complaints as "problematic," (see Am. Compl. ¶¶ 34, 42)—they do not amount to a continuous and concerted series of abusive incidents that altered

the conditions of Plaintiff's work environment.  See Littlejohn, 795 F.3d at 320-21; Alfano, 294 F.3d at 374.  They indicate only a handful of disparate occurrences, mostly over the course of eight days between when Plaintiff learned she would be terminated and when Defendant finally terminated Plaintiff, regarding the racial composition of the Hadestown cast, as well as an unflattering view of a segment of that cast.  (See Am. Compl. ¶¶ 34, 38-43.)  While some of these allegations may imply a degree of hostility to black cast members, they are insufficient to allege plausibly under the totality of the circumstances that Hadestown created an environment that a reasonable employee would perceive as pervasively hostile.  Read together with Mr. Neumann's two emails, the allegations instead imply that several of Defendant's executives were seeking to address the "white savior story" together with its black cast members, while others, such as Ms. Jenkins, may have taken a less tactful approach.

Accordingly, Plaintiff has not stated claims for discrimination under a hostile work environment theory pursuant to Title VII.  See Littlejohn, 795 F.3d at 320-21.

However, under the statutes' more lenient pleading standard, the Court separately concludes that the Amended Complaint contains facts sufficient to sustain claims for a hostile work environment under the NYCHRL and the NYSHRL.  The Amended Complaint alleges Defendant terminated Plaintiff in favor a white actress who

replaced her in the cast, and that such termination came after two different authority figures within Hadestown indicated that Defendant intended to replace Plaintiff with a white woman. (See Am. Compl. ¶¶ 36, 40, 43-45.)   The Court has already concluded, supra, that these assertions suffice to sustain the disparate treatment theory of Plaintiff's NYCHRL and NYSHRL discrimination claims because they allege plausibly that Defendant treated Plaintiff "less well" based upon Plaintiff's membership in a protected class.   See supra at 28.   Because the Court must apply the same analysis to Plaintiff's NYCHRL and NYSHRL hostile work environment theory that it applies to her disparate treatment theory, see Rothbein, 2019 WL 977878 at *9 n.12, the Court concludes for the same reasons that Plaintiff has adequately pleaded a hostile work environment theory to support her NYCHRL and NYSHRL discrimination claims.   Santiago, 634 F. Supp. 3d at 155-56; Samuels, 2023 WL 5717892, at *9-11.

### C.   Plaintiff's Retaliation Claims

Defendant challenges Plaintiff's retaliation claims on each of the four elements required to prove such claims under Title VII and § 1981. (See Def. Br. at 17-22.)

As discussed supra, the Court concludes that Plaintiff has plausibly alleged that she suffered an adverse employment action when she was terminated on December 5, 2021. See supra at 24-25. A plausible allegation of an adverse employment action is

sufficient to satisfy the third element of a retaliation claim under Title VII and § 1981.  See Littlejohn, 795 F.3d at 315–16. The Court additionally concludes that Plaintiff's alleged termination also constitutes an event "that [i]s reasonably likely to deter a person from engaging in protected activity," as she must to satisfy the more lenient pleading standard of NYCHRL and NYSHRL retaliation claims.  Xiang, 2020 WL 248941, at *9 (internal quotations and citations omitted) (finding an allegation of a termination qualified as such a deterrent event under a NYCHRL retaliation claim); Arazi, 2022 WL 912940, at *17–18 (allegation of termination sufficed for pleading elements of NYSHRL retaliation claim).

The remaining three elements of a retaliation claim—Plaintiff's participation in a protected activity, Defendant's knowledge of the protected activity, and a causal connection with the adverse employment action—are the same across all four statutes under which Plaintiff sues for retaliation.  See McHenry, 510 F. Supp. 3d at 67.  The Court finds unavailing Defendant's remaining arguments pertaining to those three elements and concludes that Plaintiff has pleaded facts sufficient to state claims for retaliation under Title VII, the NYSHRL, the NYCHRL, and § 1981.

Defendant first argues that Plaintiff's descriptions of her complaints to a human resources employee and to her union representative in response to Mr. Neumann's November 23, 2021,

email do not plausibly allege that she engaged in a "protected activity" that would give rise to a retaliation claim. (See Def. Br. at 18-20; Am. Compl. ¶¶ 31-32, 37.) Defendant further argues that Plaintiff has failed to allege plausibly that her first complaint to the human resources employee "put Defendant on notice that she was complaining about unlawful discrimination," as required to satisfy the pleading standard, because it was instead a complaint about Defendant's "creative vision and casting decisions related to the Workers Chorus."[6] (Def. Br. at 18-19.)

Defendant is correct that complaints about "conduct other than unlawful discrimination" do not constitute protected activities subject to a retaliation claim. Mi-Kyung Cho. V. Young Bin Cafe, 42 F. Supp. 3d 495, 507 (S.D.N.Y. 2013). However, an employee is not required to "mention discrimination or use particular language" for her complaint to constitute a protected activity. Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch.,

---

[6] Defendant separately contends Plaintiff failed to allege that Defendant knew of the complaint Plaintiff made to her union representative Walt Kiskaddon on November 24, 2021, because her union is not under Defendant's supervision and the Amended Complaint contains no allegation that the union communicated Plaintiff's complaint to Defendant. (See Def. Br. at 18 n.15). Indeed, an allegation of a complaint to a union representative is insufficient to plead the knowledge element of a retaliation claim "[a]bsent any allegation that [the union representative] actually contacted anyone" at Plaintiff's employer. Grant v. N.Y. State Off. for People with Developmental Disabilities, 2013 WL 3973168, at *9 (E.D.N.Y. July 30, 2013). Accordingly, Plaintiff failed to allege Defendant knew of Plaintiff's November 24, 2021, complaint to Mr. Kiskaddon.

LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). Conversely, a complaint to an employer that uses "particular words such as 'discrimination'" is not sufficient to put the employer on notice of the employee's protected activity "if nothing in the substance of [that] complaint suggests that the complained-of activity is . . . unlawfully discriminatory." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 17 (2d Cir. 2013). Ultimately, a Plaintiff's complaint constitutes a protected activity so long as she articulated the substance of her complaint in such a way that her employer would "reasonably underst[and]" that it was about unlawful discrimination against her. See Cardwell, 2020 WL 6274826, at *31.

Although Plaintiff supplies bare factual details in her Amended Complaint, she pleads that she "complained to Colette Luckie, Defendant's human resources employee, regarding discrimination against her and the 'Workers' Chorus' in the form of hostility and anti-black sentiment . . . ." (Am. Compl. ¶ 32.) Plaintiff does not specify what she said to Ms. Luckie or the medium through which she complained. However, Plaintiff need not "provide the precise language [s]he used when making [her] complaints" for the purposes of this motion to dismiss. Forgione v. City of N.Y., 2012 WL 4049832, at *10 (E.D.N.Y. Sept. 13, 2012). She specifically alleges that she complained to a Hadestown human resources employee about "anti-black" discrimination "against

36

her."   (See Am. Compl. ¶ 32.)   Based on the allegations in the Amended Complaint, Ms. Luckie should have reasonably understood that Plaintiff was complaining about unlawful racial discrimination.   See Cardwell, 2020 WL 6274826, at *31. Accordingly, Plaintiff has plausibly alleged that she engaged in a protected activity.   See id. at *31-35.

It is irrelevant whether Plaintiff's complaint occurred in the context of "the creative and artistic process [of the Musical] being discussed in real time" or "relate[d] solely to the casting of the Worker Chorus, the narrative impact of such casting, and the creative vision of [the] show." (Def. Br. at 18-19.)   For the purpose of pleading engagement in a protected activity, the conduct the employee complained about need not have actually been discriminatory so long as the employee had a "'good faith, reasonable belief that the underlying employment practice was unlawful.'"   Symotyuk-Knoll v. HealthEquity, Inc., 2023 WL 5576405, at *5 (S.D.N.Y. Aug. 29, 2023) (cleaned up) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)).

In Mr. Neumann's November 23, 2021, email to the Hadestown cast, he stated that Hadestown executives were aware that the all-black Workers Chorus could lead to an "unintended and harmful 'white savior' story" and apologized that the executives did not address the unintended racial story until "after performances where this potentially harmful storytelling ha[d] already

37

occurred."    (Harrison Decl. Ex. 4 at 1.)    In other words,
Mr. Neumann appeared to acknowledge that the racial composition of
the cast may have harmed cast members.  Even if Mr. Neumann's email
relates to Defendant's casting decisions and creative vision, his
acknowledgment that the consequences of such decisions and vision
may have unintentionally harmed cast members implies that
Defendant was aware of at least the perception of racial issues
within its cast and sought to address them.  Plaintiff alleges
that she complained to Ms. Luckie in response to this email. (See
Am. Compl. ¶¶ 31-32.)

The Court has already concluded, supra, that Mr. Neumann's
emails do not portray an objectively hostile work environment at
Hadestown.  However, due to the content of those emails and the
timing of Plaintiff's response, the Court concludes that Plaintiff
has adequately pleaded that she had a subjective, good faith,
reasonable belief that she faced anti-black discrimination when
she lodged her complaint with Ms. Luckie and therefore engaged in
a protected activity.  See Symotyuk-Knoll, 2023 WL 5576405, at *5;
Cardwell, 2020 WL 6274826, at *31-35.

Plaintiff has also plausibly alleged Defendant knew of
Plaintiff's complaint to Ms. Luckie.  Pleading "general corporate
knowledge" of a protected activity suffices to satisfy the
knowledge prong of a retaliation claim.  Patane v. Clark, 508 F.3d
106, 115 (2d Cir. 2007).  Such general corporate knowledge

"arise[s] when a supervisor, corporate officer, or employee whose job it is to investigate and resolve discrimination complaints becomes aware of the protected activity." Armstrong v. Metro. Transp. Auth., 2014 WL 4276336, at *20 (S.D.N.Y. Aug. 28, 2014) (emphasis added) (citing Patane, 508 F.3d at 115). As a human resources employee, it was, presumably, Ms. Luckie's job to investigate and resolve discrimination complaints. See, e.g., Inguanzo v. Hous. & Servs., Inc., 2014 WL 4678254, at *22 (S.D.N.Y. Sept. 19, 2014) (plaintiff's letters to defendant's human resources manager was sufficient to demonstrate general corporate knowledge). In any event, Plaintiff's allegation that she complained directly to a Hadestown employee suffices to plead general corporate knowledge. See Patane, 508 F.3d at 115. Accordingly, Plaintiff plausibly alleged that Defendant knew of Plaintiff's complaint regarding anti-black discrimination she perceived.

Finally, Plaintiff has pleaded sufficient facts to allege plausibly that there is a causal connection between her protected activity and her termination. According to Plaintiff's Amended Complaint, her termination occurred less than two weeks after she complained to Ms. Luckie. (See Am. Compl. 31-32, 43.) Accepting these allegations as true, as the Court must at the motion to dismiss stage, see Dane, 974 F.3d at 188, the Court concludes that Plaintiff's allegation that her termination "occurred within days

after her complaints of discrimination [is] sufficient to plausibly support an indirect inference of causation." <u>Littlejohn</u>, 795 F.3d at 319-20. Such a short period of time between protected activity and adverse employment action is comfortably within the range of time sufficient to support an indirect causal nexus. <u>See</u> <u>Vega</u>, 801 F.3d at 90-92 (an allegation that two months had passed before an adverse employment action sufficed to create an indirect inference of causation); <u>see also</u> <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 110 (2d Cir. 2010) ("[F]or the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

Accordingly, Plaintiff has stated plausible claims for retaliation under Title VII, the NYSHRL, the NYCHRL, § 1981.

### D. Hadestown's First Amendment Defense

Defendant argues that "permit[ting] governmental intrusion into the creative and artistic process would plainly violate the First Amendment's guarantees of free speech and free expression, and the prohibition against compelled speech." (Def. Br. at 11 (citing <u>303 Creative v. Elenis</u>, 600 U.S. 570 (2023)).) According to Defendant, Plaintiff's effort to enforce anti-discrimination statutes through the instant lawsuit amounts to an

40

unconstitutional violation of Defendant's right to make creative decisions about casting. (See id. at 4, 11.)

Relying heavily on Claybrooks v. Am. Broad. Co., 898 F. Supp. 2d 986 (M.D. Tenn. 2012), Defendant argues that because "casting decisions are part and parcel of the creative process," they "merit[] First Amendment protection against the application of anti-discrimination statutes to that process." (Id. at 11 (quoting Claybrooks, 898 F. Supp. 2d at 993).) Because the decision of whom to cast in its Musical is a form of creative expression protected by the First Amendment, Defendant argues that Plaintiff cannot "us[e] this lawsuit to restrict Defendant's casting decisions" or to compel Defendant to express a message that differs from the one it wishes to convey when it stages the Musical. (Id. at 12–13.)

In response, Plaintiff argues the Court need not decide the applicability of the First Amendment to her claims because Defendant's First Amendment defense "is not so evident on the face of the Amended Complaint to resolve it at the pleading stage." (Pl. Opp. at 5.) On the merits of the defense, however, Plaintiff contends there is no relationship between her termination and Defendant's creative expression, that she does not seek to alter such expression through the instant lawsuit, and that, even if that was what she sought, the Court could constitutionally

proscribe Defendant's expression because it is incidental to regulation of Defendant's conduct.  (See id. at 5-8.)

1.  Defendant's Defense at the Pleading Stage

The Court finds Defendant's creative expression, and therefore its First Amendment defense, is apparent both from the face of the Amended Complaint and Exhibits 4 and 5 to the Harrison Declaration.  Accordingly, Defendant properly raised it with the Court in its motion.

Affirmative defenses "usually cannot be considered on a motion to dismiss."  Doe 1 v. Deutsche Bank Aktiengesellschaft, 671 F. Supp. 3d 387, 400 (S.D.N.Y. 2023).  This rule of thumb "is not absolute," however.  Id. at 401.  Instead, "[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."  Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74-75 (2d Cir. 1998) (affirming district court's decision that plaintiff's complaint pleaded the facts necessary to sustain defendant's official immunity affirmative defense).  The Court may similarly grant a motion to dismiss based on an affirmative defense that is apparent on the face of documents incorporated by reference within the complaint or documents that are integral to the complaint.  See Teva Pharms. USA, Inc. v. Sandoz Inc., 2013 WL 3732867, at *3 (S.D.N.Y. July 16, 2013) (citing Staehr v. Hartford Fin. Servs.

Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008)) (documents incorporated by reference); City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC, 587 F. Supp. 3d 56, 83 (S.D.N.Y. 2022) (integral documents).

A live theater performance, such as the Musical produced and staged by Defendant, constitutes expressive and artistic speech that qualifies for First Amendment protection.   See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65 (1981) (noting "live entertainment, such as musical and dramatic works[,] fall within the First Amendment guarantee" of protected speech); see also Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 557-58 (1975) (noting that "live drama" is protected by the First Amendment in part because it is "the acting out—or singing out—of the written word").

Such First Amendment protection is apparent on the face of the Amended Complaint and from Exhibits 4 and 5 because Defendant's decisions with respect to its creative expression and artistic storytelling are mentioned throughout each document.  Mr. Neumann apologized to the entire Hadestown cast on November 23, 2021, because an all-black Workers Chorus had conveyed a "white savior story" in recent performances of the Musical.  (See Am. Compl. ¶¶ 30-31.)   Neumann's November 23, 2021, email stated that Hadestown's executives, including himself and director Rachel Chavkin, did not intend to convey such a "white savior story." (See Harrison Decl. Ex. 4 at 1.)   He specified that, although

43

"[t]he 'text' of Hadestown may not speak about race," the cast members are the "storytellers" and their on-stage performances "become[] the story in all its layers" when they "bring [their] selves, [their] voices, [and their] bodies to th[e] stage each night[.]"  (Id.)  He thus noted that what created the Musical's "white savior story" were "certain arrangements of actors on stage," including a "Worker Chorus of all Black performers."  (Id.)

In his second email to Hadestown's black cast members five days later, Mr. Neumann set forth the actions Defendant planned to implement to avoid "telling a 'white savior' story [through] the Ensemble of Hadestown."  (Harrison Decl. Ex. 5 at 1).  These steps included Defendant's consideration of "all future possible combinations of actors on stage . . . to prevent" the "white savior story" from occurring again and an examination of "every potential vacation/emergency scenario . . . to support consistent and diverse representation within the workers chorus onstage and in relationship to the identity of the principal performers."  (Id. at 1-2.)  Mr. Neumann made it clear that the composition of the cast on-stage was what created the unintended "white savior story" and that Defendant sought to change the composition of the cast, at least within a given performance, to avoid conveying the "white savior story" when staging the Musical.

Later that week, in furtherance of that desire to change Hadestown's unintended message, Ms. Chavkin indicated to her staff

that she had "hired a white woman to replace" Plaintiff, and Defendant then "purposefully excluded" another black cast member from "performing in the Workers Chorus" so that Defendant would avoid staging the Musical with an entirely black Workers Chorus. (Am. Compl. ¶¶ 40-41.)

The sequence of events Plaintiff describes in her Amended Complaint, with context supplied from Mr. Neumann's emails, demonstrates that Defendant was making its casting decisions with an eye toward how the racial composition of the Musical's cast affected the story Hadestown was telling on-stage. Defendant's executives were aware that the arrangements of actors on stage expressed a message that departed both from the text of the Musical's script and from what Defendant intended to express when it staged the Musical and thereafter sought to change those casting arrangements to change the unintended expression. This clearly implicates Defendant's exercise of its creative expression and artistic decisions. And, because it protects Defendant's right to exercise such creative and artistic expression, the First Amendment is also apparent on the face of the Amended Complaint and from Exhibits 4 and 5 to the Harrison Declaration.

Because Defendant's exercise of its First Amendment right to creative expression is apparent on the face of the Amended Complaint and each of the two extrinsic exhibits that the Court may consider on Defendant's motion to dismiss, the Court will

consider Defendant's First Amendment defense at this pleading
stage without converting Defendant's motion to one for summary
judgment.   See Pani, 152 F.3d at 74; City of Sterling Heights
Police & Fire Ret. Sys., 587 F. Supp. 3d at 83.

    2.   Application to Plaintiff's Claims

The Court concludes that enforcing Plaintiff's four claims
for racial discrimination would abridge Defendant's right to free
speech that is guaranteed by the First Amendment.   Hadestown's
creative decisions about what story to tell when it stages the
Musical fall squarely within the protection of the First Amendment.
See Schad, 452 U.S. at 65; Conrad, 420 U.S. at 557-58.   Because,
as the Amended Complaint and Mr. Neumann's emails demonstrate,
casting the performers who appear on stage comprised a significant
component of that artistic decision, Hadestown's First Amendment
protection extends to its decisions about casting.   Accordingly,
Counts One, Three, Five, and Seven of the Amended Complaint are
dismissed.

However, because Plaintiff's four retaliation claims do not
implicate Defendant's First Amendment rights, Counts Two, Four,
Six, and Eight survive Defendant's motion to dismiss.

    *a. Inherently Expressive Conduct*

The First Amendment provides that "Congress shall make no
law . . . abridging the freedom of speech . . . ."   U.S. Const.
amend. I.   Judicial orders that curtail speech in private civil

actions amount to the exercise of state power sufficient to warrant "constitutional scrutiny" of a First Amendment violation.  See N.Y. Times Co. v. Sullivan, 376 U.S. 254, 265 (1964).

Deciding whom to cast in a theatrical performance is, of course, an employment decision.  Plaintiff argues in her opposition brief that the First Amendment does not affect her claims because employment discrimination laws like the ones pursuant to which she brings this suit "regulate conduct . . . not speech."  (Pl. Opp. at 5.)

Conduct does not become "speech" for the purposes of a constitutional analysis simply because "the person engaging in the conduct intends thereby to express an idea."  United States v. O'Brien, 391 U.S. 367, 376 (1968).  The government thus does not necessarily run afoul of the First Amendment when it regulates conduct in a manner that incidentally burdens one's speech.  See id.  Instead, the First Amendment protects only "conduct that is inherently expressive."  Rumsfeld v. F. for Acad. and Inst. Rights, Inc., 547 U.S. 47, 66 (2006).  For example, because employment discrimination statutes primarily regulate the conduct of hiring or firing, they can "require an employer to take down a sign reading 'White Applicant Only'" without unconstitutionally abridging the employer's speech.  Id. at 62.  In such situations, the speech restriction is typically incidental to the government's regulation of an employer's practices.

47

In Rumsfeld, which Plaintiff cites in her opposition brief, the Supreme Court held that a federal statute requiring law school campuses to provide space to military recruiters did not unconstitutionally compel the law schools' speech, in part because the statute did not affect the law school's own speech. Id. at 64. However, the Supreme Court specifically distinguished the case before it from other cases in which it had held the government had unconstitutionally compelled speech because "the complaining speaker's own message was affected by the speech it was forced to accommodate" and the affected speaker's message was "inherently expressive." Id. at 63-64.  In such cases, the Supreme Court noted, government regulation violates the speaker's First Amendment right if it compels the speaker to "'alter[] [its] expressive content'" or "alter[] the message the [speaker] wished to express." Id. (quoting Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. Of Bos., 515 U.S. 557, 572-73 (1995)).

The expressive nature of Defendant's work is what distinguishes this case from Rumsfeld and from the typical case of employment regulation.  Hadestown, the employer in question, produces a Broadway musical, a medium that is inherently expressive and whose creative expression and artistic speech are protected by the First Amendment.  See Conrad, 420 U.S. at 557-58.

The decisions Hadestown makes about whom to cast for which roles—its employment decisions—are inherently expressive because

they are tied to the story it intends to tell and its creative expression.

The Amended Complaint and Mr. Neumann's emails make this clear.  They reveal that Hadestown executives realized in late November of 2021 that, due to "certain arrangements of actors on stage" during performances—including an all-black Workers Chorus—live performances of its Musical were conveying a "white savior story" that those executives did not wish to express because it was "harmful."  (Harrison Decl. Ex. 4 at 1.)  Neumann specifically told the cast that "casting decisions," including such "arrangements of actors on stage," affect the story the Musical conveys, (see id.), and that he and his colleagues had to "consider . . . all future combinations of actors on stage" to avoid expressing a "white savior story" in another performance, (see Harrison Decl. Ex. 5 at 1).  Toward that end, director Rachel Chavkin subsequently indicated to her staff that she hired a white woman to replace Plaintiff in the cast to avoid staging a performance with an entirely black Workers Chorus.  (See Am. Compl. ¶ 40.)

Defendant's executives were keenly aware that the Musical had recently begun to convey a "white savior story" in recent performances due to the composition of the cast, that this story departed from the script and the artistic vision they intended, and that they planned to make changes to the cast to so that they

could tell the story they intended to tell. Changing the
composition of Hadestown's cast affected whether its performances
conveyed Defendant's intended message or an unintended "white
savior story." Accordingly, Defendant's casting decisions are
"inherently expressive" and protected by the First Amendment.
Rumsfeld, 547 U.S. at 66. Regulating Defendant's casting
decisions thus imposes more than an incidental burden on its speech
and implicates its constitutionally protected speech.

### b. Regulation of Hadestown's Speech

The First Amendment protects a speaker not only from
governmental punishment or regulation of speech he or she has
already expressed, but from the government regulation requiring a
speaker to express a message with which he or she disagrees. See
Hurley, 515 U.S. at 573. Indeed, "one important manifestation of
the principle of free speech" guaranteed by the First Amendment
"is that one who chooses to speak may also decide 'what not to
say.'" Id. (quoting Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of
Cal., 475 U.S. 1, 16 (1986) (plurality opinion)). The First
Amendment thus grants a speaker "the right to tailor [his]
speech . . . not only to expressions of value, opinion, or
endorsement, but equally to statements of fact the speaker would
rather avoid." Id.

In more concrete terms, the First Amendment forbids the
government from "tell[ing] a newspaper in advance what it can print

and what it cannot" or "forc[ing] [it] to respond to views that others may hold," see Pac. Gas & Elec. Co, 475 U.S. at 11, and "forc[ing] all manner of artists, speechwriters, and others whose services involve speech to speak what they do not believe," see 303 Creative LLC, 600 U.S. at 598. Under the same principles, the First Amendment likewise forbids compelling a theater company to stage a performance in a manner that expresses a story the theater company does not wish to tell.

That is exactly what enforcing Plaintiff's discrimination claims would do. In support of her discrimination claims, Plaintiff relies heavily on her allegations that Defendant wanted to—and did—replace Plaintiff with a white woman to avoid an entirely black Workers Chorus. (See Am. Compl. ¶¶ 36, 40, 45; see also Pl. Opp. at 8-9 (noting allegations of such race-based replacement are "decidedly enough to plead discrimination").) As discussed in detail above and as pleaded in Plaintiff's Amended Complaint, Defendant made these casting decisions out of a desire to avoid expressing an unintended "white savior story." The Amended Complaint and Mr. Neumann's emails illustrate that what Hadestown sought "not to say," see Hurley, 515 U.S. at 573, was this "white savior story."

Through Counts One, Three, Five, and Seven, Plaintiff asks the Court to grant her relief for casting decisions Hadestown made with an eye toward ending this "white savior story" narrative on

stage.  Any order granting such relief would unconstitutionally
"force[] [Defendant] to accommodate" a message different from its
intended message and "alter[] [its] expressive content."
Rumsfeld, 547 U.S. at 63 (citing Hurley, 515 U.S. at 572-73).
Judicially penalizing Hadestown for its decision to re-cast the
Musical in a way that avoids the "white savior story" would
constitute a regulation of its constitutionally protected
expressive discretion not to stage an all-black Workers Chorus
that tells a story contrary to the one it wishes to tell.  See
Sullivan, 376 U.S. at 365; Hurley, 515 U.S. at 572-74.  Such
unconstitutional regulation of the message Defendant wants its
Musical to convey warrants dismissal of Plaintiff's four counts of
discrimination.  See Hurley, 515 U.S. at 572-74; 303 Creative LLC,
600 U.S. at 598.

Although there is surprisingly little case law addressing the
extent to which casting of creative performances qualifies as
speech protected by the First Amendment, the Court finds the
analogous Claybrooks case instructive.  In Claybrooks, each of the
two plaintiffs had applied to be cast as the lead bachelor on a
season of ABC's popular reality television show, "The Bachelor."
See 898 F. Supp. 2d 986, 989-91 (M.D. Tenn. 2012).  After ABC and
its co-defendants chose not to cast the plaintiffs—two black men—
as "The Bachelor," the plaintiffs sued under § 1981, claiming their
rejection was the result of racial discrimination.  See id. at 989-

90.   Specifically, the plaintiffs claimed that their exclusion from the cast resulted from the defendants' desire to send a "message" that "only all-white relationships are desirable . . . ." Id. at 990.   The district court dismissed plaintiffs' claims for discrimination under § 1981 because, it concluded, the defendants' casting decisions were protected by the First Amendment.   Id. at 1000.

Assuming that the defendants had racially discriminated against the aspiring "Bachelors," the court concluded that the First Amendment protects the right of producers of "The Bachelor" to "craft and control" their show's creative content as well as the message the show "communicate[s] or [is] intended to communicate," of which the show's "casting decisions are part and parcel." Id. at 999-1000.   In other words, the First Amendment "entitled" the producers of "The Bachelor" to "select the elements (here, cast members) that support whatever expressive message the Show[] convey[s] or [is] intended to convey." Id. at 1000 (citing Hurley, 515 U.S. at 574).   Accordingly, the court concluded that applying § 1981 to restrict the defendants' discriminatory casting decisions would unconstitutionally regulate the "message" the show's producers purportedly wanted to convey about the propriety of interracial romantic relationships.   See id. at 999.

Just as "The Bachelor" producers wished to express a particular message through broadcasts of their show, Defendant

here intended to ensure that the Musical's performances did <u>not</u>
convey a "white savior story," which Defendant's executives and
director expressly wanted to avoid.   (See Am. Compl. ¶¶ 31, 36,
39-41, 43-45; Harrison Decl. Exs. 4-5.)   Defendant's creative
decision about how not to express a "white savior story"—which the
First Amendment entitles it to make—involved changing certain
"elements" of the Musical—here, altering the composition of the
Hadestown cast and the arrangements of its actors on stage.   <u>See
Claybrooks</u>, 898 F. Supp. 2d at 1000; (<u>see also</u> Harrison Decl. Exs.
4-5.)   As the court concluded in <u>Claybrooks</u>, if successful,
Plaintiff's effort to regulate this creative decision through the
Court's enforcement of anti-discrimination statutes would violate
Defendant's First Amendment right to decide the message it wanted
to express on stage.   <u>See Claybrooks</u>, 898 F. Supp. 2d at 999.

It is of no moment that the instant case involves the alleged
firing of Plaintiff, whereas <u>Claybrooks</u> involved the defendants'
decision not to cast aspiring "Bachelors" before ever hiring them.
The First Amendment protects Hadestown's creative decision to
express its preferred message regardless of whether it made the
decision in its initial casting calls or after the unintended
message was brought to its attention after several performances of
the Musical, as was the case here.   Producers of live theater may
be required to make regular casting decisions based on how the
cast composition affects the story in future performances.   That

may include removing cast members whose inclusion expresses unintended messages or adding actors whose inclusion conveys the message the producers intend to express.

Here, in the middle of its run on Broadway, Defendant understood that the message of its Musical had unintentionally changed to one that it never intended to express. Because Defendant continues to stage regular performances of the Musical, the First Amendment's protection of its casting decision did not expire once a cast had been initially assembled.

Therefore, by re-arranging its casting combinations between performances, including by replacing Plaintiff with an actress of a different race, Hadestown "clearly decided to exclude [the 'white savior story'] it did not like from the communication it chose to make" on stage. Hurley, 515 U.S. at 574. It therefore exercised its First Amendment right to tailor and adjust the message it preferred the Musical to convey in future performances. Id. at 573-74. Granting Plaintiff's requested relief, pursuant to the four discrimination causes of action she asserts, would impermissibly regulate Hadestown's right to alter the content of the story it tells—or chooses not to tell—on stage. For that reason, Plaintiff's four discrimination claims are dismissed.

> *c. Inapplicability to Plaintiff's Retaliation Claims*

Defendant's First Amendment defense does not protect it from Plaintiff's four claims for retaliation.  Although the Court holds, <u>supra</u>, that Defendant's casting decisions are protected by the First Amendment, that protection applies only insofar as Defendant made such casting decisions to tailor the Musical's message. Defendant's casting decisions can only be "inherently expressive," such that they warrant First Amendment protection, <u>Rumsfeld</u>, 547 U.S. at 66, if Defendant made them specifically to change the story the Musical conveyed on stage.

Plaintiff's bases her retaliation claims upon her allegations that Defendant terminated her on December 5, 2021, in response to the complaints of racial discrimination she had made in the two weeks prior.  (See Am. Compl. ¶¶ 36-38, 43-44.)  There is nothing Plaintiff alleges in her Amended Complaint, or anything apparent on the face of Mr. Neumann's emails, that would lead the Court to conclude that Defendant's alleged decision to terminate Plaintiff for engaging in such protected activity was related in any way to the "inherently expressive" artistic decisions it makes with respect the cast it puts on stage.  Instead, the facts Plaintiff pleads to support her retaliation claims amount only to allegations that Hadestown chose to fire an employee who had lodged a complaint to its human resources employee.  Such an alleged retaliatory

firing is in no way related to the artistic storytelling that confers certain First Amendment protections upon Defendant.  See Rowell v. Sony Pictures Television, Inc., 2016 WL 10644537, at *10 (C.D. Cal. June 24, 2016) (rejecting defendant television producers' First Amendment defense to retaliation claims where the complaint lacked any allegation "that the decision not to hire [the plaintiff] was related to Defendants' creative vision").

Therefore, without any allegation that Defendant retaliated against Plaintiff to further its creative expression or tailor the Musical's story, the First Amendment cannot provide Defendant with a defense to Plaintiff's four retaliation claims.  Extending Defendant's First Amendment rights to Plaintiff's retaliation claims would impermissibly enable Defendant to terminate any employee who engaged in protected activity—such as complaining about working conditions—under the auspice of its "creative decisions."

### E. Plaintiff's Proposed Amendment

The Court retains discretion to decide whether to grant or deny leave to amend a complaint under Federal Rule of Civil Procedure 15(a).  See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).  Although the rule is permissive and courts often grant plaintiffs leave to amend freely, see id., proposed amendments must be denied if they are futile.  See Tannerite Sports, LLC v. NBCUniversal News Grp., a division of

NBCUniversal Media, LLC, 864 F.3d 236, 252 (2d Cir. 2017).
Proposed amendments are futile if they "would fail to cure prior
deficiencies or to state a claim under Rule 12(b)(6)[.]" Tannerite
Sports, LLC, 864 F.3d at 252 (citing Thea v. Kleinhandler, 807
F.3d 492, 496-97 (2d Cir. 2015)).

Plaintiff's proposed amendments would be futile because they
would not cure the legal deficiencies with respect to her
discrimination claims that the Court has described above.  The
Court has determined that the First Amendment bars Plaintiff's
discrimination claims because Defendant exercised its First
Amendment right to creative expression when it changed the
composition of the Workers Chorus on stage.  See supra at 53-55.
The allegations that Plaintiff proposes to add to the Amended
Complaint clarify only that the all-black Workers Chorus that
triggered Defendant's decision appeared together on-stage only for
three performances when a white member of the Workers Chorus was
unable to perform for two consecutive days due to illness and that
director Rachel Chavkin sought to replace Plaintiff with a white
actress so that the Musical could more easily avoid staging
performances with an all-black Workers Chorus if that original
white cast member became unavailable again. (See dkt. no. 18-1
¶¶ 33-36, 48.)

These proposed additions do not change the fact that, when
Defendant sought and chose to avoid staging performances with an

entirely black Workers Chorus, the First Amendment protected its right to do so.  If anything, they bolster Defendant's First Amendment defense.  The additional allegations Plaintiff proposes demonstrate that Defendant's executives, including Chavkin, realized quickly that staging an all-black Workers Chorus in only three performances told a "white savior story" they did not intend to convey and quickly utilized Defendant's creative discretion to re-cast the Workers Chorus in an effort to ensure the cast did not tell the "white savior story" again.  Functionally, these allegations do not alter the Amended Complaint in a way that indicates Defendant re-cast the Workers Chorus for any reason other than an exercise of its constitutionally protected creative expression.  Because the First Amendment would still bar Plaintiff's discrimination claims, Plaintiff's proposed amendments would not cure the Amended Complaint's deficiencies and are futile. See Tannerite Sports, LLC, 864 F.3d at 252.  Accordingly, the Court denies Plaintiff's request for leave to amend the Amended Complaint.

**IV.    Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED in part and DENIED in part.  The Court denies Defendant's motion to dismiss Counts Two, Four, Six, and Eights of the Amended Complaint.  The Court grants Defendant's motion to dismiss Counts One, Three, Five, and Seven of Plaintiff's Amended Complaint, with

prejudice.  The Clerk of the Court shall close docket entry number 16.  Counsel, Plaintiff, and a decision-maker for Defendant shall appear for a settlement conference on April 4, 2024, at 10:00 a.m. in Courtroom 12A, 500 Pearl Street, New York, New York 10007.

**SO ORDERED.**

Dated:     March 7, 2024
           New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge